**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------x

DONALD F. BENOIT, Derivatively on
Behalf of MBNA CORP. and on Behalf of
Himself and All Others Similarly Situated,

        Plaintiff,

    vs.

BRUCE L. HAMMONDS, KENNETH A.
VECCHIONE, RICHARD K. STRUTHERS,
JOHN R. COCHRAN, III, LANCE L.
WEAVER, CHARLES C. KRULAK,
MICHAEL G. RHODES, JOHN W.
SCHEFLEN, RANDOLPH D. LERNER,
JAMES H. BERICK, MARY M. BOIES,
BENJAMIN R. CIVILETTI, WILLIAM L.
JEWS, STUART L. MARKOWITZ,
WILLIAM B. MILSTEAD, THOMAS G.
MURDOUGH, LAURA S. UNGER, and
KENNETH D. LEWIS,

        Defendants,
   --and--

BANK OF AMERICA CORPORATION, a
Delaware Corporation, AS SUCCESSOR IN
INTEREST TO MBNA CORP., and MBNA
CORP., a Maryland Corporation,

        Nominal Defendants.
------------------------------------------------------------x

Case No. _____

JURY TRIAL DEMANDED

CLASS AND DERIVATIVE ACTION

## VERIFIED SHAREHOLDER'S CLASS AND DERIVATIVE COMPLAINT

Plaintiff, by his attorneys, submit this shareholder's derivative and class complaint against the defendants named herein. The allegations are asserted on information and belief, except as to those matters which relate to plaintiff and his own acts, which are asserted on personal knowledge.

## NATURE OF THE ACTION

1.    Plaintiff herein was a longtime shareholder of nominal defendant MBNA Corporation ("MBNA" or "the Company"), who subsequently became shareholders of Bank of America Corporation ("Bank of America" or "BAC") pursuant to a merger between the two

companies which was effectuated through the dissemination of a false Proxy Statement issued in late 2005 in violation of the federal proxy laws. Plaintiff brings this action to remedy harm done to both MBNA and its shareholders. This harm was caused by the actions of MBNA's top officers and directors, which not only included a federal proxy fraud redressable under Section 10(b) of the Securities Exchange Act of 1934, but which also resulted in: (a) a diminution of the Company's value; (b) the assertion of numerous securities fraud class action lawsuits against the Company; and (c) the entry into a merger agreement with Bank of America Corporation ("Bank of America" or "BAC") which provided MBNA shareholders with no true acquisition premium, but which enormously enriched MBNA's key insiders. In order to secure the merger, defendant Bruce Hammonds ("Hammonds"), MBNA's Chief Executive Officer, who stood the most to gain personally from a merger, falsely denied to a national business publication that MBNA had decided that it was not for sale, even though MBNA was at *that very time* engaged in active efforts to sell the Company. Hammonds' unquestionable deception depressed the stock price, facilitating a "sweetheart" merger deal with Bank of America which contained onerous provisions guaranteed to scare off other bidders who might not be so solicitous of Hammonds' personal ambitions. The resulting merger agreement reflected an unfair and unduly low price for MBNA's shares. Based on industry valuation comparisons, MBNA was worth billions of dollars more in value at the time of the shareholder vote on the merger, but its shareholders were deprived of this value by reason of the misconduct alleged herein. The Proxy Statement concealed Hammonds' unlawful behavior, the true events leading up to the merger agreement, and other facts material to a vote, all in violation of federal law.

2.     Among MBNA insiders, there was no doubt that MBNA was for sale in the spring of 2005. Indeed, MBNA's top executives (the "Insider Defendants") were desperate to find a buyer for the Company and defendant Hammonds had a clear agenda. He wanted to find a strategic buyer for the Company which would accede to the following demands: (i) the acquirer would buy MBNA; (ii) the acquirer would accede to the payment of enormous sums to the insider defendants and the vesting of MBNA options in connection with the transaction; (iii)

2

Hammonds himself would retain an executive position of influence after the merger; (iv) Hammonds' close friends would be offered employment in the new entity; and (v) the liability arising out of a securities class action, wherein Hammonds and other MBNA executives were personally named as defendants would be assumed by the acquirer, by the extraction of broad indemnification agreements from the strategic acquirer. In exchange for these essentials, Hammonds was willing to give the acquirer a "show-stopper" in the form of an option to purchase almost 20 percent of MBNA at a price so attractive that no other suitor would consider challenging the acquirer's proposed deal. Thus, Hammonds sacrificed the interests of the public shareholders to achieve his own agenda and that of his close colleagues. Unfortunately, the eventual transaction cost the public shareholders *billions* of dollars in lost consideration.

3. To effect a sale of the Company, Hammonds had MBNA retain Joseph Perella ("Perella"), a noted investment banker and agreed to pay him $40 million, in addition to the mammoth fees already being paid to UBS Inc. as MBNA's investment advisor. Perella was retained for one purpose: to find a buyer. After negotiations with MBNA's initial suitor, Wachovia Inc., proved to be unsuccessful, Hammonds and the other Insider Defendants were *desperate* for a new buyer. Perella came up with BAC. The actual transaction between MBNA and BAC was negotiated between defendant Hammonds and defendant Kenneth D. Lewis (BAC's President and CEO) over a two hour dinner at an exclusive club in Wilmington, Delaware. The members of the MBNA Board of Directors (hereinafter, "the Director Defendants") approved the deal shortly thereafter, without fully informing themselves of its implications, or of potential alternatives.

4. In fact, the MBNA Board (the "Board") had no role in the negotiation of the transaction. Rather, the Board approved a transaction which was solely negotiated by MBNA's conflicted CEO, and which contained material payments and benefits to Hammonds and the other MBNA executives, not MBNA's public shareholders. Accordingly, the consideration and approval of the merger is not entitled to any presumption of business judgment because it was effected by a conflicted fiduciary who was primarily working for his own account and that of his

3

colleagues, and ratified by the MBNA Board which acted quickly on incomplete information, and which could not have made the decisions it did in good faith.

5.      To top this all off, MBNA's shareholders were induced to approve the merger (which they did by a vote held on November 2, 2005) by means of a deceptive Proxy Statement, which concealed Hammonds' misconduct and other materials facts. MBNA's Board, which was controlled by Hammonds, failed in their duty to obtain the highest merger value for MBNA by refusing to shop the Company, and instead leapt into a merger agreement with Bank of America, which contained a "stock option agreement" (similar to a "poison pill") and which was guaranteed to make a higher bid for MBNA by another bidder prohibitively expensive. Thus, Bank of America was crowned the winning bidder without the MBNA Board ever having conducted the requisite auction designed to maximize shareholder value. The MBNA directors, including Hammonds, were joined in certain of this misconduct by top executives of Bank of America. The personal benefits accruing to Hammonds from this transaction include tens of millions of dollars of cash "retention" payments over the course of two years, a lucrative new job with Bank of America, and other valuable benefits. Although the MBNA Board was keenly aware that Hammonds was engaged in a self-dealing negotiation with Bank of America which involved an acute conflict of interest, it never appointed a Special Committee of independent directors to negotiate with Bank of America or considered the merger from a perspective independent of that presented by Hammonds.    Instead, the MBNA Board approved this important transaction within approximately one day of learning of its proposed terms. The merger did not reflect either fair dealing or fair price, and thus does not meet the standard of "entire fairness" which is expected of corporate fiduciaries negotiating an important deal in such circumstances.

6.      Some of the claims asserted herein are brought derivatively pursuant to Federal Rules of Civil Procedure, Rule 23.1. These claims are pursued both on behalf of MBNA and its successor-in-interest, Bank of America. The derivative claims may be pursued by plaintiff without the necessity of making a demand on the Bank of America board of directors (the BAC

4

Board"), as such a demand would be futile. Indeed, the BAC Board, by means of the merger agreement between the companies, has obligated itself to defend and respond to any claims against Hammonds and the other MBNA officers and directors. Therefore, the BAC Board has robbed itself of the discretion to pursue the claims stated herein, obviating the need for Plaintiff to make a futile demand upon them to bring such claims. This action is also brought as a class action against certain officers and directors of MBNA (the "MBNA Individual Defendants") for federal securities law violations and breaches of fiduciary duty that directly harmed MBNA shareholders. The class claims are brought on behalf of all MBNA shareholders whose MBNA shares were exchanged for Bank of America shares by reason of the merger that was accomplished by means of a deceptive proxy statement, at an unfair price, and without an auction designed to elicit a bid at full value. Such conduct is alleged to have furthered the personal interests of MBNA's key executives, with the acquiescence of a Board of Directors which failed in its duty to act with complete loyalty, with due care and in good faith.

## SUMMARY OF THE ACTION

7.    In the wake of the passage of the Sarbanes-Oxley Act of 2002, which tightened standards for corporate governance, MBNA and its Board came under a blistering attack for a pervasive pattern of excessive compensation awarded to its executives, a history of nepotism, and a cozy relationship between its executives and its purportedly independent directors. Under such pressure, MBNA undertook some measures to remedy these abuses, which resulted in cuts to its traditionally overly generous compensation packages. This left MBNA's top executives keenly interested in novel ways of boosting their compensation. As detailed herein, they turned to deceptive misstatements to the public designed to inflate the stock price. After certain insiders materially benefited from this scheme, it collapsed. These insiders next engineered a merger that was unfair to shareholders, but exceedingly generous to defendant Hammonds and other key executives. The merger was accomplished through deceptive means, including violations of the federal securities laws.

8.      The aforementioned scheme hatched by the MBNA insiders to inflate the stock began to unravel on April 21, 2005 when an adverse and unexpected announcement caused MBNA shares to drop precipitously on extraordinary trading of over 51 million shares. On or about May 5, 2005, MBNA shareholder James M. Baker brought a securities class action complaint (the "Securities Class Action") against MBNA and defendants Hammonds, Kenneth A. Vecchione ("Vecchione"), Richard K. Struthers ("Struthers"), John R. Cochran, III ("Cochran"), Lance L. Weaver ("Weaver"), Charles C. Krulak ("Krulak"), Michael G. Rhodes ("Rhodes") and John W. Scheflen ("Scheflen") (all MBNA insiders, hereinafter referred to as the "MBNA Insider Defendants") alleging violations of the Securities Exchange Act of 1934. *See Baker v. MBNA Corp., et al.*, U.S. District Court for the District of Delaware, Docket No. 1:05-CV-0272-GMS ("Securities Class Action"). Thereafter, this complaint was followed by a Consolidated Amended Class Action Complaint, filed December 12, 2005 (the "Securities Class Action Complaint"), which was upheld in part by Order of this Court dated July 6, 2007. The Securities Class Action Complaint alleged that certain of the MBNA Insider Defendants (specifically, defendants Hammonds, Vecchione, Struthers, Krulak and Cochran) failed to disclose and misrepresented material adverse facts during the period from January 20, 2005 through April 20, 2005 (the "Class Period"). The operative allegations of the Securities Class Action Complaint were summarized in the Court's July 6, 2007 Order, which upheld claims against defendants Hammonds, Vecchione, and Krulak, (the "Securities Class Action Individual Defendants") and nominal defendant MBNA:[1]

(a)      MBNA deceived the plaintiffs by reporting false information regarding its growth in order to artificially inflate its stock, thereby allowing the defendants to participate in insider trading of personal stock. According to the amended complaint, in a succession of announcements and public filings in January 2005, the defendants deceived the market by reporting; (1) "that the true size of the Company's restructuring charge was unexpected," (2) "that

---

[1]   The full allegations of the Securities Class Action Complaint will not be repeated in this pleading, but rather for the sake of economy, are incorporated herein by reference.

6

MBNA revenues and earnings exceeded analysts' projections," and (3) "that MBNA would undergo significant growth despite a slow growth environment." According to the Securities Class Action Complaint, this alleged behavior by the defendants "created and sustained the false impression that the Company was sufficiently adapting to pressure on its interest margins for credit card debt.";

(b)     The plaintiffs further claim that the defendants knew or recklessly disregarded the alleged false reporting, which caused MBNA's fourth quarter and year-ended 2004 reported assets, stockholders' equity, net income, and earnings per share to be artificially inflated.  The plaintiffs also allege that "[the] defendants knowingly or recklessly failed to disclose or to reflect in their public statements that MBNA's critical assumptions used to value its IO strip receivables related to securitization of its credit card and loan pools did not comport with Generally Accepted Accounting Principles ("GAAP") and other principles of fair reporting.";

(c)     The plaintiffs allege that due to the fact that the defendants manipulated MBNA 's 2004 financial statements in violation of GAAP, investors were unaware of the critical assumptions that MBNA used to value its IO strip receivables. In other words, because MBNA allegedly misstated its credit card payment rates in its 2004 financial statements, the Company's "IO strip receivables were not truthfully adjusted to reflect known adverse payment rates and trends at MBNA." For these reasons, the plaintiffs claim that "the Company's public statements touting its growth and profitability . . . were materially overstated.";

(d)     According to the Securities Class Action Complaint, when MBNA decided to virtually eliminate its 0% Balance Transfer Program and dramatically increase its credit card interest rates in October 2004, it was aware that these changes would lead to higher volumes of payments.  The plaintiffs claim that MBNA was aware of the impact on the elimination of the 0% Program as early as November 2004.  The plaintiffs thus claim that MBNA 's April 2005 characterization of the higher payment volumes as "unexpected" was false. Specifically, the plaintiffs claim that because the defendants evaluated the accuracy of the IO

strip receivables monthly, they knew when MBNA 's credit card payment rates required MBNA to write down income during each reporting period;

(e)     The plaintiffs additionally aver that the defendants announced at "the beginning of the Class Period that they expected annual income growth of 10% in 2005." In the weeks following the projection, the plaintiffs allege that the "defendants having insider knowledge of the true undisclosed financial condition of MBNA . . . sold more than one million shares of their personally-held MBNA stock, including 351,409 shares sold by defendant Hammonds on January 27, 2005 for proceeds in excess of $ 9 million.";

(f)     The plaintiffs next allege that on April 21, 2005, MBNA was forced to reveal that: (1) it had to take an almost $ 207 million write-down of its "IO strip receivable;" (2) its first-quarter income was down 93% year-over-year, including the restructuring charge; and (3) it expected full year earnings to come in "significantly below its 10% growth objective." The plaintiffs allege that this announcement caused "shares of MBNA [ to fall] to a two-year intraday low of $ 18.50 before closing at $ 19.28, down $ 3.83, or 16.6%, on a day most major bank stocks rose." As a result of this alleged fraudulent scheme, the plaintiffs claim that "the price of MBNA securities [was] artificially inflated during the Class Period, that the individual defendants reaped substantial economic proceeds from their insider stock sales, and that the investors suffered damages when revelation of the alleged 'true facts' caused a decline in the value of their investment."; and

(g)     Last, the plaintiffs' claim that "all the defendants knowingly or recklessly directly participated in the alleged fraudulent acts and misconduct for which damages are sought against each of them and/or are charged with liability as controlling persons." Put another way, the plaintiffs alleged that "the financial condition of the Company was materially overstated in its public statements and these defendants knew or recklessly disregarded this alleged fact."

9.     During the Class Period the MBNA Insider Defendants also caused the Company to repurchase 10 million shares of its own stock for $250.3 million, which furthered the scheme to artificially inflate MBNA's share price.    Those defendants also used the Company's

8

purportedly stellar performance to justify the payment of millions of dollars in bonuses to themselves in January 2005. Indeed, although MBNA's stock price was basically stagnant throughout 2004, Hammonds was handed a paycheck at the end of the year worth over $9 million, including salary, bonus, and restricted shares.

10.      Following the Company's shocking April 21, 2005 disclosures concerning its business operations, financial results and reduced 2005 earnings expectations, the Company's stock price plummeted from its closing price of $23.11 on April 20, 2005 to below $19 per share on extremely high trading volume of 51 million shares, or 793% of its 52-week average daily trading volume. MBNA's market capitalization declined by over *$5.8 billion* in one trading session.

11.      The Securities Class Action Complaint charges that while MBNA's market price remained at an artificially high level due to the MBNA Insider Defendants' misrepresentations and omissions, those defendants took advantage of the price inflation. Specifically, "[d]uring the two years that preceded the Class Period, the Individual Defendants sold 2,429,313 shares of MBNA common stock for proceeds of $56,230,935. In comparison, over a mere three months (the Class Period), the Individual Defendants sold 1,480,484 shares of MBNA common stock for proceeds of $ 39,364,725." (*See* Securities Class Action Cplt. ¶100). Defendant Hammonds sold over $9 million worth of MBNA stock in January 2005 alone.

12.      As further set forth below, at all times relevant hereto, defendants Hammonds, Vecchione, and Krulak, were among the highest ranking executives of MBNA. Individually and jointly, they were in a position to control the affairs of MBNA, including the dissemination of materially false and misleading public statements as charged in the Securities Class Action Complaint.

13.      As a consequence of this asserted wrongdoing, MBNA and successor-in-interest Bank of America stand to lose many millions of dollars relating to the Securities Class Action, including defense costs, and potential payment made in settlement, or as a consequences of an adverse jury verdict. Additionally, upon revelation of the omitted material facts, MBNA shares

9

dropped considerably, and the Company thereby lost over $5.8 billion in market value. This drop, and the concomitant risk of liability, deprived the MBNA shareholders of the premium bid for the Company that could have been obtained had the fiduciary breaches not occurred. It would be unfair and inequitable for the shareholders of MBNA to bear the direct or indirect burden to pay these damages caused by the Securities Class Action Individual Defendants and therefore plaintiffs in this action seek to require these defendants to make recompense to successor in interest Bank of America.[2]

14.     In the spring of 2005, MBNA's share price was languishing at about $20 per share, and shareholder dissatisfaction was growing. In early June 2005, MBNA's Board of Directors determined that MBNA was for sale, and directed management to attempt to arrange a transaction. When reporters for *Business Week* questioned Hammonds for an article in its June 20, 2005 edition (which came out on June 13, 2005) as to whether MBNA was a takeover candidate, Hammonds denied that MBNA was for sale. This was at a time when merger talks had been commenced with at least one potential merger partner, and MBNA had a list of several others it intended to approach. Hammonds' statement had the purpose and effect of artificially deflating MBNA's stock price, thereby helping Hammonds arrange a merger at a price which would benefit Hammonds (and his fellow top executives personally) and would provide for cozy "retention" or severance deals with an acquirer who was not pressed hard in negotiations to pay full price. In sum, Hammonds and the other insiders were satisfied so long as they received what they personally desired.

15.     June 30, 2005, it was announced that Bank of America would acquire all of the outstanding shares of MBNA in a stock and cash transaction (the "Merger"). No special committee negotiated this deal, which was put together in a hurry by MBNA management, with an eye towards benefits that MBNA insiders would receive post-merger. In addition, MBNA

---

[2]     The MBNA Insider Defendants consist of those defendants herein who also were officers of MBNA or its affiliates or subsidiaries. The MBNA Individual Defendants are defined herein as all individual defendants associated with MBNA, inclusive of corporate insiders. All defendants herein are members of one or both of these groups, with the exception of defendant Lewis, who is CEO of Bank of America.

granted Bank of America an "option" to acquire almost 250 million MBNA shares at a $1.3 billion discount to the merger price upon the occurrence of certain events, *including a third party bidder making a higher offer for MBNA's shares!* This unlawful agreement had the purpose and effect of ensuring that no auction of the Company would ever take place, and no bidder could prevail that might not be as solicitous as Bank of America of the pecuniary needs of MBNA's overcompensated insiders.

16.     On November 3, 2005 MBNA's shareholders approved the Merger between MBNA and Bank of America. The Merger was completed on January 1, 2006. According to the merger agreement, each share of MBNA was exchanged for 0.5009 shares of Bank America stock and $4.125 in cash (the "Merger Agreement"). The transaction was worth approximately $26.50 per share to MBNA shareholders as of July 1, 2005. On January 19, 2005 MBNA stock closed at $26.88 per share. On April 21, 2005, MBNA stock closed at $19.16 per share. On June 29, 2005, the day before the announcement of the Merger, MBNA stock closed at $21.07. Clearly, the wrongdoing of the MBNA Individual Defendants has deprived long-term holders of any true premium for their shares, a detriment not equally shared by all shareholders, as the MBNA Insider Defendants received benefits from the Merger that were not available to ordinary public shareholders. The proxy statement for the Merger concealed Hammonds' efforts to depress the value of the stock, and the true sequence of events which led to the Merger Agreement, as well as other facts material to a proxy vote. This violated federal law.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction:

(a)     Over all claims asserted herein pursuant to 28 U.S.C §1332(a)(2), because complete diversity exists between the plaintiffs and each defendant and the amount in controversy exceeds $75,000. This action is not a collusive action designed to confer jurisdiction on a count of the United States that it would not otherwise have;

(b)     over this action pursuant to 28 U.S.C §1331 (federal question jurisdiction) insofar as this action arises under Section 10(b) of the Securities Exchange Act of 1934 (the

"Exchange Act"), SEC Rule 10b-5, and Section 21D of the Private Securities Litigation Reform Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act. Prior to Congress having enacted an express provision for contribution under Section 21D of the Exchange Act, the United States Supreme Court recognized that a federal cause of action existed for contribution pursuant to Section 10(b) of the Exchange Act and Rule 10b-5. *See Musick, Peeler & Garrnett v. Employers Ins. of Wausau*, 508 U.S. 286 (1993). Thus, pursuant to federal statutory law and Supreme Court authority, this Court has original federal question jurisdiction over the Federal contribution claim alleged herein; and

(c)     This Court also has jurisdiction over the pendent state law claims asserted herein pursuant to 28 U.S.C. §1367 (supplemental jurisdiction), because this statute provides that the district court has supplemental jurisdiction over all other claims where, as here, they are so related to claims in the action within the original jurisdiction of the Court, that they form part of the same case or controversy. This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b). A number of the wrongful acts and practices contained of herein occurred in this District.

19.     In connection with the violations of law alleged herein, the defendants used the means and instrumentalities of interstate commerce including the United States mail, interstate wire and telephone facilities, the facilities of the national securities markets and the Internet to distribute the false and misleading statements complained of herein.

## THE PARTIES

20.     Plaintiff Donald Benoit held MBNA shares before MBNA suffered the damages alleged herein, did not vote in favor of the merger, and continues to hold shares of Bank of America it received pursuant to the merger. Plaintiff is a citizen of Florida.

21.     Defendant Bruce L. Hammonds ("Hammonds") was Chief Executive Officer ("CEO"), President and a director of MBNA. Prior to assuming these positions on December 30,

12

2003, Defendant Hammonds served as Chairman and CEO, and prior thereto as Chief Operating Officer of MBNA. Defendant Hammonds was a director of MBNA from 1986 until the Merger. Because of Defendant Hammonds' position, he knew material adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. In 2005, Defendant Hammonds sold approximately 350,000 MBNA shares for proceeds of more than $9 million. Upon completion of the Merger on January 1, 2006, Defendant Hammonds became CEO and President of Bank of America Card Services and joined Bank of America's Risk and Capital Committee. Also upon completion of the merger on January 1, 2006, Defendant Hammonds received over $23 million under his retention agreement with Bank of America. Defendant Hammonds is a citizen of Delaware.

22.    Defendant Kenneth A. Vecchione ("Vecchione") was Vice Chairman and Chief Financial Officer ("CFO") of MBNA and CFO of MBNA America Bank. Defendant Vecchione was a director of MBNA America from January 2005 until the Merger, and also served as CFO of MBNA Delaware. Defendant Vecchione was responsible for accounting, corporate and strategic planning, treasury and financial operations, business analysis (including M&A analysis), financial planning, and investor relations. Because of Defendant Vecchione's position, he knew material adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. In 2005, Defendant Vecchione sold more than 100,000 MBNA shares for proceeds of over $2.6 million.  Upon completion of the merger on January 1, 2006, Defendant Vecchione received $5.8 million in cash severance. Defendant Vecchione is a citizen of Delaware.

13

23.     Defendant Richard K. Struthers ("Struthers") was Vice Chairman of MBNA and MBNA America. Defendant Struthers was also a director and serves as Chief Loan Officer of MBNA America, as well as Chairman of MBNA Europe and MBNA Canada.  In addition, Defendant Struthers was a director and serves as Chairman and Chief Executive Officer of MBNA Delaware.  Defendant Struthers was responsible for international operations, consumer finance, business lending, and MBNA America's American Express credit card program. Because of Defendant Struthers' position, he knew material adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and via reports and other information provided to him in connection therewith.  In 2005, defendant Struthers sold more than 450,000 MBNA shares for proceeds of over $12 million.  Upon completion of the Merger on January 1, 2006, defendant Struthers received over $17 million under his retention agreement with Bank of America.  Defendant Struthers is a citizen of Delaware.

24.     Defendant Cochran was the COO of MBNA and was the Chairman, CEO and President of MBNA America.  Cochran previously served as the COO and Chief Marketing Officer of MBNA America.  Defendant Cochran was a director of MBNA America from 1986 until the Merger.  Because of defendant Cochran's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. In 2005, defendant Cochran sold more than 500,000 MBNA shares for proceeds of $14 million.  Upon completion of the Merger on January 1, 2006, defendant Cochran received $22.7 million under his retention agreement with Bank of America.  Defendant Cochran is a citizen of Delaware.

14

25.    Defendant Weaver was Vice Chairman of MBNA and MBNA America. Weaver was also a director of MBNA America. Defendant Weaver was responsible for MBNA America's U.S. credit card business, including business development, marketing, sales, customer satisfaction, U.S. regional operations, credit, customer assistance and fraud. Defendant Weaver also served as a board member and former chairman of Mastercard International Inc. Defendant Weaver was a director of MBNA America from 1993 until the Merger. Because of defendant Weaver's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. In 2005, defendant Weaver sold more than 370,000 MBNA shares for proceeds of $10 million. Upon completion of the Merger on January 1, 2006, defendant Weaver received over $17 million under his retention agreement with Bank of America. Defendant Weaver is a citizen of Delaware.

26.    Defendant Krulak was at all times relevant hereto Vice Chairman of MBNA and of the Bank. Because of defendant Krulak's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. In 2005, defendant Krulak sold almost 500,000 MBNA shares for proceeds of over $13 million. For each of the executives of MBNA who did not enter into a retention agreement, the executive experienced a qualifying termination of employment immediately thereafter, and the amount of cash severance payable to such executives as a group (including Krulak) was $31.3 million. Defendant Krulak is a citizen of Delaware.

27.    Defendant Rhodes was at all times relevant hereto Group Executive for the U.S. Credit Card Business Development division of MBNA. Because of defendant Rhodes's position,

15

he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. In 2005, defendant Rhodes sold over 400,000 MBNA shares proceeds of over $10 million. For each of the executives of MBNA who did not enter into a retention agreement, the executive experienced a qualifying termination of employment immediately thereafter, and the amount of cash severance payable to such executives as a group (including Rhodes) was $31.3 million. Defendant Rhodes is a citizen of Delaware.

28.     Defendant Scheflen was at all times relevant hereto Vice Chairman of MBNA America and Secretary of MBNA and the Bank. Because of defendant Scheflen's positions, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. In 2005, defendant Scheflen sold over 125,000 MBNA shares for proceeds of almost $3.4 million. For each of the executives of MBNA who did not enter into a retention agreement, the executive experienced a qualifying termination of employment immediately thereafter, and the amount of cash severance payable to such executives as a group (including Scheflen) was $31.3 million. Defendant Scheflen is a citizen of Delaware.

29.     The Defendants named in ¶¶21-28 herein constitute the MBNA Insider Defendants.

30.     Defendant Randolph D. Lerner ("Lerner") was at all times relevant hereto Chairman of the Board and a director of MBNA. Because of Defendant Lerner's position, he knew adverse material non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees,

16

attendance at management and Board meetings and committees thereof and via reports and other information provided to him. Defendant Lerner is a citizen of New York.

31.    Defendant James H. Berick ("Berick") was at all times relevant hereto a director of MBNA. Because of Defendant Berick's position, he knew material adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Defendant Berick is a citizen of Ohio.

32.    Defendant Mary M. Boies ("Boies") was at all times relevant hereto a director of MBNA. Because of Defendant Boies' position, she knew material adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. Defendant Boies is a citizen of New York.

33.    Defendant Benjamin R. Civiletti ("Civiletti") was at all times relevant hereto a director of MBNA. Because of Defendant Civiletti's position, he knew material adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Defendant Civiletti is a citizen of Maryland.

34.    Defendant William L. Jews ("Jews") was at all times relevant hereto a director of MBNA. Because of Defendant Jews' position, he knew material adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other

17

corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Defendant Jews is a citizen of Maryland.

35.    Defendant Stuart L. Markowitz ("Markowitz") was at all times relevant hereto a director of MBNA. Because of Defendant Markowitz's position, he knew material adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Defendant Markowitz is a citizen of Ohio.

36.    Defendant William B. Milstead ("Milstead") was at all times relevant hereto a director of MBNA. Because of Defendant Milstead's position, he knew material adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Defendant Milstead is a citizen of South Carolina.

37.    Defendant Thomas G. Murdough ("Murdough") was at all times relevant hereto a director of MBNA. Because of Defendant Murdough's position, he knew material adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Defendant Murdough is a citizen of Ohio.

38.    Defendant Laura S. Unger ("Unger") was at all times relevant hereto a director of MBNA. Because of Defendant Unger's position, she knew material adverse non-public information about the business of MBNA, as well as its finances, markets and present and future

18

business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. Defendant Unger is a citizen of Pennsylvania.

39.    The Defendants named in Paragraphs 30-38 herein constitute the "Director Defendants." These Director Defendants, together with the Insider Defendants, constitute the MBNA Individual Defendants.

40.    Defendant Kenneth D. Lewis ("Lewis") is Chairman, Chief Executive Officer and President of Bank of America. Defendant Lewis has served as Chief Executive Officer since April 2001, President since July 2004 and Chairman since February 2005. He previously served as Chairman from April 2001 to April 2004 and President from January 1999 to April 2004. Defendant Lewis also served as Chief Operating Officer from October 1999 to April 2001. Defendant Lewis also serves as Chairman, Chief Executive Officer, President and a director of Bank of America, N.A. He has been a director of the corporation since 1999 and is a member of the executive committee. Defendant Lewis is a citizen of North Carolina.

41.    Because of their positions with the Company, the MBNA Individual Defendants possessed the power and authority to control the contents of MBNA's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

42.    The Securities Class Action MBNA Insider Defendants, because of their positions and access to material non-public information available to them but not to the public, knew or improperly failed to determine that the adverse facts specified herein, as alleged in the Securities Class Action Complaint, had not been disclosed to and were being concealed from the public and that the positive representations being made were materially false and misleading.    The Securities Class Action Complaint alleges that the Securities Class Action Insider Defendants are

19

liable under the federal securities laws for the false statements pleaded therein, as those statements were each "group-published" information, the result of the collective actions of the MBNA Insider Defendants.

43.    Defendant Lewis, because of his position with Bank of America, possessed the power and authority to control the contents of Bank of America and MBNA's Joint Proxy Statement dated September 19, 2005 (the "Joint Proxy"). As reflected in the allegations set forth below, Defendant Lewis aided and abetted certain of the Insider Defendants in their breach of their duty of candor to fully disclose all material facts in the Joint Proxy.

44.    Nominal defendant MBNA was a bank holding company organized under the laws of the state of Maryland and the parent of MBNA America Bank, N.A., a national bank. MBNA America had two principal subsidiaries: MBNA Europe Bank Limited and MBNA Canada Bank, fully chartered banks that issued credit cards in the United Kingdom, Ireland, Spain and Canada. The Company was headquartered at 1100 North King Street, Wilmington, Delaware and had over 1.277 billion shares of common stock issued and outstanding. The Company's shares traded on the New York Stock Exchange ("NYSE") under the ticker symbol "KRB."

45.    Nominal defendant Bank of America is one of the world's largest financial institutions, serving individual consumers, small and middle market businesses and large corporations with a full range of banking, investing, asset management and other financial and risk-management products and services. Bank of America serves more than 38 million consumer and small business relationships with more than 5,800 retail banking offices, more than 16,700 ATMs and online banking with more than 14 million active users. Bank of America is the No. 1 overall Small Business Administration (SBA) lender in the United States and the No. 1 SBA lender to minority-owned small businesses. It serves clients in 150 countries and has relationships with 97 percent of the U.S. Fortune 500 companies and 79 percent of the Global Fortune 500. Bank of America is headquartered at 100 North Tryon Street, Charlotte, NC 28255

and organized and existing under the laws of the State of Delaware. Bank of America shares trade on the New York Stock Exchange under the ticker symbol "BAC."

## DUTIES OF THE MBNA INDIVIDUAL DEFENDANTS

46.     As detailed herein, each of the MBNA Individual Defendants owed MBNA and its shareholders fiduciary duties, including the duties of loyalty, good faith, and candor and due care.

47.     To discharge their legal duties, the MBNA Individual Defendants were required to exercise reasonable and prudent supervision over, and keep themselves informed of policies, practices, public statements, controls and financial affairs, which included, *inter alia*, taking necessary steps to ensure that adequate policies and reporting systems existed at MBNA and functioned properly to ensure that relevant rules and regulations under which MBNA operated were followed. Specifically, the MBNA Individual Defendants were required, among other things, to:

(a)     in good faith, manage, conduct, supervise, and direct the business and affairs of MBNA carefully and prudently, and in accordance with applicable the law;

(b)     neither violate nor intentionally or recklessly permit any officer, director, or employee of MBNA to violate applicable federal and state laws, rules and regulations, or any Company rule or regulation;

(c)     ensure MBNA had in place reasonable, adequate and effective systems and controls regarding critical business functions;

(d)     remain informed as to the status of MBNA operations, and, upon receipt of notice or information of improper practices or actions, to make a reasonable inquiry in connection therewith, and to take steps reasonably necessary to correct such conditions or practices, and make such disclosures as are necessary to comply with applicable federal and state laws;

(e)     supervise the preparation, filing, and/or dissemination of any Securities and Exchange Commission ("SEC") filings, press releases, audits, reports, or other information

21

required by law, and to examine and evaluate any audits or other financial information concerning the financial condition of MBNA and to cause them to obey and comply with, and not violate the federal or state securities laws; and

(f)    refrain from misusing inside information for personal profit; and insure that disclosures by the Company to the investing public were accurate and complete.

48.    During the Class Period, the MBNA Audit Committee was composed of defendants Berick, Jews, Markowitz, Milstead, Murdough, and Unger. The Audit Committee was charged with the oversight of MBNA management and was responsible to insure that MBNA management caused the Company to comply with applicable laws and regulations and that the Company's disclosures were accurate and complete. The Audit Committee failed to properly monitor and oversee the functions and acts of MBNA management, recklessly disregarded adverse information available to it, as reflected in the allegations set forth below, and as such these Defendants breached their fiduciary duties owed to MBNA and its shareholders.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION OF CERTAIN OF THE MBNA INSIDER DEFENDANTS

49.    In committing the wrongful acts alleged herein, the MBNA Insider Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, certain of the MBNA Insider Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

50.    During all times relevant hereto, Hammonds, Vecchione and Krulak collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the MBNA Insider Defendants' executive positions at MBNA and the profits, power and prestige that the MBNA Insider Defendants enjoyed as a result of these positions; and (iii) deceive the investing

public, including shareholders of MBNA, regarding the MBNA Insider Defendants' management of MBNA's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Class Period. In furtherance of this plan, conspiracy and course of conduct, the MBNA Insider Defendants collectively and individually took the actions set forth herein.

51.     Defendants Hammonds, Vecchione and Krulak engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least January 2005 and continuing thereafter. During this time the MBNA Insider Defendants caused the Company to conceal the true fact that MBNA was misrepresenting its financial results. In addition, these Defendants also made other specific, false statements about MBNA's financial performance and future business prospects, as alleged herein.

52.     The purpose and effect of the Hammonds, Vecchione and Krulak conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the MBNA Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of MBNA common stock so they could: (i) dispose of their personally held stock; and (ii) protect and enhance their executive positions and the substantial compensation and prestige they obtained as a result thereof.

53.     Hammonds, Vecchione and Krulak accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.

54.     Hammonds, Vecchione and Krulak rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each MBNA Insider Defendants acted with knowledge of the

primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

### THE MBNA INSIDER DEFENDANTS' EXCESSIVE COMPENSATION

55.    Having been run by a closely knit group of officers and directors, MBNA's executives grew all too accustomed over the years to receiving absurd levels of executive compensation. During 2001 to 2003, the Company's top five most highly paid officers alone received well over $60 million in cash compensation – not counting the tens of thousands of stock options and shares of restricted stock they also received:

| Defendant | Salary | Bonus | Total Cash Compensation |
|---|---|---|---|
| Hammonds | | | |
| 2003 | $2.5 M | $2.1 M | $4.6 M |
| 2002 | $2.4 M | $2.5 M | $4.9 M |
| 2001 | $1.8 M | $4 M | $5.8 M |
| Cochran | | | |
| 2003 | $2.5 M | $2.1 M | $4.6 M |
| 2002 | $2.4 M | $2.5 M | $4.9 M |
| 2001 | $1.8 M | $4 M | $5.8 M |
| Weaver | | | |
| 2003 | $2 M | $1.7 M | $3.7 M |
| 2002 | $1.9 M | $2 M | $3.9 M |
| 2001 | $1.5 M | $3 M | $4.5 M |
| Struthers | | | |
| 2003 | $2 M | $1.7 M | $3.7 M |
| 2002 | $1.9 M | $2 M | $3.9 M |
| 2001 | $1.5 M | $3 M | $4.5 M |
| Vecchione | | | |
| 2003 | $1.6 M | $1.4 M | $2.7 M |
| 2002 | $1.5 M | $1.6 M | $3.1 M |
| 2001 | not disclosed | not disclosed | not disclosed |

56.    As reported by the *Philadelphia Inquirer* on April 25, 2005, it had become an old joke in Wilmington, Delaware that the "initials in MBNA, the credit-card lender once known as Maryland Bank, National Association, also stood for 'Mothers, Brothers, Nephews and Aunts.'" In fact, under founder Charles M. Cawley ("Cawley"), MBNA had developed a "penchant" for hiring via friendship, blood and marriage – including Cawley's own relatives and in-laws. MBNA's most recent proxy statement filed with the SEC on March 15, 2005 reveals the names and cash compensation of 15 employees who are related to senior managers Cawley hired.

57.    The Company's Board lacked independence as well.  For example, in early 2004,

the Board consisted of the following nine directors:

> *James H. Berick, Esq.*: Retired Partner, Squire, Sanders & Dempsey L.L.P. (successor to Berick, Pearlman & Mills Co., L.P.A., of which Mr. Berick was Chairman from July 1986 until January 2000), a law firm which received substantial compensation for legal services provided to the Company.  Berick's son is a partner at Squire, Sanders & Dempsey.  Berick has ties to the Lerner family going back decades.  He was Al Lerner's college roommate and is godfather to Randolph Lerner, who became MBNA's Chairman after his father's death.  A member of MBNA's Board since 1991, he was the Lerner family's lawyer and he still provides advice to the Lerner family.  He is also a director of the Town and Country Trust, a real estate investment trust with longstanding ties to the Lerner family.
>
> *Benjamin R. Civiletti, Esq.*: Chairman, Venable LLP, a law firm which has received substantial compensation for legal services provided to the Company.  One of Civiletti's sons, also a lawyer, is employed in MBNA's legal department.
>
> **Bruce L. Hammonds**: President and CEO of MBNA.
>
> **William L. Jews**.
>
> **Randolph D. Lerner, Esq.**: Owner of the Cleveland Browns football team.  In 1999, the Board approved a 10-year marketing agreement with the Cleveland Browns football team, then owned by Al Lerner and now owned by Randolph D. Lerner, MBNA's Chairman.
>
> **Stuart L. Markowitz, M.D.**
>
> **William B. Milstead**: Retired Partner, Ernst & Young LLP, the Company's certified public accountant.  Milstead served as the coordinating partner for MBNA at the time of its initial public offering in 1991.
>
> **Norma Lerner**: Widow of Company co-founder Al Lerner.
>
> **Michael Rosenthal**: Professor of English at New York's Columbia University, Al Lerner's alma mater.

58.    Defendant Berick was Chairman of MBNA's Compensation Committee, which

made compensation decisions for Lerner and co-founder Cawley.  According to a 2004 survey

by *Bloomberg News*, Cawley, who retired in December 2003, received total compensation of

$45.5 million in 2003, *putting him at the top of the U.S. list for CEO pay*.

59.    MBNA came under intense pressure from shareholders in advance of the May

2004 annual meeting of shareholders who argued that the directors had become too cozy with the

executives they were supposed to watch over.  Preceding the Company's annual meeting of

shareholders in May 2004, significant individual shareholders waged a campaign questioning the Board's independence. As a result, Norma Lerner and Michael Rosenthal were removed from the Company's Board.

60.     As a result of the intertwined relationships and consequent lack of independence on the MBNA Board, MBNA's executives had become accustomed to receiving excessive compensation. In fact, the Company now admits it had previously followed what it describes as "a *policy* of providing high levels of compensation." Following the shareholder-led shakeup of the MBNA Board in 2004, the Compensation Committee finally conceded to making significant reductions in executive compensation.

61.     By early 2005 the Compensation Committee had approved reductions of salaries, bonuses and equity awards which resulted in a 34% reduction in total direct compensation for MBNA's CEO, defendant Hammonds, and a combined 37% reduction in total direct compensation for defendants Hammonds, Cochran, Struthers, Weaver and Vecchione, the Company's five most highly compensated executive officers.

62.     As a result of these cuts, at the beginning of the Class Period, the Company's senior executives faced massive reductions in the level of compensation to which they had grown accustomed to receiving. At the same time, the Company's senior executives were sitting on tens of thousands of shares they had received in prior years as part of their compensation and unexercised stock options which would expire if not exercised by the expiration date. The strike price on these options was generally set at the price the stock was trading at on the day the options were granted, making them worthless if the stock price dropped below the strike price. Some of these stock options would have expired in 2005 if not exercised. The Insider Defendants knew the value of these options and knew that shares would rapidly decline if they disclosed the true status of the Company's operations and business environment.

63.     Moreover, despite the attempt to better align MBNA's executive compensation with shareholder interests, the Company's executive compensation program for 2004 still utilized "short term corporate performance" as a primary metric in determining annual compensation to

senior executives. As a result of the Insider Defendants' concealment of the Company's true operating and financial status, the Compensation Committee determined that the Company had for 2004 "substantially achieved its net income goal and achieved its performance objectives for new accounts, managed credit losses and operating efficiency," but that it "did not achieve its goal for growth in managed loans or net interest margin." Nonetheless, the Compensation Committee determined that the Company's "overall results for 2004 were strong and the [Company] had a number of significant achievements in 2004 that the Committee and management believe position the [Company] well for the future." As a result, in January 2005 the Compensation Committee awarded a performance bonus to defendant Hammonds equal to 90% of his 2004 salary (as reduced in August 2004) and awarded bonuses to defendants Cochran, Weaver, Struthers and Vecchione equal to 80% of their 2004 salaries (as reduced in August 2004). Based on the Company's purportedly stellar performance, the Compensation Committee bequeathed the Company's top five highest-paid executives alone over $200 million worth of performance bonuses and restricted stock awards (which vest 20% per year over five years and require no payment to exercise), as shown below:

| Defendant | 2004 Bonus | Value of Restricted Shares Upon Grant | Total 2004 Incentive Compensation Award |
|-----------|------------|---------------------------------------|------------------------------------------|
| Hammonds  | $1.083 million | $1.083 million | $2.17 million |
| Cochran   | $943,000 | $943,000 | $1.89 million |
| Weaver    | $1.962 million | $1.962 million | $3.92 million |
| Struthers | $1.962 million | $1.962 million | $3.92 million |
| Vecchione | $1.569 million | $1.569 million | $3.14 million |

## THE SCHEME ASSERTED IN THE SECURITIES CLASS ACTION

64. This section summarizes the essential allegations of the Securities Class Action Complaint, with the entirety of those allegations being incorporated herein by reference. The following allegations have been held sufficient by the Court to state federal securities fraud claims against defendants Hammonds, Vecchione, Krulak and MBNA.

65.    The Securities Class Action is asserted on behalf of all persons, other than defendants and certain other related parties, who purchased or otherwise acquired the publicly traded securities of MBNA during the period January 20, 2005 through April 20, 2005 inclusive (the "Class Period"), and who were damaged when the revelation of the true facts regarding MBNA caused a decline in MBNA securities' stock price.  Plaintiffs in the Securities Class Action seek to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and the regulations promulgated thereunder by the SEC, including Rule 10b-5.

66.    In a succession of announcements and public filings in January 2005, defendants deceived the market by reporting purported present facts that the true size of a restructuring charge was unexpected, that MBNA revenues and earnings exceeded projections, and that MBNA would undergo significant growth despite a slow growth environment. Defendants thereby created and sustained the false impression, at all relevant times, that the Company was sufficiently adapting to pressure on its interest margins for credit card debt.

67.    In the Securities Class Action, Defendants, however, allegedly knew or recklessly disregarded the fact that MBNA's fourth quarter and year-ended 2004 reported assets, stockholders' equity, net income and earnings per share were artificially inflated as a result of overly aggressive and improper accounting practices, which violated Generally Accepted Accounting Principles ("GAAP") and other principles of fair reporting, in valuing its interest-only ("IO") strip receivables. In that regard, Defendants knowingly or recklessly failed to disclose or to reflect in their public statements that MBNA's critical assumptions used to value its IO strip receivables related to securitization of its credit card loan pools did not comport with GAAP.

68.    MBNA knowingly or recklessly manipulated its 2004 financial statements in violation of GAAP. These manipulations masked from investors that fourth quarter 2004 EPS (earnings per share), which were reported by Legg Mason on January 20, 2005, to be "a penny ahead of consensus," were artificially inflated. Investors were unaware that MBNA's critical assumptions used to value its IO strip receivables were not truthfully adjusted to reflect known

adverse payment rates and trends at MBNA. For this reason, among others, the Company's public statements touting its growth and profitability, at all relevant times, were materially overstated. These Defendants knowingly or recklessly manipulated the assumptions on the Company's credit card loan pools, which hid the true extent of the credit card payment rate increase and its adverse effect on MBNA's earnings.

69.     With internal controls in place to closely monitor the impact of MBNA's decisions to virtually eliminate its 0% Balance Transfer Teaser Program and dramatically increase its credit card interest rates in October 2004, Defendants could not credibly support their claim made just six months later in April 2005 that MBNA was surprised that its earnings were "impacted by unexpectedly high payment volumes" as reported by *TheStreet.com* on April 21, 2005. Defendants knew or recklessly disregarded the immediate impact on MBNA's 2004 credit card payment rates of the elimination of the 0% Program starting at least as early as November 2004. To be sure, MBNA's payment rates increased dramatically as credit card customers transferred their balances to competing credit card companies and/or to home equity loans. Despite this known change, MBNA failed to alter the assumptions it used to value its IO receivables, thus overstating its assets, stockholders' equity, net income and earnings per share during the Class Period.

70.     The Securities Class Action Individual Defendants falsely represented to the investing public that the payment rate assumption used to value the Company's IO strip receivables was regularly adjusted to reflect actual prepayment experience and trends and that the Company had made all adjustments that were necessary for a fair presentation of its financial position. In truth, because the defendants evaluated the accuracy of these receivables monthly, they knew whether MBNA's credit card payment rates required MBNA to take a charge (write-down) to income during each reporting period.

71.     At the beginning of the Class Period, these defendants announced that they expected annual income growth of 10% in 2005. In the weeks following the projection, January 25 to February 3, 2005, Defendants having insider knowledge of the true undisclosed financial

condition of MBNA (that they would be later forced to reveal), sold more than one million shares of their personally-held MBNA stock, including 351,409 shares sold by defendant Bruce L. Hammonds on January 27, 2005 for proceeds in excess of $9 million.

72.    By the time MBNA's fraudulent scheme was finally revealed on April 21, 2005, MBNA revealed that MBNA had to take an almost $207 million write-down of its "IO strip receivable," that its first-quarter income was down 93% percent year-over-year, including the restructuring charge, and that the Company expected full-year earnings to come in "significantly below its 10% growth objective." On this news, shares of MBNA fell to a two-year intraday low of $18.50 before closing at $19.28, down $3.83, or 16.6%, on a day most major bank stocks rose.

73.    As a result of the fraudulent scheme, the price of MBNA securities were artificially inflated during the Class Period, the Securities Class Action Individual Defendants reaped substantial economic proceeds (over $39 million) from their insider stock sales, and investors suffered damaged when revelations of the true facts caused a decline in the value of their investments.

74.    These Defendants knowingly or recklessly directly participated in the fraudulent acts and misconduct for which damages are sought against each of them and/or are charged with liability as controlling persons. The fact that the financial condition of the Company was materially overstated in its public statements was known to or recklessly disregarded by all defendants at all relevant times. All of these Defendants culpably participated in the commission of the wrongs alleged herein.

## INSIDER SELLING

75.    During the Class Period alleged in the Securities Class Action, and while in possession of undisclosed material adverse information inflating the market price, the below listed "Insider Selling Defendants" sold the following shares of MBNA stock:

| NAME | DATE | SHARES | PRICE | PROCEEDS |
|------|------|--------|-------|----------|
| Bruce L. Hammonds | 1/27/2005 | 351,409 | $ 26.51 | $ 9,315,044.35 |
| Kenneth A. Vecchione | 1/25/2005 | 79,829 | $ 26.70 | $ 2,131,434.30 |

30

|                      | 1/25/2005 | 20,633<br>100,462 | $ | 26.80 | $  552,964.40<br>$ 2,684,398.70 |
|----------------------|-----------|-------------------|---|-------|---------------------------------|
| Richard K. Struthers | 2/3/2005  | **457,464**       | $ | 26.84 | **$12,277,922.04**              |
| Charles C. Krulak    | 2/1/2005  | 224,754           | $ | 26.75 | $ 6,012,169.50                  |
|                      | 2/1/2005  | 50,217            | $ | 27.00 | $ 1,355,859.00                  |
|                      | 1/31/2005 | 92,483            | $ | 26.50 | $ 2,450,799.50                  |
|                      | 1/25/2005 | 130,000<br>**497,454** | $ | 26.61 | $ 3,459,547.00<br>**$13,278,375.00** |
| John R. Cochran, III | 1/27/2005 | 398,150           | $ | 26.51 | $10,554,040.76                  |
|                      | 1/27/2005 | 133,009<br>**531,159** | $ | 26.55 | $ 3,531,388.95<br>**$14,085,429.71** |
| Michael G. Rhodes    | 1/25/2005 | **406,040**       | $ | 26.76 | **$10,865,346.17**              |
| Lance L. Weaver      | 1/25/2005 | **376,835**       | $ | 26.76 | **$10,085,574.26**              |
| John W. Scheflen     | 1/25/2005 | **125,810**       | $ | 26.85 | **$ 3,377,998.50**              |
|                      | **TOTAL** | **2,846,633**     |   |       | **$75,970,088.73**              |

## THE MERGER

### A.  Background of the Merger

76.    According to the Joint Proxy, in early June 2005, the MBNA Board met with MBNA management and the Company's outside advisors, including representatives of UBS and Wachtell, Lipton, Rosen & Katz, to discuss MBNA's recent financial performance and prospects, consolidation activity in the credit card industry and the general environment, long-term trends and other developments in the markets in which MBNA conducts business. Possible strategic alternatives were summarized, including hypothetical scenarios involving a business combination.

77.    Unbeknownst to the investing public, MBNA was in fact for sale. The MBNA Insider Defendants were desperate to find a buyer for the Company and defendant Hammonds had a clear agenda. He wanted to find a strategic buyer for the Company which would accede to

31

the following conditions: (i) the acquirer would buy MBNA; (ii) the acquirer would accede the to the payment of enormous sums and the vesting of MBNA options in connection with the transaction; (iii) Hammonds himself would remain an executive position of influence at the new company; (iv) Hammonds' close friends would be offered employment in the new entity; and (v) the liability arising out of a securities class action, wherein Hammonds and other MBNA executives were personally named as defendants, effectively would be made to go away by the extraction of broad indemnification from the strategic acquirer. In trade for these essentials, Hammonds was willing to give the acquirer a "show-stopper" in the form of an option to purchase almost 20 percent of MBNA at a price so attractive that no other suitor would consider challenging the acquirer's proposed deal. Thus, Hammonds sacrificed the interests of the public shareholders to achieve his own agenda and that of his close colleagues. Unfortunately, the Merger cost the public shareholders *billions* of dollars in lost consideration on the transaction.

78.     The MBNA Director Defendants were conducting a sale of MBNA without taking the appropriate steps to maximize shareholder value. Accordingly, the MBNA Board is not entitled to any presumption of business judgment, because its actions demonstrate that it was beholden to defendant Hammonds and the other insiders; that it did not exercise independent business judgment over the transaction, and did not fairly consider in a timely manner all information reasonably available; that it did not act in good faith in approving a Merger which did not give full value to the public shareholders; and that it failed to properly auction the Company.

79.     Shortly thereafter, representatives of MBNA purportedly contacted a major financial institution, most likely Wachovia, identified at the MBNA Board meeting as potentially having the greatest interest in a possible transaction. As a result of these discussions, MBNA management concluded that it was not likely that a transaction could be negotiated with this financial institution. Subsequently, during the week of June 20, representatives of MBNA contacted the management of Bank of America to gauge the level of Bank of America's interest in a possible transaction with MBNA. Very shortly thereafter, defendant Hammonds and Lewis

32

shook hands on the Merger Agreement. The Merger price did not reflect MBNA's true value for numerous reasons, including the fact that Hammonds had deflated the stock by falsely denying MBNA was for sale. Despite the ongoing efforts to sell MBNA that commenced at the beginning of June, on June 13, 2005 an article entitled "*One Tough Card Game; MBNA's stock is down 25% this year, and it's suddenly a takeover candidate*" authored by Amy Barrett and Mike McNamee was published in *Business Week's* June 20, 2005 edition wherein defendant Hammonds was quoted as saying *"[t]here's no 'For Sale' sign on MBNA's Wilmington (Del.) headquarters."*

80.    Pursuant to the merger agreement, MBNA agreed to "no shop" provisions which limited MBNA's ability to discuss, facilitate or commit to competing third-party proposals to acquire all or a significant part of the company. In addition, MBNA granted to Bank of America an option to acquire up to approximately 249.8 million shares of MBNA common stock under the stock option agreement at a low price, amounting to a discount of approximately $1.3 billion. These "show stopper" provisions were designed to prevent the emergence of any potential new bidder who might have an interest in acquiring all or a significant part of MBNA from considering or proposing such an acquisition.

81.    On June 29, 2005, the BAC Board held a special meeting and approved the merger agreement, the stock option agreement and the transactions contemplated by the Merger Agreement.    The MBNA Board met in the afternoon of June 29, 2005 and unanimously approved and adopted the merger agreement and the stock option agreement. The proposed Merger was jointly announced by Bank of America and MBNA on the morning of June 30, 2005, prior to the opening of U.S. financial markets.

82.    The merger negotiations were fatally infected by unfair dealing. Hammonds negotiated the deal himself over a two hour dinner with defendant Lewis, even though he and Lewis had not previously met. Despite Hammonds' conflict of interest in negotiating for both himself and MBNA, no Special Committee was appointed to negotiate or carefully vet the transaction. To ensure no challenge to his sweetheart compensation deal with Bank of America,

33

Hammonds agreed to the unlawful no-shop agreement and lock-up option granted to Bank of America, and the supine MBNA Board promptly rubber-stamped these actions. These provisions acted as a complete "show-stopper" and prevented a full and fair auction for MBNA. The MBNA Board also stood mute when Hammonds artificially depressed the stock's price by falsely denying that MBNA was for sale, while simultaneously working feverishly to attract a bidder that was to his liking. The MBNA Board then acquiesced in a Joint Proxy that, as described below, fell woefully short of full disclosure. Thus, as to this Merger, the MBNA Board failed to act in good faith, with full knowledge and with due care to ensure entire fairness, to fairly auction the Company to the highest bidder without favoritism, and to fully inform shareholder voters of all pertinent facts. Indeed, the Director Defendants conducted a sale of MBNA without taking the appropriate steps to maximize shareholder value. Accordingly, the MBNA Board is not entitled to any presumption of business judgment, because its actions demonstrate that: (i) it was beholden to defendant Hammonds and the other insiders; (ii) it did not exercise independent business judgment over the transaction, and did not fairly consider in a timely manner all information reasonably available; (iii) it did not act in good faith in approving a Merger which did not give full value to the public shareholders; and (iv) it failed to properly auction the Company.

### The MBNA Individual Defendants Agree to Sell the Company in Exchange for Indemnification and Personal Benefits

83.     The MBNA Individual Defendants knew that the only way they could escape liability for the damage they, and the former directors and officers of the Company, to whom they remain loyal, inflicted upon MBNA's shareholders during the Class Period was to sell the Company, thereby attempting to pull the rug out from beneath this shareholder derivative action.

84.     On June 30, 2005, Bank of America issued a press release announcing Bank of America's plans to acquire MBNA. On July 5, 2005, *bizjournals.com* issued a press release entitled, "MBNA Chief to Gain Up to $125M from BofA Deal." The press release provided in relevant part:

> *Bruce Hammonds, chief executive of MBNA Corp., will be entitled to more than $125 million if the credit-card company is bought by Bank of America*

*Corp., the Wall Street Journal reports, citing MBNA regulatory filings and a compensation expert.*

85.     For years, MBNA doled out large amounts of restricted stock to its top executives, including Defendant Hammonds, who was part of the management team that founded the company in the 1980s. The stock awards had a 10-year vesting period and contained a clause to permit immediate vesting in the event of a change of control.

86.     Since becoming CEO at the end of 2003, Defendant Hammonds has reduced the granting of restricted stock and options. In 2005, he collected total cash compensation of $3.5 million, including $2.5 million in salary and a $1 million bonus. That was down from $4.6 million in 2003, the newspaper says.

87.     According to newspaper accounts, the merger deal was put together in two hours. Clearly, by agreeing to this transaction, the MBNA Individual Defendants were attempting to insulate themselves from liability in the ongoing federal securities class actions against MBNA and current shareholder derivative litigation, including this action. In order to escape personal liability for their actions and those of their fellow Defendants, the MBNA Individual Defendants negotiated the sale of MBNA to Bank of America on unfair terms to the shareholders, and got Bank of America's agreement to help them defend themselves against the pending accusations. In addition, upon completion of the merger on January 1, 2006, Defendants Cochran, Hammonds, Struthers, Vecchione and Weaver, respectively, received approximately $22.7 million, $23 million, $17 million, $5.8 million and $17 million pursuant to their retention agreements with Bank of America.

88.     The MBNA Insider Defendants structured the entire sale process to ensure that they would (i) obtain indemnification for their prior misdeeds; (ii) retain their positions with the surviving Company and the benefits flowing therefrom; and (iii) personally benefit as a result of the transaction. In exchange for the aforementioned direct and collateral benefits, the MBNA Individual Defendants agreed to sell MBNA via an unfair process and at an unfair price.

## INJURY TO MBNA'S SHAREHOLDERS

89.    As a result of the Merger, the MBNA shareholders had their shares exchanged for shares of Bank America stock and cash. For those shareholders who were exchanged out, the consideration in to be received in the Merger was inadequate and unfair because:

(a)    As result of the MBNA Individual Defendants' wrongdoing as alleged, the consideration to be received in the Merger was far lower than it would have been had these Defendants done their jobs and had the wrongs alleged not occurred.  The value received in the merger is far below industry valuation standards as measured by such ratios as trailing 12 months price/earnings and price/sales. While the deal, as of November 17, 2005, provides MBNA shareholders with a price/earnings ratio of 15.8, this is well blow the average industry figure of 17.8; similarly, the industry average price/sales ratio is 4.0, while the merger sets a value on MBNA 15% lower, at 3.4 times sales.  These deviations cost MBNA shareholders *billions* of dollars in value, even before consideration of a merger premium, which would ordinarily result in  a takeover price exceeding industry average figures;

(b)    In that regard, the rise in the MBNA share price as a result of the announcement of the Merger does not compensate the MBNA shareholders for the damage done to them as a result of the wrongdoing by the MBNA Individual Defendants. Indeed, as a result of the wrongdoing alleged herein the MBNA share price declined dramatically from January 19, 2005 to June 29, 2005, and only recovered (following the Merger announcement) to share price levels which are slightly below those which existed on January 19, 2005;

(c)    Some of the Insider Defendants profited from the Merger in ways that other MBNA shareholders did not. For example, defendants Hammonds, Cochran, Weaver, Struthers, and Vecchione benefited from change of control severance agreements and retention agreements they each signed with Bank of America.

(d)    Under the terms of the change of control severance agreements, if an executive's employment is terminated under certain conditions, the executive will be entitled to receive, among other things:

36

(i) the executive's accrued salary;

(ii) a pro rata portion of the executive's bonus;

(iii) a lump sum cash payment equal to three times (one and one-half times for Mr. Vecchione) the sum of the highest annual salary paid to the executive since three years prior to the change of control and the higher of the most recent bonus or the average bonus in the prior three years paid to the executive prior to the change of control;

(iv) for a period of up to three years (two years for Mr. Vecchione) after the date of termination, certain medical, life insurance and other welfare benefits;

(v) relocation expenses to the United States if the executive is based overseas;

(vi) In the event that the payments received by any executive in connection with a change of control are subject to the excise tax imposed upon certain change of control payments under federal tax laws, the agreements provide for an additional "gross-up" payment sufficient to restore the executive to the same after-tax position he would have been in if the excise tax had not been imposed; and

(vii) Upon a change of control, the executives would receive full vesting of all outstanding stock options and restricted stock awards in accordance with policies adopted pursuant to the 1997 Long Term Incentive Plan. In addition, if an executive's employment is terminated at any time following a change of control, or within 12 months prior to a change of control and in connection with a change of control, and such termination is by the Corporation (or its successor) other than for "cause" or by the executive for "good reason" or by the executive (except for Mr. Vecchione) for any reason in the 30-day period beginning one year after a change of control, then the executive will receive a benefit under the Supplemental Executive Retirement Plan.

(e) Pursuant to retention agreements, which were effective on the consummation of the merger with certain of such executives (including Defendants Cochran, Hammonds, Struthers and Weaver) that replace the change of control agreements (or in the case

of one other executive officer, coverage under the MBNA change of control severance pay plan). The amount (based upon recent base salaries and recent bonus amounts but excluding income, employment and excise tax gross ups and interest) paid under the retention agreements to each of Defendants Cochran, Hammonds, Struthers and Weaver and one other executive officer, including the estimated total gross incremental cost to Bank of America of the applicable aircraft benefit, respectively, is approximately $22.7 million, $23 million, $17 million, $17 million and $784,615.  For each of the executives of MBNA who did not enter into a retention agreement, and the executive experiences a qualifying termination of employment immediately thereafter, the amount of cash severance (based upon recent base salaries and recent bonus amounts but excluding excise tax gross-ups) payable to Defendant Vecchione and the remaining such executives as a group, was approximately $5.8 million and $31.3 million.

90.     MBNA shareholders who held shares as of January 19, 2005 and suffered diminution in the value of their shares as a result of the MBNA Insider Defendants' breaches of fiduciary duty and breach of their duty of candor have also been injured.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

91.     Plaintiff brings this action, in part, derivatively in the right and for the benefit of MBNA and its successor-in-interest, Bank of America, to redress injuries suffered and to be suffered as a result of the breaches of fiduciary duty and other violations of law by the MBNA Individual Defendants.

92.     Upon completion of the Merger between MBNA and Bank of America, on or about January 1, 2006, MBNA's derivative claims passed by operation of law to Bank of America, the surviving corporation.

93.     As a result of the facts set forth herein, plaintiff has not made any demand on the BAC Board to institute this action, and need not do so in the future.  Such demand would be a futile and useless act because the BAC Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.  There is reasonable doubt

that the BAC Board can fairly address whether suit should be brought on behalf of Bank of America and MBNA.

94. The BAC Board has already pre-judged the merits of this action. Having reached its conclusions, no demand need be made on the Board as it will not likely reconsider.

95. Nor could the BAC Board assert the allegations herein. Bank of America agreed to indemnify and hold harmless each present and former director, officer and employee of MBNA from liability and exculpation for matters arising at or prior to the completion of the Merger to the fullest extent provided by applicable law, the MBNA articles of incorporation and the MBNA bylaws. Bank of America also has agreed that it will maintain in place existing indemnification and exculpation rights in favor of MBNA directors, officers and employees for six years after the merger and that it will maintain MBNA's current policy of directors' and officers' liability insurance coverage, or an equivalent replacement policy for the benefit of MBNA directors and officers, for six years following completion of the merger, except that Bank of America is not required to incur annual premium expense greater than 250% of MBNA's current annual directors' and officers' liability insurance premium. In addition, the BAC Board, via the Merger Agreement, agreed to "cooperate" with the defendants named herein and "use their best efforts" to "defend" against and defeat the claims set forth herein. Thus, they cannot possibly independently review a demand to prosecute such claims, as they have pledged themselves to oppose them.

96. As of the date of the filing of this action, the BAC Board consisted of 17 members. Of the Board, 12 members, constituting a majority were members of the BAC Board at the time the indemnification was provided to the MBNA Insider Defendants as part of the merger transaction. Those Directors are William Barnett, III a BAC Board member since April 2004; John T. Collins, a BAC Board member since April 2004; Gary Countryman, a BAC Board member since April 2004; Charles K. Gifford, ABAC Board Member since April 2004; Kenneth D. Lewis, a BAC Board member since 1999; Walter E. Massey, a BAC Board member since 1998; Thomas J. May, a BAC Board member since April 2004; Patricia E. Mitchell, a BAC

Board member since 2001; Thomas M. Ryan, a BAC Board member since April 2004; O. Temple Sloan, Jr., a BAC Board member since 1996; Meredith R. Spangler, a BAC Board member since 1988; Robert L. Tillman, a BAC Board member since April 2005, and Jackie M. Ward, a BAC Board member since 2000. Thus there is reasonable doubt as to the independence of a majority of the BAC Board, since business judgment of that Board is at issue in the instant action, and a majority of the Board cannot fairly address a demand in such situation.

### CLASS ACTION ALLEGATIONS

97.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all MBNA shareholders who had their shares exchanged in the Merger and suffered damages as a result of the wrongs alleged herein, including the federal proxy disclosure violations, and the unfair and inadequate MBNA Merger price (the "Class"). Excluded from the Class are defendants and members of their immediate families.

98.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. MBNA had approximately 1,277,700,000 shares of stock outstanding, owned by thousands of persons.

99.     There are questions of law and fact common to the members of the Class, which predominate over questions which may affect individual class members. These common questions include:

(a)     Whether Defendants violated Section 14 10(b) of the Exchange Act and Rule 10b-5;

(b)     Whether Defendants breached their fiduciary duties to the Class;

(c)     Whether Defendants violated their duties of candor, loyalty, good faith, due care, and entire fairness;

(d)     Whether class members were damaged; and

(e)     The appropriate measure of damages.

40

100. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

101. Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interest which conflict with those of the Class.

102. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Further, as individual damages may be relatively small for most members of the Class, the burden and expense of prosecuting a litigation of this nature makes it unlikely that members of the Class would prosecute individual actions. Plaintiff anticipates no difficulty in the management of this action as a class action. Further, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying results, which may establish incompatible standards of conduct for defendants.

## COUNT I

### (Against Hammonds,Vecchione and Krulak Pursuant to Sections 10(b) and 21D of the Exchange Act)

103. Plaintiff incorporates by reference and reallege each and every allegation contained above, as if though fully set forth herein.

104. Hammonds and Vecchione had a duty not to defraud the investing public by the dissemination of materially false and misleading press releases and the dissemination of materially false and misleading financial information and projections.

105. These defendants have been sued in the Securities Class Action alleging that they caused the Company to issue false financial statements, and, as a result, the Company and these defendants violated Section 10(b) of the Exchange Act, and the claims have been upheld by the Court.

106. It is alleged in the Securities Class Action that these Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated by or

in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.    These Defendants, by virtue of their receipt of information reflecting the true facts regarding MBNA, their control over MBNA and its public communications, their inside knowledge of its financial results, and/or their associations with the Company which made them privy to confidential proprietary information concerning MBNA, were active and culpable participants in (and carried out) the fraudulent scheme alleged herein.    These Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.    The ongoing alleged fraudulent scheme alleged in the Securities Class Action could not have been perpetrated over a substantial period of time without the knowledge and complicity of the personnel at the highest level of the Company, including these Defendants.

107.    It is alleged in the Securities Class Action that during the Class Period these defendants caused MBNA to carry out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of MBNA securities; and (iii) cause plaintiff and other members of the Class to purchase MBNA stock at artificially inflated prices.

108.    As alleged in the Securities Class Action, these defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for MBNA securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.    The Defendants

named in this count are sued as primary participants in the wrongful and illegal conduct charged herein.

109.    In addition to the duties of full disclosure imposed on these defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to disseminate truthful information promptly that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance, so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

110.    It is alleged in the Securities Class Action that these Defendants, individually and in concert, directly and indirectly, by the use of the mails or other means or instrumentalities of interstate commerce, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of MBNA as specified herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of MBNA's value and future profitability. This included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about MBNA and its business, operations and future prospects, in the light of the circumstances under which they were made, not misleading, and engaging in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of MBNA securities during the Class Period.

111.    As alleged in the Securities Class Action, as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of MBNA's securities was artificially inflated during the Class Period.

Unaware of the fact that the market price of MBNA's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by these defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by these defendants but not disclosed in public statements during the Class Period, Class members acquired MBNA securities during the Class Period at artificially high prices and were damaged thereby.

112.    As alleged in the Securities Class Action, at the time of said misrepresentations and omissions, the Class members were unaware of their falsity, and believed them to be true. Had the Class members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of MBNA, which were not disclosed by these defendants, plaintiff Baker and other members of the Class would not have purchased or otherwise acquired their MBNA securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

113.    As alleged in the Class Action, by virtue of the foregoing, these Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5.

114.    It is further alleged in the Securities Class Action that the Company participated in the wrongful conduct and is equally liable for violation of Section 10(b) of the Exchange Act. Assuming that the Company is liable, these Defendants caused the Company to violate Section 10(b) of the Exchange Act, and incur liability for damages for violation of the federal securities laws.

115.    If the Company is deemed to have violated the federal securities laws, and incurs damages therefore, these Defendants are liable to the Company or its successor in interest for contribution pursuant to sections 10(b) and 21(D) of the Exchange Act.

## COUNT II

(Against Defendants Hammonds, Vecchione, Krulak for Violations of Section 10(b) of the
Exchange Act and Exchange Act Rule 10b-5)

116.    Plaintiff incorporates by reference and realleges each and every allegation
contained above, as if though fully set forth herein. This Second Cause of Action is brought on
behalf the named plaintiff, and is asserted against Defendants Hammonds, Vecchione and
Krulak, since each violated Section 10(b) of the Exchange Act and Rule 10b-5 by preparing and
approving the Joint Proxy or by permitting the use of their names to solicit proxies, while
knowing or recklessly disregarding that the Joint Proxy was false and misleading by omitting or
misrepresenting the facts set forth below.

117.    The Defendants named herein failed to fully disclose all material information in
the Joint Proxy.

118.    More specifically, the Joint Proxy failed to fully disclose all facts regarding:

(a)    **The Top Insiders' Misconduct.** The Joint Proxy fails to disclose and
discuss Hammonds' misstatements regarding whether MBNA was for sale, and the deleterious
affect these statements had on MBNA's stock price, and its ability to obtain a higher bid. The
Joint Proxy also fails to disclose: (1) that Hammonds, Vecchione and Krulak, and perhaps others,
had engaged in a fraudulent scheme to inflate MBNA share prices so that they might personally
benefit; (2) that the aforementioned scheme, when it collapsed, depressed MBNA's share price,
making a Merger not a business necessity but rather a maneuver by Hammonds, Vecchione,
Krulak and others to extricate themselves from personal liability; (3) that due to the acts of
Hammonds, Vecchione and Krulak the merger price obtained was measured for "fairness"
against the artificially depressed post-fraud price, rather than the true value of MBNA absent
both the fraud, and the desires of top management to arrange a merger that would help protect
them against ruinous personal liability; (4) enough facts concerning Hammonds' personal
exposure to liability (given his responsibility for creating false financial statements which were
incorporated into the Proxy) and personal conflict of interest to allow shareholders to consider

45

whether, if this deal were voted down, a Merger price could be obtained by an unconflicted negotiator that was superior to the Merger price obtained from BAC; (5) that Hammonds orchestrated a process designed to eliminate all bidders other than those who would protect Hammonds, and accede to the exorbitant pecuniary demands he made for himself, and his cohorts; (6) that the "show stopper" option would cost other bidders huge sums if they chose to challenge the merger, and that it *would* dissuade other bidders from seeking to top the Bank of America price; and (7) that a "shadow" investment banker, Joseph Perella, had been paid $40 million and had served as a conduit between Hammonds and those who would agree to personal demands that were inconsistent with the best interests of MBNA and its shareholders.

(b)    **UBS Accretion/Dilution Analysis**.  Given that an estimated 85% of the total merger consideration is payable in shares of Bank of America common stock, additional information disclosing the circumstances under which merger could be dilutive to MBNA stockholders, and extending the pro forma merger analysis to 2008 was omitted from the Joint Proxy.

(c)    **Fairness Opinion Using Best Available Projections.**  Full disclosure regarding fairness opinion using the best available projections was omitted from the Joint Proxy. Bank of America failed to obtain and fully disclose an updated fairness opinion using the "best currently available estimates" of Bank of America's future financial performance, including its latest internal projections, as UBS did with MBNA.

(d)    **Dilutive Impact of Option Exercise**.  The Joint Proxy fails to fully disclose dilutive impact on an EPS basis to existing MBNA stockholders arising from the potential exercise of the option issued by MBNA to Bank of America, including the net impact on MBNA's estimated EPS of the $1.4078 billion in profit potentially available to Bank of America thereunder.

(e)    **Effect of Change in Dividend Policy**.  The Joint Proxy fails to fully disclose impact on accretion/dilution analysis of any foreseeable changes to Bank of America's dividend policy.  MBNA stockholders were not provided with the net accretive/dilutive impact

on EPS of an elimination of the Bank of America dividend relative to MBNA's standalone estimated EPS in calendar years 2006, 2007 and 2008.

(f) **MBNA's Efforts to Maximize Shareholder Value.** Each of "the most promising potential partners" were not identified and there was no disclosure as to all communications MBNA or its advisors had with those institutions, including any communications with the companies identified as comparable to Bank of America. There is no disclosure as to the identity of the "major financial institution" contacted by MBNA in mid-June 2005 or the reasons for MBNA's conclusion "that it was not likely that a transaction could be negotiated with this financial institution at a level of consideration that would be satisfactory to MBNA."

(g) **Effect of Failure to Repurchase.** The Joint Proxy omits any disclosure as to the dilutive impact on an EPS basis to MBNA stockholders if Bank of America fails to execute the repurchase of 51,000,000 shares, or fails to obtain the assumed funding rate of 2.5%.

(h) **Basis for Assumed Discount and Growth Rates.** The basis for using discount rates in the range of 9.0% to 11.0%, and an asset growth rate of 5.0%, in the present value analysis of Bank of America's discounted cash flows was omitted from the Joint Proxy. Also, with respect to the present value analysis of MBNA's discounted cash flows, the basis for using discount rates in the range of 13.0% to 15.0%, an EPS growth rate of 10%, and asset growth rates of 9.4% for 2005 and 2006 and 8.0% per annum thereafter was omitted as well. There is no explanation for the reasons for the different assumed discount and growth rates for both companies and the basis for the difference in assumed ratio of equity to assets for both companies (4.25% for MBA versus 7.0% for Bank of America).

(i) **Potential UBS Conflicts.** The aggregate amount of compensation received by UBS and its affiliates from the "various debt and equity financings for Bank of America" and "bank financings for MBNA" was not fully disclosed in the Joint Proxy. Also, all positions held for their own account by UBS or its affiliates in the securities of the merger parties were not fully disclosed.

(j)     **Potential Value of Derivative Claims**.   The maximum aggregate damages recoverable by MBNA based on the derivative claims being asserted on its behalf, and EPS impact of same were not disclosed in the Joint Proxy.

119.   Accordingly, based on the foregoing, each of the Defendants named herein breached their duty of full disclosure and complete candor by failing to fully and fairly disclose all material information in the Joint Proxy, and they did so knowingly, and with scienter.

120.   As a result of the misconduct alleged herein, these Defendants are liable to for damages for violation of Section 10(b) of the Exchange Act and Rule 10b-5.

121.   In the alternative, plaintiff is entitled to a declaratory judgment that the defendants and each of them violated Section 10(b) of the Exchange Act and Rule 10b-5.

## COUNT III

### (Against all Insider Defendants for Breach of Fiduciary Duty)

122.   Plaintiff incorporates by reference and reallege each and every allegation contained above, as if though fully set forth herein.

123.   The Defendants named in this Cause of Action owed and owe MBNA fiduciary obligations.  By reason of their fiduciary relationships, these Defendants owed and owe MBNA the highest obligations of good faith, fair dealing, loyalty and due care.

124.   These Defendants breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

125.   Each of these Defendants had actual or constructive knowledge that they had caused MBNA to improperly misrepresent the business and prospects of the Company.  These actions could not have been a good faith exercise of prudent business judgment.  Moreover, these Defendants are asserted to have engaged in the actions alleged in the Securities Class Action, which would be a breach of their duty to conduct the business of the Company only through lawful and proper means.

126.   As a result of the wrongs allegedly committed herein the Company has been seriously damaged.

127.    As a direct and proximate result of these Defendants' misconduct, MBNA has suffered and will continue to suffer significant damages. As a result of the misconduct alleged herein, the Defendants are liable to the Company, or its successor in interest.

## COUNT IV

(Against all MBNA Individual Defendants for Breach of Fiduciary Duty)

128.    Plaintiff incorporates by reference and reallege each and every allegation contained above, as if though fully set forth herein.

129.    The MBNA Individual Defendants owed and owe MBNA fiduciary obligations. By reason of their fiduciary relationships, the MBNA Individual Defendants owed and owe MBNA the highest obligations of good faith, fair dealing, loyalty and due care.

130.    These Defendants breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

131.    Each of these Defendants had actual or constructive knowledge that they had either caused MBNA to improperly misrepresent the business and prospects of the Company, or breached their duties of oversight in failing to be informed and active in the ultimate management of the Company. These actions could not have been a good faith exercise of prudent business judgment, or fiduciary oversight.

132.    In addition, these Defendants approved and caused or permitted MBNA to re-purchase approximately $250,000,000 of its shares on the open market, at allegedly inflated prices, causing substantial damage to MBNA for overpaying for its shares.

133.    As a result of the wrongs allegedly committed herein the Company has been seriously damaged.

134.    As a direct and proximate result of the MBNA Individual Defendants' misconduct, MBNA has suffered and will continue to suffer significant damages. As a result of the misconduct alleged herein, these Defendants are liable to the Company, or its successor in interest.

## COUNT V

(Against All MBNA Insider Selling Defendants for Breach of Fiduciary Duties
for Insider Selling, and Unjust Enrichment)

135.    Plaintiff incorporates by reference and realleges each and every allegation
contained above, as if though fully set forth herein.

136.    The MBNA Insider Selling Defendants' misconduct alleged herein constituted an
abuse of their ability to control and influence MBNA, for which they are legally responsible.
Moreover, many of these Defendants sold shares during the Class Period while in possession of
material, non-public information, and are required to disgorge to the Company all profits
received thereby.

137.    The aforementioned information was proprietary non-public information
concerning the Company's financial condition and future business prospects. It was a proprietary
asset belonging to the Company, which the insider selling defendants used for their own benefit
when they sold MBNA common stock.

138.    At the time of their stock sales, the MBNA Insider Selling Defendants knew that
MBNA 's revenues were materially overstated. The insider selling defendants' sales of MBNA
common stock while in possession and control of this material adverse non-public information
was a breach of their fiduciary duties of loyalty and good faith.

139.    Since the use of the MBNA's proprietary information for their own gain
constitutes a breach of the insider selling defendants' fiduciary duties, MBNA, and upon the
completion of the merger Bank of America, is entitled to the imposition of a constructive trust on
any profits the insider selling defendants obtained thereby.

140.    By their wrongful acts and omissions, the MBNA Insider Selling Defendants were
unjustly enriched at the expense of and to the detriment of MBNA.

141.    Plaintiff, as shareholder and representative of MBNA, seeks restitution from the
MBNA Insider Selling Defendants, and each of them, and seek an order of this court disgorging
all profits, benefits and other compensation obtained by these defendants, and each of them, from
their wrongful conduct and fiduciary breaches.

142.    The MBNA Insider Selling Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence MBNA, for which they are legally responsible. As a direct and proximate result of the MBNA Insider Selling Defendants' abuse of control, MBNA has sustained significant damages.

143.    As a direct and proximate result of the MBNA Individual Defendants' abuse of control, MBNA has sustained significant damages, and Defendants are liable to the Company, or its successor in interest.

## COUNT VI

(Class Action Against The MBNA Director Defendants for
Breaches of Fiduciary Duty in Connection With the Merger Through Gross Mismanagement )

144.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as if though fully set forth herein. This Cause of Action is brought on behalf of the Class, and is asserted against the members of the MBNA Board ("the MBNA Director Defendants"), with the exception of Defendant Murdough.

145.    The MBNA Director Defendants named herein owed and owe the MBNA shareholders the highest obligations of good faith, fair dealing, loyalty and due care. The MBNA Director Defendants breached their duty of entire fairness by agreeing to sell MBNA at a potentially unfair price and to the detriment of the Company's shareholders, in exchange for indemnification and personal benefit.

146.    In early June 2005, As the MBNA stock was declining and the Company and the MBNA Individual Defendant were facing ruinous liability, the MBNA Director Defendants decided to sell the Company. Hence, in less than a month after possible strategic alternatives were discussed at an MBNA meeting, including hypothetical scenarios involving a business combination, MBNA and Bank of America announced their merger. The Board did not conduct public market testing or adequately attempt to solicit all possible any other bids. Instead during the same week that MBNA was making vigorous efforts to sell itself, and Bank of America were negotiating the merger deal, Defendant Hammonds was publicly declaring announcing that the Company was not for sale. Additional bids were further discouraged by the no-shop provision

51

contained in the merger agreement and the stock option agreement signed by MBNA, which was designed to make any competing bid financially ruinous for the bidder.

147.    The MBNA Director Defendants acted as they did in the face of blatant self-dealing by and on behalf of the MBNA Insider Defendants. While shareholders were getting shortchanged, pursuant to their retention agreements with Bank of America, Defendants Cochran, Hammonds, Struthers, Vecchione and Weaver negotiated to receive respectively, approximately $22.7 million, $23 million, $17 million, $5.8 million and $17 million upon consummation of the merger. Moreover, Bank of America has agreed to indemnify and hold harmless each present and former director, officer and employee of MBNA from liability and exculpation for matters arising at or prior to the completion of the merger, and to cooperate with them, defend them, and respond to claims asserted against them.

148.    A well-settled concept of corporate law is that a fiduciary is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the shareholders. This is founded on the belief that a fiduciary cannot be expected to exercise his or her independent business judgment without being influenced by the personal benefits resulting from the transaction. The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest.

149.    Particularly, when a fiduciary stands on both sides of a transaction, he or she is required to demonstrate his or her outmost good faith and most scrupulous inherent fairness of the bargain. Because certain MBNA Insider Defendants' business judgment in this merger transaction was clearly colored by their self-interest, the merger transaction does not withstand entire fairness review. All MBNA Director Defendants acted in bad faith in permitting and acquiescing in a self-dealing transaction that benefited privileged insiders the detriment of the MBNA shareholders.

150.    As a result of the misconduct alleged herein, these Defendants are liable to the Class for damages.

### COUNT VII

(Class Action Against MBNA Director Defendants for Violation of Their Revlon Duties)

151.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as if though fully set forth herein. This Cause of Action is brought on behalf of the Class, and is asserted against the members of the Director Defendants, with the exception of Defendant Murdough.

152.    The Director Defendants owed and owe the MBNA shareholders the highest obligations of good faith, fair dealing, loyalty and due care.

153.    When a board is on the verge of selling, breaking up or transferring control of the corporation, directors have a duty to maximize shareholder value. Such actions as the Board must take are often referred to as "Revlon Duties" after a well-known fiduciary law case which first established these principles in Delaware. Such "Revlon Duties" are consistent with Maryland fiduciary jurisprudence.

154.    When Revlon Duties arise, the board has a duty to maximize immediate shareholder value and obligation to auction the company fairly. A change of control represents the last chance for shareholders to obtain a control premium for their shares. Revlon Duties greatly diminish the risk that directors will engage in self-interested transactions at the expense of shareholders.

155.    The Director Defendants breached their Revlon Duties in the following ways: by failing to conduct a public market test and to auction the Company fairly; by agreeing to a "no shop" provision in the merger agreement which prohibited MBNA to discuss, facilitate or commit to competing third-party proposals to acquire all or a significant part of the company; and by granting Bank of America an option to acquire up to approximately 249.8 million shares of MBNA common stock under the stock option agreement at a substantial discount;.

156.    In addition, despite the fact that the merger negotiations were ongoing since early June 2005 on June 13, 2005 in a *Business Week* article authored by Amy Barrett and Mike McNamee and entitled *One Tough Card Game; MBNA's stock is down 25% this year, as it's suddenly a takeover candidate*, Defendant Hammonds was quoted as saying: *"[t]here's no 'For Sale' sign on MBNA's Wilmington (Del.) headquarters."* This statement was totally false and

misleading and in derogation of Hammonds' duty of candor and his Revlon duties. In truth and in fact, during this time, MBNA and its advisors were engaged in energetic efforts to sell the Company. Hammonds' false statement had the affect of artificially depressing the price of MBNA's stock, and thus facilitating a merger with Bank of America at a price which was palatable to Hammonds (who stood to gain very handsomely from such a merger) and Bank of America, but provided MBNA shareholders with less than fair value for their shares.  The MBNA Director Defendants were aware of Hammonds' statement to *Business Week,* or recklessly disregarded its false and damaging nature. This is additional proof that the MBNA Director Defendants, under the control of Hammonds, disregarded their duty to get the highest price from all possible bidders for MBNA once they determined the Company was sale, and thereafter controlled the sale to a "chosen bidder," and made it impossible for any other bidder to emerge.

157.    The proposed merger was jointly announced by Bank of America and MBNA on the morning of June 30, 2005, prior to the opening of U.S. financial markets.  According to the Joint Proxy and newspaper accounts, MBNA's merger was negotiated and completed in less than a month, which clearly is not enough time to seek, facilitate and negotiate competing third-party proposals to acquire all or a significant part of the Company.  Indeed, the deal with Bank of America was struck in the course of a two hour dinner attended by defendants Hammonds and Lewis.

158.    Further, without fully considering all options and offers available, MBNA's Board agreed to a "no shop provision" in the merger agreement.  Pursuant to that provision, MBNA agreed not to initiate, solicit, encourage or facilitate any inquiries or proposals for any "Alternative Proposal" or participate in any discussions or negotiations, or enter into any agreement, regarding any "Alternative Transaction."  MBNA also agreed to notify Bank of America promptly to notify Bank of America promptly (but in no event later than 24 hours) after it receives any Alternative Proposal, or any material change to any Alternative Proposal, or any request for nonpublic information relating to MBNA or any of its subsidiaries, and to provide

Bank of America with relevant information regarding the Alternative Proposal or request; to keep Bank of America fully informed, on a current basis, of any material changes in the status and any material changes in the terms of any such Alternative Proposal; and to cease any existing discussions or negotiations with any persons with respect to any Alternative Proposal, and to use reasonable best efforts to cause all persons other than Bank of America who have been furnished with confidential information in connection with an Alternative Proposal within the 12 months prior to the date of the merger agreement to return or destroy such information. In addition, under the terms of the stock option granted by MBNA to Bank of America, Bank of America may purchase up to 249,764,005 shares of MBNA common stock, not to exceed 19.9% of MBNAS common stock outstanding, at an exercise price of $21.30 per share. The stock option agreement acted as a "show stopper" making any alternative acquisition or other business combination of MBNA by third party in practical terms impossible.

159.    Under applicable principles of corporation law, no shop and other related agreements are permitted, but only where their adoption is untainted by director interest or other breaches of fiduciary duty. Such options can entice other bidders to enter a contest for control of the corporation, creating an auction for the company and maximizing shareholder profit. However, while those lock-ups which draw bidders into the battle benefit shareholders, similar measures which end an active auction and foreclose further bidding operate to the shareholder's detriment. The no-shop provision, like the lock-up provision, while not *per se* illegal, is impermissible under the well-known "*Unocal*" standards (which are consistent with Maryland fiduciary jurisprudence) when a board's primary duty becomes that of an auctioneer responsible for selling the company to the highest bidder. In the instant case, MBNA directors breached their Revlon Duties by failing to conduct public market testing and entertain other bids. Instead, the MBNA Board approached Bank of America about a possible merger, rushed into signing the merger agreement containing the no-shop provision and stock option agreement, thus effectively ending any possibility of third parties proposing an alternative transaction to the merger, including one that might be more favorable to the MBNA stockholders.

160.    As a result of the misconduct alleged herein, these Defendants are liable to the Class for substantial damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

(a)    Against the Securities Class Action Individual Defendants for contribution to BAC pursuant to Sections 10(b) and 21(D) of the Exchange Act;

(b)    Damages to the Class and/or a declaratory judgment for violations of Section 10(b) of the Exchange Act and Rule 10b-5; and

(c)    Against all of the MBNA Individual Defendants for the damages sustained by BAC, as a result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

(d)    Equitable and/or injunctive relief as permitted by law;

(e)    Restitution and disgorgement of profits;

(f)    Damages to the Class for the wrongs committed, including punitive damages, if permitted;

(g)    Reasonable attorneys' fees, and expenses;

(h)    Any such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: September 18, 2007

**CHIMICLES & TIKELLIS, LLP**

By: _____
Pamela S. Tikellis (#2172)
A. Zachary Naylor (#4439)
One Rodney Square
P. O. Box 1035
Wilmington, DE 19899
302-656-2500 (Tel.)
302-656-9053 (Fax)

ATTORNEYS FOR PLAINTIFF

**OF COUNSEL:**

**ROBBINS UMEDA & FINK, LLP**
Jeffrey P. Fink
Carolyn A. Schnurer
610 West Ash Street, Suite 1800
San Diego, CA 92101
(619) 525-3990 (tel.)
(619) 525-3991 (fax)

282453_2.DOC

## PLAINTIFF'S CERTIFICATE AND VERIFICATION

Donald Benoit ("Plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the complaint involving, among other things, claims that the federal proxy laws and other federal laws were violated in connection with the MBNA and Bank of America merger, and believes such allegations as are contained in the complaint, directly and derivatively, to be accurate and correct to the best of plaintiff's information, knowledge and belief.

Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

Plaintiff owned shares of MBNA common stock prior to the announcement of the MBNA and Bank of America merger, did not vote shares it was eligible to vote in favor of the merger, and had **300** shares, which were exchanged pursuant to the merger. Plaintiff continues to own shares of Bank of America stock received pursuant to the merger.

During the three years prior to the date of this Certification, Plaintiff has moved to serve or served as a representative party for a class in an action filed under the federal securities laws.

I declare under penalty of perjury, this **12** day of September, 2007 that the information above is accurate.

DONALD BENOIT

**JS 44** (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Benoit, Donald

### DEFENDANTS

Hammonds, Bruce L.
Additional Defendants Listed on Exhibit A

**(b)** County of Residence of First Listed Plaintiff Leon County, FL
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant

(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number) Chimicles & Tikellis LLP, One Rodney Square, Wilmington, DE 19801 302-656-2500

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1   U.S. Government Plaintiff

☐ 3   Federal Question
(U.S. Government Not a Party)

☐ 2   U.S. Government Defendant

☒ 4   Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☒ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332(a)(2)
Brief description of cause: Class and Derivative Action for Contribution, Declaratory Judgement & Breach of Fiduciary Duty

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE Judge Sleet   DOCKET NUMBER 05-cv-272 GMS   05-cv-327 GMS

DATE 9/18/07

SIGNATURE OF ATTORNEY OF RECORD   a. Zuly  #4439

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

## EXHIBIT A

**Hammonds, Bruce L.**
**Vecchione, Kenneth A.**
**Struthers, Richard K.**
**Cochran, III, John R.**
**Weaver, Lance L.**
**Krulak, Charles C.**
**Rhodes, Michael G.**
**Sheflen, John W.**
**Lerner, Randolph D.**
**Berick, James H.**
**Boies, Mary M.**
**Civiletti, Benjamin R.**
**Jews, William L.**
**Markowitz, Stuart L.**
**Milstead, William B.**
**Murdough, Thomas G.**
**Unger, Laura S.**
**Lewis, Kenneth D.**

**Defendants,**

**and**

**Bank of America Corporation, as successor in interest to MBNA Corp.**
**MBNA Corp.**

**Nominal Defendants.**

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

0 7 - 5 6 1

Civil Action No. _____

# ACKNOWLEDGMENT
# OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ___10___ COPIES OF AO FORM 85.

___9/18/07___
(Date forms issued)

_____
(Signature of Party or their Representative)

DANNY P Randolph Sr.
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action