IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

− − − − − − − − − − − − − − − − − − − − − − − − − − x

DONALD F. BENOIT, Derivatively on       :
Behalf of MBNA CORP., and on Behalf of  :
Himself and All Others Similarly Situated, :
                                        :
                Plaintiff,              :
        v.                              :
                                        :
BRUCE L. HAMMONDS, *et al.*,            :    Civ. No. 07-CV-561-GMS
                                        :
                Defendants,             :
                                        :
        – and–                         :
                                        :
BANK OF AMERICA CORPORATION, a  :
Delaware Corporation, AS SUCCESSOR :
IN INTEREST TO MBNA CORP., and   :
MBNA CORP., a Maryland Corporation, :
                                        :
                Nominal Defendants.  :
− − − − − − − − − − − − − − − − − − − − − − − − − − x
*Additional Caption on Following Page*

## OPENING BRIEF IN SUPPORT OF THE MBNA
## OUTSIDE DIRECTOR DEFENDANTS' MOTION TO DISMISS

Edward P. Welch (I.D. No. 671)
Edward B. Micheletti (I.D. No. 3794)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP

Of The New York Bar:          One Rodney Square
Jay B. Kasner                 P.O. Box 636
Susan L. Saltzstein           Wilmington, Delaware  19899
SKADDEN, ARPS, SLATE,         Tel.: (302) 651-3000
    MEAGHER & FLOM LLP        Fax: (302) 651-3001
4 Times Square                E-mail:  ewelch@skadden.com
New York, New York  10036-6522
(212) 735-3000                *Attorneys for the MBNA Outside Director*
                              *Defendants*

DATED:  April 17, 2008

```
– – – – – – – – – – – – – – – – – – – – – – – – – – x
                                        :
LEMON BAY PARTNERS, LLP and             :
MALCOLM ROSENWALD,                      :
                                        :
              Plaintiff,                :
                                        :
       v.                               :
                                        :
BRUCE L. HAMMONDS, et al.,              :         Civ. No. 07-CV-562-GMS
                                        :
              Defendants,               :
                                        :
       – and–                           :
                                        :
BANK OF AMERICA CORPORATION,            :
AS SUCCESSOR IN INTEREST TO             :
MBNA CORP., and MBNA CORP.,             :
                                        :
              Nominal Defendants.       :
                                        :
– – – – – – – – – – – – – – – – – – – – – – – – – – x
```

# TABLE OF  CONTENTS

PAGE

TABLE OF CASES AND AUTHORITIES ........................................................................ i

NATURE AND STAGE OF THE PROCEEDINGS ........................................................... 1

SUMMARY OF ARGUMENT ..................................................................................... 4

STATEMENT OF FACTS .......................................................................................... 7

    A.    The Company (And Its Independent Board) .............................................. 7

    B.    MBNA's January 2005 Earnings Forecast And First Quarter 2005 Results ........................................................................................... 7

    C.    The Merger ........................................................................................... 8

    D.    MBNA Shareholders Approve The Merger ............................................. 9

    E.    The Duplicative Complaints .................................................................. 9

ARGUMENT ......................................................................................................... 10

I.    PLAINTIFFS' CLAIMS IGNORE THE COURT'S PREVIOUS ORDERS, ARE PROCEDURALLY UNSOUND, AND ARE BARRED BY THE DOCTRINE OF *RES JUDICATA* ........................................................... 10

II.    TO THE EXTENT THE COURT REACHES THE MERITS OF THIS DISPUTE, THE DUPLICATIVE COMPLAINTS MUST BE DISMISSED UNDER MARYLAND LAW. ....................................................................... 15

    A.    Standard Of Review ............................................................................. 15

    B.    The Internal Affairs Doctrine Mandates That Maryland Law Governs  This Dispute. ......................................................................... 16

    C.    Under Maryland Law, Breach Of Fiduciary Duty Claims Are Derivative ........................................................................................... 17

    D.    By Virtue Of The Merger, Plaintiffs Have Lost Standing To Pursue Their Claims Against The Outside Directors ............................. 19

    E.    Plaintiffs Have Not Alleged That Demand Was Excused. ....................... 21

III.   IN THE ALTERNATIVE, THE DUPLICATIVE COMPLAINTS
       SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM. ..................24

       A.   Conclusory Breach Of Fiduciary Duty Allegations Fail To State A
            Claim. ...............................................................................................24

            1.   Plaintiffs' conclusory allegations of mismanagement and
                 lack of oversight fail to state a claim. ............................................26

       B.   Plaintiffs' Attack On The Merger Process Should Fail. .............................29

            1.   Plaintiffs' reliance on *Revlon*, *Unocal* or any other
                 heightened form of judicial scrutiny of director conduct
                 should be rejected. .......................................................................29

            2.   Plaintiffs' allegations that the Outside Directors failed to
                 obtain the highest Merger price do not state a claim under
                 Maryland law. .............................................................................30

            3.   The Merger claims fail because the Merger was ratified by
                 the MBNA shareholders after full and fair disclosure. .................34

       C.   The Duplicative Complaints Should Be Dismissed In Their
            Entirety Because The Outside Directors Are Not Subject To
            Liability For Money Damages. .................................................................35

CONCLUSION ...........................................................................................................37

## TABLE OF CASES AND AUTHORITIES

Aronson v. Lewis,
    473 A.2d 805 (Del. 1984), overruled on other grounds sub nom.
    Brehm v. Eisner, 746 A.2d 244 (Del. 2000) ....................................................21, 25

Barkan v. Amsted Indus., Inc.,
    567 A.2d 1279 (Del. 1989) ..................................................................................30

In re Baxter Int'l, Inc. S'holders Litig.,
    654 A.2d 1268 (Del. Ch. 1995)..............................................................................6

Boone v. Kurtz,
    617 F.2d 435 (5th Cir. 1980) ...............................................................................13

Brambles USA, Inc. v. Blocker,
    735 F. Supp. 1239 (D. Del. 1990).........................................................................2

Bromwell v. Michigan Mut. Ins. Co.,
    115 F.3d 208 (3d Cir. 1997)................................................................................13

In re Caremark Int'l Inc. Derivative Litig.,
    698 A.2d 959 (Del. Ch. 1996)..............................................................................26

Cede & Co. v. Technicolor, Inc.,
    634 A.2d 345 (Del. 1993) ....................................................................................34

Century Nat'l Bank v. Makkar,
    751 A.2d 1 (Md. Ct. Spec. App. 2000) ................................................................25

Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of
Cincinnati, Inc.,
    C.A. No. 13389, 1996 WL 506906 (Del. Ch. Sept. 3, 1996), aff'd mem.,
    692 A.2d 411 (Del. 1997) ....................................................................................27

In re Citigroup Inc. S'holders Litig.,
    C.A. No. 19827, 2003 WL 21384599 (Del. Ch. June 5, 2003), aff'd mem.
    sub nom. Rabinovitz v. Shapiro, 839 A.2d 666 (Del. 2003).................................28

Criden v. Steinberg,
    C.A. No. 17082, 2000 WL 354390 (Del. Ch. Mar. 23, 2000) ..............................15

CTS Corp. v. Dynamics Corp. of Am.,
    481 U.S. 69 (1987)...............................................................................................16

Danielewicz v. Arnold,
769 A.2d 274 (Md. Ct. Spec. App. 2001) ...........................................18, 19, 24, 30

In re Digital Island Sec. Litig.,
C.A. No. 02-57-GMS, 2002 WL 31667863 (D. Del. Nov. 25, 2002),
aff'd, 357 F.3d 322 (3d Cir. 2004) .......................................................................12

In re Encore Computer Corp. S'holders Litig.,
C.A. No. 16044, 2000 WL 823373 (Del. Ch. June 16, 2000) ..............................25

Ercole v. Conectiv & Coventry Health Care of Del., Inc.,
C.A. No. 03-186-GMS, 2003 WL 21104926
(D. Del. May 15, 2003) ........................................................................................15

Ettridge v. TSI Group, Inc.,
548 A.2d 813 (Md. 1988) .....................................................................................19

Ferguson v. Cramer,
695 A.2d 603 (Md. Ct. Spec. App. 1997), aff'd,
709 A.2d 1279 (Md. 1998) ...................................................................................25

In re First Interstate Bancorp Consol. S'holder Litig.,
729 A.2d 851 (Del. Ch. 1998) .........................................................................19, 21

In re Frederick's of Hollywood, Inc. S'holders Litig.,
C.A. No. 15944, 2000 WL 130630 (Del. Ch. Jan. 31, 2000) ...................26, 27, 34

Freedman v. Rest. Assocs. Indus.,
C.A. No. 9212, 1990 WL 135923 (Del. Ch. Sept. 19, 1990)................................30

In re Freeport-McMoran Sulphur, Inc. S'holders Litig.,
C.A. No. 16729, 2001 WL 50203 (Del. Ch. Jan. 11, 2001) .................................26

Grasty v. United States Patent and Trademark Office,
211 Fed. Appx. 952, 953-954 (Fed. Cir. 2007).....................................................13

Globis Partners., L.P. v. Plumtree Software, Inc.,
C.A. No. 1577-VCP, 2007 Del. Ch. LEXIS 169
(Del. Ch. Nov. 30, 2007).......................................................................................32

Goodman v. Poland,
395 F. Supp. 660 (D. Md. 1975) ...........................................................................17

Grill v. Hoblitzell,
771 F. Supp. 709 (D. Md. 1991) .......................................................................5, 36

Grobow v. Perot,
    526 A.2d 914 (Del. Ch. 1987), aff'd,
    539 A.2d 180 (Del. 1988) ........................................................................22

Guttman v. Huang,
    823 A.2d 492 (Del. Ch. 2003)................................................................28

Hayes v. Crown Cent. Petroleum Corp.,
    249 F. Supp. 2d 725 (E.D. Va. 2002), aff'd,
    78 Fed. Appx. 857 (4th Cir. 2003)........................................................36

Herd v. Major Realty Corp.,
    C.A. No. 10707, 1990 WL 212307 (Del. Ch. Dec. 21, 1990) ...............30

Hudson v. Prime Retail, Inc.,
    C.A. No. 24-C-03-5806, 2004 WL 1982383
    (Md. Cir. Ct. Apr. 1, 2004) ......................................5, 24, 25, 29, 31, 34

Jasinover v. Rouse Co.,
    C.A. No. 13-C-04-59594, 2004 WL 3135516
    (Md. Cir. Ct. Nov. 4, 2004)...................................................5, 29, 31, 32

Jolly Roger Fund LP v. Sizeler Prop. Investors, Inc.,
    C.A. No. RDB 05-841, 2005 WL 2989343
    (D. Md. Nov. 3, 2005)......................................................................18, 19

Kamen v. Kemper Fin. Servs., Inc.,
    500 U.S. 90 (1991)................................................................................17

Knox v. Rosenberg,
    No. H-99-0123 (S.D. Tex. Sept. 28, 1999)...........................................36

Lemon Bay Partners LLP v. Hammonds,
    C.A. No. 05-327 (GMS), 2007 WL 1830899
    (D. Del. June 26, 2007).....................................................1, 2, 4, 10, 11

Lewis v. Anderson,
    477 A.2d 1040 (Del. 1984) ..............................................................19, 20

Lewis v. Leaseway Transp. Corp.,
    C.A. No. 8720, 1990 WL 67383 (Del. Ch. May 16, 1990) ...................32

Lewis v. Ward,
    852 A.2d 896 (Del. 2004) ................................................................20, 21

Llewellyn v. Queen City Dairy, Inc.,
    48 A.2d 322 (Md. 1946) ...................................................................................17

In re MONY Group Inc. S'holder Litig.,
    852 A.2d 9 (Del. Ch. 2004)..............................................................................33

Magnus Electronics, Inc. v. La Republica Argentina,
    830 F.2d 1396 (7th Cir. 1987) ..........................................................................14

McDermott Inc. v. Lewis,
    531 A.2d 206 (Del. 1987) ...........................................................................16, 17

McMillan v. Intercargo Corp.,
    768 A.2d 492 (Del. Ch. 2000).....................................................................16, 26

Morse v. Lower Merion Sch. Dist.,
    132 F.3d 902 (3d Cir. 1997)..............................................................................16

Nebenzahl v. Miller,
    C.A. No. 13206, 1993 WL 488284 (Del. Ch. Nov. 8, 1993)..............................28

Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v.
    Elkins,
    C.A. No. 20228, 2004 WL 1949290 (Del. Ch. Aug. 24, 2004)...........................28

Pogostin v. Rice,
    C.A. No. 6235, 1983 WL 17985 (Del. Ch. Aug. 12, 1983), aff'd,
    480 A.2d 619 (Del. 1984) .................................................................................22

Porter v. Texas Commerce Bancshares, Inc.,
    C.A. No. 9114, 1989 WL 120358 (Del. Ch. Oct. 12, 1989) ..........................19, 32

In re Prudential Ins. Co. Derivative Litig.,
    659 A.2d 961 (N.J. Super. Ct. Ch. Div. 1995)......................................................23

Rattner v. Bidzos,
    C.A. No. 19700, 2003 WL 22284323 (Del. Ch. Sept. 30, 2003).........................28

Resource Ventures, Inc. v. Resources Mgmt. Int'l, Inc.,
    42 F. Supp. 2d 423 (D. Del. 1999).......................................................................7

Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,
    506 A.2d 173 (Del. 1985) .................................................................................29

Sale v. Pittsburgh Steel Co.,
    57 F. Supp. 283 (W.D. Pa., 1944)..........................................................................11

Sanchez v. Caribbean Carriers Ltd.,
    552 F.2d 70 (2d Cir. 1977)....................................................................................14

Schoen v. Mountain Producers Corp,
    170 F.2d 707 (3d Cir. 1948)..................................................................................11

S. Freedman & Co. v. Raab,
180 Fed. Appx. 316 (3d Cir. 2006) ............................................................................2, 11

Shaw v. Merritt-Chapman & Scott Corp.,
    554 F.2d 786 (6th Cir. 1977) ...............................................................................14

Stone v. Ritter,
    911 A.2d 362 (Del. 2006) .....................................................................................27

Sussex County Senior Servs., Inc. v. Carl J. Williams & Sons, Inc.,
    C.A. No. 99-473-GMS, 1999 WL 33220035 (D. Del. Dec. 29, 1999)................15

In re Talley Indus., Inc. S'holders Litig.,
    C.A. No. 15961, 1998 WL 191939 (Del. Ch. Apr. 13, 1998)................................23

In re Toys "R" Us, Inc., S'holder Litig.,
    877 A.2d 975 (Del. Ch. 2005)...............................................................................33

Unocal Corp. v. Mesa Petroleum Co.,
    493 A.2d 946 (Del. 1985) .....................................................................................29

Valentine v. On Target, Inc.,
    686 A.2d 636 (Md. Ct. Spec. App. 1996), aff'd,
    727 A.2d 947 (Md. 1999) .....................................................................................25

VantagePoint Venture Partners 1996 v. Examen, Inc.,
    871 A.2d 1108 (Del. 2005) ...................................................................................16

Waller v. Waller,
    49 A.2d 449 (Md. 1946) .......................................................................................18

Walsh v. International Longshoremen's Ass'n, AFL-CIO,
    630 F.2d 864 (1st Cir. 1980)..................................................................................14

Weiss v. Samsonite Corp.,
    741 A.2d 366 (Del. Ch.), aff'd mem., 746 A.2d 277 (Del. 1999) ............................8

Werbowsky v. Collomb,
    766 A.2d 123 (Md. 2001) ...............................................................17, 28

In re Wheelabrator Techs. Inc. S'holders Litig.,
    C.A. No. 11495, 1992 WL 212595 (Del. Ch. Sept. 1, 1992)................................17

Wittman v. Crooke,
    707 A.2d 422 (Md. Ct. Spec. App. 1998)..................................................24, 33, 34

## STATUTES

Fed. R. Civ. P. 23.1 .......................................................................................21

28 U.S.C. § 1401 .........................................................................................11

8 Del. C. § 102(b)(7) ...................................................................................35

Maryland's Corporate Code § 2-405.1....................................17, 18, 24, 28, 32

Maryland's Corporate Code § 2-405.2.....................................................5, 6, 35

Md. Code Ann., Cts. & Jud. Proc. Code § 5-418 ...........................................35

Kenneth B. Abel, The Maryland Corporation:  Legal Aspects of
    Organization & Operation § VI(H) (2004) ...........................................29

James J. Hanks, Jr., Maryland Corporation Law, § 6.6[b] ..............................29

James J. Hanks, Jr., Maryland Corporation Law, § 6.9...................................35

## NATURE AND STAGE OF THE PROCEEDINGS

More than two years ago, on November 21, 2005, Plaintiffs Lemon Bay Partners, LLP, Donald F. Benoit and Malcolm Rosenwald filed a Consolidated Amended Complaint, alleging, for the most part, state law fiduciary duty claims against MBNA's officers and directors (the "Original Action").[1]  On June 26, 2007, after full briefing – including sur-reply briefing on the issues of subject matter jurisdiction – the Court issued a written opinion dismissing Plaintiffs' claims in their entirety under Rule 12(b)(1).  See Lemon Bay Partners, LLP v. Hammonds, C.A. No. 05-327 (GMS), 2007 WL 1830899, at *5 (D. Del. June 26, 2007).[2]  Specifically, the Court held that:

> [T]he state law claims in this case substantially predominate over the federal claim.  The [Consolidated Amended Complaint] is comprised almost entirely of state law issues that bear no discernable relationship to the contribution claim, and the plaintiffs present no persuasive reason for the court to use its discretionary power to exercise supplemental jurisdiction in this case.  Given the foregoing, the court concludes that exercising supplemental jurisdiction in a case such as this would be an improper exercise of subject matter jurisdiction, since it 'would truly permit the tail to wag the dog.'

---

[1]   On August 25, 2005, the parties agreed and the Court ordered that any related shareholder derivative action would be consolidated with the Original Action (the "Consolidation Order"). (D.I. 28).  The Consolidation Order also made clear that Plaintiffs could not separately bring subsequent actions raising essentially the same facts and claims against the same defendants. Specifically, the Consolidation Order stated that it "shall apply to each shareholder derivative and state law based class action arising out of the same or substantially the same transactions or events as these cases that is subsequently filed in, removed to or transferred to this Court". . . "and counsel are to assist in assuring that counsel in subsequent actions receive notice of this Order." *Id.*

[2]   Specifically, the Court ordered that:

> 1. The defendants' Motions to Dismiss (D.I. 38, D.I. 42) are GRANTED.
> 2. The plaintiffs' amended complaint (D.I. 31) is hereby DISMISSED in its entirety.
> 3. The Clerk of Court is directed to close this case.

See Lemon Bay Partners, LLP v. Hammonds, 2007 WL 1830899, at *6.

*Id.* at *5 (citing *In re Litig. Trust of MDIP*, No. Civ. A. 03-779-GMS, 2005 WL 1242157, at *5 (D. Del. May 25, 2005)).  The Court also squarely held that "since the plaintiffs failed to affirmatively and distinctly assert diversity jurisdiction in their amended complaint, the plaintiffs cannot now assert diversity as a possible basis for subject matter jurisdiction." *Id.* at *5 n.9 (citing *S. Freedman & Co. v. Raab*, 180 Fed. Appx. 316, 320 (3d Cir. 2006) ("It is well established that the basis upon which jurisdiction depends must be alleged affirmatively and distinctly and cannot be established argumentatively or by mere inference.")).  Not satisfied with the Court's well-reasoned Opinion dismissing the action, Plaintiffs moved on July 11, 2007, for reconsideration ("Motion for Reconsideration").  (Consol. D.I. 76).[3]

Rather than wait for the Court to decide their Motion for Reconsideration, Plaintiffs filed two new complaints, again on behalf of Lemon Bay Partners, LLP, Malcolm Rosenwald and Donald F. Benoit, on September 18, 2007, against the same Defendants, raising virtually the same facts and claims as the Original Action (the "Duplicative Actions").[4]  Just like the Original Action, the Duplicative Actions arise out of events related to market disclosures made by MBNA Corporation ("MBNA" or the "Company") between January 21 and April 21, 2005, and a stock and cash merger between MBNA and Bank of America Corporation ("BAC") that was approved by MBNA shareholders on November 3, 2005 (the "Merger").  As to the former outside directors of MBNA (the "Outside Directors"), the Duplicative Actions allege that

---

[3]     In many respects, Plaintiffs were attempting to treat the Court's Opinion as a "'first draft[], subject to revision and reconsideration at [Plaintiffs'] pleasure,'" an approach that this Court does not condone.  *See Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1241 (D. Del. 1990) (citation omitted).

[4]     In fact, in a letter to the Court dated September 18, 2007, Plaintiffs acknowledged that the two "new" complaints in this action were "similar" to the dismissed pleading in the Original Action.  (Consol. D.I. 79).

they (1) breached their fiduciary oversight duties (Count Four);  (2) breached their fiduciary

duties in connection with the Merger through gross mismanagement (Count Six); and (3)

breached their so-called <u>Revlon</u> duties (Count Seven).  Most significantly, the Duplicative

Actions *again failed  to raise any federal law claims against the Outside Directors*.

Plaintiffs then attempted to push the Duplicative Actions forward, even before the

Court had the opportunity to rule on *their* Motion for Reconsideration.  First, Plaintiffs filed a

motion for consolidation and to be appointed lead plaintiff of the Duplicative Actions ("Motion

for Consolidation and Lead Plaintiff") (D.I. 26), and later filed a Motion to vacate the stay of

discovery imposed by the Private Securities Litigation Reform Act of 1995 ("Motion to Vacate")

(D.I. 33).[5]  Since Plaintiffs brought the Duplicative Actions, and with each subsequent filing,

Defendants have told Plaintiffs that the pursuit of these actions was improper and flouted the

Court's authority to decide the Original Action.  (D.I. 30, 37) Nevertheless, Plaintiffs persisted in

pursuing these virtually identical claims.

On March 26, 2008, the Court denied Plaintiffs' Motion for Reconsideration in the

Original Action.  The following day, the Outside Directors sent a letter to Plaintiffs requesting

that they voluntarily withdraw the Duplicative Actions against the Outside Directors.  (Ex. A)

The Outside Directors also informed the Plaintiffs that they intended to file a motion to dismiss

the Duplicative Actions if Plaintiffs did not agree to withdraw them. Plaintiffs refused to do so,

and indicated that they intended to pursue *both* appellate review of the Court's decision in the

Original Action *and* the Duplicative Actions.  (Ex. B)

---

[5]  To make matters worse, Plaintiffs' Motion to Vacate asks this Court to permit them to
participate in discovery in another action, *Baker v. MBNA Corp., et al.*, 05-CV-272 (GMS)
("Securities Action"), where the Outside Directors are not a named party and have had no
involvement with discovery in that case.

3

Shortly thereafter, the Outside Directors moved to dismiss the Duplicative Actions. Plaintiffs' conduct has forced the Outside Directors to file this accompanying brief, which is regrettably lengthy, and which must necessarily address the many arguments presented in the earlier motion to dismiss.

## SUMMARY OF ARGUMENT

Plaintiffs' continued pursuit of state law fiduciary claims against the Outside Directors ignores the Court's decision to dismiss virtually identically claims in the Original Action on jurisdictional grounds and deny their Motion for Reconsideration. See Lemon Bay Partners, 2007 WL 1830899, at *5. Plaintiffs' actions are especially egregious given that they have stated that they intend to appeal the Court's dismissal of the Original Action, thereby allowing them to pursue their claims in both a trial court and appellate court *at the same time*. Plaintiffs' tactics are a blatant abuse of the judicial process. Moreover, Plaintiffs' attempt to plead diversity jurisdiction in the *Benoit* action (Benoit ¶ 17(a)), defies the Court's ruling that "the plaintiffs cannot now assert diversity as a possible basis for subject matter jurisdiction." See Lemon Bay Partners, 2007 WL 1830899, at *5 n.9. For these procedural reasons alone, the Duplicative Actions should be dismissed.

In the alternative, the Court may dismiss the Duplicative Actions on a number of grounds, including, the following:

1.   Plaintiffs' actions are in violation of the Court-ordered Consolidation Order entered in the Original Action, and are, in any event, barred on *res judicata* grounds. Indeed, such repetition wastes the Court's resources and is exactly what the rule of *res judicata* is designed to prevent.

2.   Under the continuous ownership rule, which applies in both Maryland and Delaware, Plaintiffs cannot assert derivative claims on behalf of either MBNA (which no longer

exists) or BAC.  MBNA's merger with BAC, which closed on January 1, 2006, extinguished

Plaintiffs' standing to pursue derivative claims against the Outside Directors.  Likewise, a

plaintiff cannot assert claims on behalf of a company based on events that occurred before he or

she acquired shares in the company.  Plaintiffs were not BAC shareholders at the time of the

events at issue, and, therefore, they cannot assert derivative claims on BAC's behalf based on

those events.

      3.  Even if Plaintiffs were allowed to circumvent the continuous ownership

rule and assert derivative claims, Plaintiffs' claims should be dismissed for failure to make a

demand on either the MBNA or BAC boards of directors.

      4.  Plaintiffs fail to adequately plead any breach of fiduciary duty claims

under Section 2-405.1 of the Maryland Corporations and Associations Law, which states that

"corporate directors [who] perform their duties (1) in good faith, (2) in a manner [the director]

reasonably believes to be in the best interests of the corporation, and (3) with the care that an

ordinarily prudent person in a like position would use under similar circumstances . . . [have] no

liability by reason of being or having been a director of a corporation." Hudson v. Prime Retail,

Inc., C.A. No. 24-C-03-5806, 2004 WL 1982383, at *11 (Md. Cir. Ct. Apr. 1, 2004).  In fact,

Plaintiffs' claims against the Outside Directors are, for the most part, premised entirely on their

purported breach of so-called Revlon-based fiduciary duties, which Maryland courts have

specifically stated are not recognized under Maryland corporation law.  See, e.g., Jasinover v.

Rouse Co., C.A. No. 13-C-04-59594, 2004 WL 3135516, at *9 (Md. Cir. Ct. Nov. 4, 2004).

      5.  MBNA's certificate of incorporation (the "MBNA Charter") immunizes

MBNA's Directors from any liability predicated on the kinds of claims Plaintiffs seek to pursue.

See Md. Code Ann., Corps. & Ass'ns § 2-405.2; Grill v. Hoblitzell, 771 F. Supp. 709, 712 (D.

Md. 1991) (dismissing derivative action against directors of a Maryland corporation pursuant to Maryland Corporate Code § 2-405.2). [6]

      6.  Plaintiffs' Merger-related claims should be dismissed on the ground that MBNA shareholders, who were fully informed about the Merger, have ratified the MBNA Board's actions in connection with the Merger by overwhelmingly voting in favor of the Merger, effectively extinguishing Plaintiffs' claims against the Outside Directors.

      For all of these reasons, and as set forth more fully below, the Outside Directors respectfully submit that all claims asserted against them should be dismissed.

---

[6]  The court may take judicial notice of the MBNA Charter.  (Ex. E)  See In re Baxter Int'l, Inc. S'holders Litig., 654 A.2d 1268, 1270 (Del. Ch. 1995) (when reviewing whether a certificate of incorporation exempts directors from liability, "[t]he court may take judicial notice of the certificate [of incorporation] in deciding a motion to dismiss").

## STATEMENT OF FACTS[7]

### A.    The Company (And Its Independent Board)

MBNA, a Maryland company headquartered in Wilmington, Delaware, was (as of 2004) the world's largest independent credit card lender.  (Lemon Bay ¶ 43; Benoit ¶ 44)  MBNA had a ten-member board of directors.  (Lemon Bay ¶¶ 21, 30-38; Benoit ¶¶ 21, 30-38)  Only one out of the ten directors – Bruce Hammonds, MBNA's Chief Executive Officer and President –  is expressly alleged to also be an officer of the Company.[8]

### B.    MBNA's January 2005 Earnings Forecast And First Quarter 2005 Results

In January 2005, MBNA reported its fourth quarter and full year 2004 financial results.  (Lemon Bay ¶ 67; Benoit ¶ 68)  By many standards, MBNA had a strong 2004 financial performance.  Plaintiffs do not directly challenge the accuracy of MBNA's reported financial results for 2004, but rather merely incorporate by reference allegations asserted in the Securities Action – an action in which the Outside Directors are not named parties.  (See  Lemon Bay ¶ 63; Benoit ¶ 64).

Thereafter, between January 25, 2005 and February 3, 2005, certain officer defendants allegedly sold shares of the Company's stock.  (Lemon Bay ¶ 74; Benoit ¶ 75)  Relying on the separately filed Securities Action, Plaintiffs suggest that these insiders were

---

[7]    The Statement of Facts is taken from the few well-pleaded allegations in the *Lemon Bay Partners* Complaint (cited herein as "Lemon Bay") and the virtually identical *Benoit* Complaint (cited herein as "Benoit"). While these allegations may be accepted as true for purposes of this motion only, the Court may not accept Plaintiffs' conclusory allegations as true.  See, e.g., Resource Ventures, Inc. v. Resources Mgmt. Int'l, Inc., 42 F. Supp. 2d 423, 438 (D. Del. 1999) (court "'not required to accept legal conclusions either alleged or inferred from the pleaded facts'") (quoting Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993)).

[8]    The remaining eight independent directors are referred to as the Outside Directors.  They are James H. Berick, Mary M. Boies, Benjamin R. Civiletti, William L. Jews, Stuart L. Markowitz, William B. Milstead, Thomas G. Murdough and Laura S. Unger.  However, Murdough resigned as a director before Plaintiffs filed any derivative action.

aware of a pending business downturn at the time they sold their shares (Lemon Bay ¶ 137; Benoit ¶ 138) – but allege no factual support for this contention. Moreover, there is no allegation in the Duplicative Complaints that the Outside Directors participated in any of the alleged stock sales, or were on notice (or should have been on notice) of any facts suggesting wrongdoing in connection with those sales.

## C.     The Merger

On June 30, 2005, MBNA announced it had reached a merger agreement with BAC, whereby each share of MBNA stock would be exchanged for $27.50 in cash and shares of BAC stock (the "Merger Agreement"). (Lemon Bay ¶ 83; Benoit ¶ 84) The Merger price represented a significant premium over (1) the $21.07 closing price of MBNA's shares the day before the announcement of the Merger (Lemon Bay ¶ 16; Benoit ¶ 16); and (2) the $23.11 closing price of MBNA's shares on April 20, 2005, the day before MBNA's first-quarter 2005 earnings results were announced (which Plaintiffs claim led to the general decline in MBNA's stock price).[9] (Ex. C) MBNA's Board unanimously approved the Merger. (Lemon Bay ¶ 80; Benoit ¶ 81)

The Merger was the culmination of a thorough search process for potential merger partners. (Lemon Bay ¶ 14; Benoit ¶ 14) MBNA hired not one, but two, financial advisors to assist it in connection with the search process. (Lemon Bay ¶ 3; Benoit ¶ 3) In early June 2005, the MBNA Board met with management, its financial advisors and its outside counsel (Wachtell, Lipton, Rosen & Katz) to discuss certain issues, including (1) the Company's recent financial performance and prospects, (2) consolidation activity in the credit card industry and the general

---

[9]     The Court may take judicial notice of MBNA's stock prices. See, e.g., Weiss v. Samsonite Corp., 741 A.2d 366, 375 n.26 (Del. Ch.), aff'd mem., 746 A.2d 277 (Del. 1999) (taking judicial notice of trading price of listed stock in ruling on a motion to dismiss).

environment, (3) long-term trends, and (4) other developments in the markets in which MBNA conducts business. (Lemon Bay ¶ 75; Benoit ¶ 76) The Board also considered "[p]ossible strategic alternatives," including remaining independent or engaging in a business combination. (Id.) Thereafter, MBNA held discussions with at least one other potential merger partner (Wachovia Inc. ("Wachovia")) (Lemon Bay ¶ 78; Benoit ¶ 79), and had a list of several other merger candidates it was willing to consider. (Lemon Bay ¶ 75; Benoit ¶ 76) Ultimately, MBNA approved a deal with BAC, which represented a significant premium to MBNA's shareholders. (Lemon Bay ¶ 16; Benoit ¶ 16)

D.      **MBNA Shareholders Approve The Merger**

On or about September 26, 2005, MBNA sent proxy materials to shareholders containing extensive disclosures about the Merger and the search process. (Lemon Bay ¶ 75; Benoit ¶ 76) Thereafter, on November 3, 2005, MBNA's shareholders approved the Merger. (Lemon Bay ¶ 16; Benoit ¶ 16) For the more than four months between the time the Merger was announced and the shareholders approved the Merger, no other suitor came forward. (Lemon Bay ¶ 15; Benoit ¶ 15)

E.      **The Duplicative Complaints**

The Duplicative Complaints, though lengthy, consist largely of conclusory allegations and unsubstantiated attacks on the presumptively careful, loyal and good faith efforts of the MBNA Board in connection with the Company's disclosure of its first-quarter 2005 results and the Merger process. As to the Outside Directors, what the Duplicative Complaints fail to allege speaks volumes. Critically, Plaintiffs do not allege any federal claims against the Outside Directors, and fail to state sufficient facts supporting their three state law fiduciary counts. Even a cursory review of the Duplicative Complaints leads one to the conclusion that the Outside Directors here were disinterested and independent – Plaintiffs have not adequately alleged that

any of them acted disloyally or failed to act independently or in good faith in connection with the

Merger.  Indeed, Plaintiffs largely ignore the Outside Directors, choosing instead to lump them

together with all other defendants when attempting to state a claim.  This tactic –  which leaves

Plaintiffs without any alleged factual support for any of the claims against the eight Outside

Directors –  dooms the Duplicative Complaints to failure.

    As explained below, all claims against the Outside Directors – which consist

solely of state law fiduciary claims – should be dismissed as a matter of law.

## ARGUMENT

**I.    PLAINTIFFS' CLAIMS IGNORE THE COURT'S PREVIOUS ORDERS, ARE
    PROCEDURALLY UNSOUND, AND ARE BARRED BY THE DOCTRINE OF
    *RES JUDICATA*.**

    Plaintiffs' pursuit of the Duplicative Actions is a blatant attempt to end-run the

Court's decision to dismiss virtually identically claims in the Original Action on jurisdictional

grounds.  More than two years ago, the Outside Directors moved to dismiss the Original Action

on a number of grounds, including lack of subject matter jurisdiction.  After full briefing –

including sur-reply briefing on the issue of subject matter jurisdiction – the Court issued a

written opinion granting the Outside Directors' motion, and directed the Clerk of the Court to

close the case.  Lemon Bay Partners, LLP, 2007 WL 1830899, at *5-6.  In dismissing the action,

the Court specifically ruled that "it is without jurisdiction over the subject matter of this action"

because the "state law claims. . . substantially predominate over the federal claim."  *Id.* at *1, 5.

Unsatisfied with the Court's ruling, Plaintiffs moved for reconsideration, which this Court denied

on March 26, 2008.

    However, before the Court had the opportunity to rule on Plaintiffs' own Motion

for Reconsideration, Plaintiffs filed these Duplicative Actions that predominantly mirror the

Original Action and continue to assert only state law fiduciary claims against the Outside

Directors.  While the Duplicative Actions allege additional federal law claims against the Inside

Director Defendants – *they fail to raise any federal law claims against the Outside Directors.*

Instead, Plaintiffs attempted to make another go around at pleading jurisdiction by asserting

diversity jurisdiction in the *Benoit* complaint.  (Benoit ¶ 17(a)).  Benoit's long-abandoned theory

of diversity jurisdiction, which – apart from its dubious prospects, given that MBNA's principal

place of business was Wilmington, Delaware[10] – was consciously dropped from the case at the

time Plaintiffs filed their Consolidated Amended Complaint, and the Court ruled that "plaintiffs

cannot now assert diversity as a possible basis for subject matter jurisdiction."  See Lemon Bay,

2007 WL 1830899, at *5 n.9.

       To make matters worse, Plaintiffs have expressed that they intend to seek

appellate review of the Court's decision in the Original Action, while at the same time pursue the

Duplicative Actions, thereby allowing them to litigate their claims in two forums.  This tactic is

an improper attempt to interfere with the Court's decision-making process, forces the Defendants

to defend against these claims on multiple fronts, and opens the door to potential inconsistent

---

[10]  There is significant doubt as to whether Plaintiffs could even establish diversity jurisdiction given that MBNA was a citizen of both Maryland (where it is incorporated) and Delaware (where its principal place of business is located), and at least one of the defendants was a Delaware resident.  See, e.g., Raab, 180 Fed. Appx. at 320 (for purposes of diversity jurisdiction, a corporation is a resident of the state of its incorporation and its principal place of business).  Under 28 U.S.C. § 1401, an action brought by a stockholder on behalf of a corporation may be prosecuted in "any judicial district where the corporation might have sued the same defendants."  Thus, because at least one of the individual defendants is a resident of Delaware, Plaintiffs have not established that diversity exists here.  See, e.g., Sale v. Pittsburgh Steel Co., 57 F. Supp. 283 (W.D. Pa., 1944) (finding requisite diversity jurisdiction lacking where corporation and some of defendants were residents of the district); Schoen v. Mountain Producers Corp., 170 F.2d 707 (3d Cir. 1948) (holding that in a derivative action, section 1401 requires that there be diversity between the injured corporation and all other defendants).

rulings.  Accordingly, the Court should dismiss the Duplicative Actions to put an end to such

inappropriate procedural gamesmanship.

> In addition to these reasons, the Duplicative Actions should be dismissed for

several other procedural-based reasons.

> *First*, the filing of the Duplicative Complaints directly contradicts the

Consolidation Order agreed upon by the parties and ordered by the Court in the Original Action.

(D.I. 28).  The Consolidation Order made clear that Plaintiffs could not separately bring new

actions raising essentially the same facts and claims against the same defendants.  See id.  ("This

Order shall apply to each shareholder derivative and state law based class action arising out of

the same or substantially the same transactions or events as these cases that is subsequently filed

in, removed to or transferred to this Court". . . and "counsel are to assist in assuring that counsel

in subsequent actions receive notice of this Order.").  Therefore, the subsequent filing of the

Duplicative Actions violates the Consolidation Order.

> *Second*, Plaintiffs made a tactical decision not to amend the Consolidated

Amended Complaint in the Original Action in response to the Outside Directors' motion to

dismiss.  Plaintiffs are now bound by that decision, and, as a result, cannot simply file two "new"

complaints to avoid dismissal.  Had they wanted to amend or revise the original Consolidated

Amended Complaint to avoid dismissal, they should have done so *before* the Court granted the

motion to dismiss.[11]  See e.g., In re Digital Island Sec. Litig., C.A. No. 02-57-GMS, 2002 WL

31667863, at *1 (D. Del. Nov. 25, 2002) ("When faced with the defendants' motion to dismiss,

---

[11]  Plaintiffs clearly had a chance to amend, but chose not to take it.  In fact, Plaintiffs admitted
this point by representing to the Court in their sur-reply brief in opposition to the motion to
dismiss the Original Action that they "do not now move to re-plead."  (D.I. 60 Sur-Reply at
13)

the plaintiffs would have been well within their rights to request leave to amend.  Instead, they

chose to oppose the motion, in its entirety, without seeking such relief.  Such an approach is

highly suspect as the plaintiffs were aware of the facts which they now seek to add at the time

the original pleading was filed.  Thus, there is no excuse for failure to plead them before the case

was dismissed."), aff'd, 357 F.3d 322 (3d Cir. 2004).  In fact, in the Motion for Reconsideration,

the Court denied Plaintiffs' meritless contention that the Court erred by "overlooking" their

motion for leave to amend their Consolidated Amended Complaint to add additional counts in an

effort to establish jurisdiction.  (D.I. 43 Pls.' Op. Br. at 10-15)  As such, permitting Plaintiffs to

continue to pursue these Duplicative Actions will effectively allow them the relief that the Court

denied them in their Motion for Reconsideration.

        *Third*, Plaintiffs are barred under the doctrine of *res judicata* from bringing any

further actions in this Court based on the same facts underlying the previously dismissed

complaint.  "Although the dismissal of a complaint for lack of jurisdiction does not adjudicate

the merits so as to make the case *res judicata* on the substance of the asserted claim, it does

adjudicate the court's jurisdiction, and a second complaint cannot command a second

consideration of the same jurisdictional claims."  Boone v. Kurtz, 617 F.2d 435, 436 (5th Cir.

1980) (holding that complaint was properly dismissed under the doctrine of *res judicata* where

the District Court had already dismissed an almost identical complaint for lack of jurisdiction);

Bromwell v. Michigan Mut. Ins. Co., 115 F.3d 208, 212-13 (3d Cir. 1997) ("A dismissal for lack

of subject-matter jurisdiction, while 'not binding as to all matters which could have been raised,'

is, however, conclusive as to matters actually adjudged.") (citations omitted); Grasty v. U.S.

Patent and Trademark Office, 211 Fed. Appx. 952, 953-54 (Fed. Cir. 2007) (applying the law of

the Third Circuit and stating that "[i]t has long been the rule that principles of *res judicata* apply

to jurisdictional determinations – both subject matter and personal.") (citation omitted); <u>Shaw v. Merritt-Chapman & Scott Corp.</u>, 554 F.2d 786, 789 (6th Cir. 1977) (holding that "while a dismissal for lack of jurisdiction does not constitute an adjudication upon the merits, it does constitute a binding determination on the jurisdictional question, which is not subject to collateral attack").

Moreover, Plaintiffs cannot simply rework the Consolidated Amended Complaint in the Original Action and add claims (or revise old ones) in newly-filed complaints in the same Court to avoid dismissal. "The res judicata doctrine . . . not only binds the parties and their privies as to grounds or issues actually litigated, but also as to any other admissible matter which might have been offered for that purpose." <u>See</u> <u>Sanchez v. Caribbean Carriers Ltd.</u>, 552 F.2d 70, 71 (2d Cir. 1977) (citation omitted) (barring second suit arising from identical facts and issues where court had already dismissed a similar action for lack of jurisdiction and finding that new claim asserted by plaintiff did not affect the decision); <u>see also</u> <u>Magnus Elecs., Inc. v. La Republica Argentina</u>, 830 F.2d 1396, 1400 (7th Cir. 1987) (holding that "it does not make sense to allow a plaintiff to begin the same suit over and over again in the same court, each time alleging additional facts that the plaintiff was aware of from the beginning of the suit, until it finally satisfies the jurisdictional requirements"). Plaintiffs are bound by the Court's decision in the Original Action and their only option is to appeal the Court's dismissal. <u>Shaw</u>, 554 F.2d at 789 (holding that plaintiffs were barred from bringing a subsequent suit asserting essentially the same claims and citing the same jurisdictional basis because plaintiff did not appeal the dismissal). Simply put, "the remedy for a [purported] wrong decision is the right of appeal, not an unlimited opportunity to bring repetitious petitions." <u>See</u> <u>Walsh v. Int'l Longshoremen's Ass'n, AFL-CIO</u>, 630 F.2d 864, 869 (1st Cir. 1980); <u>see also</u> <u>Magnus Electronics, Inc.</u>, 830 F.2d at

1402 (holding that plaintiff could have appealed the court's decision, but could not simply file a new suit in district court and allege new bases of subject matter jurisdiction that were available to it at the time of the first-filed suit). Accordingly, the Duplicative Complaints should be dismissed.

In any event, to the extent the Court considers the Duplicative Complaints, Plaintiffs have not asserted any federal law claims against the Outside Directors. In fact, as to the Outside Directors, the Duplicative Complaints assert only three state fiduciary counts – Count Four (breach of fiduciary oversight duties), Count Six (breach of fiduciary duties in connection with the Merger through gross mismanagement), and Count Seven (breach of fiduciary Revlon duties). As such, these "new" complaints do not affect the Court's well-reasoned decision that it lacks subject matter jurisdiction as to claims asserted against the Outside Directors.

For these reasons, the Duplicative Actions should be dismissed in their entirety.

## II.    TO THE EXTENT THE COURT REACHES THE MERITS OF THIS DISPUTE, THE DUPLICATIVE COMPLAINTS MUST BE DISMISSED UNDER MARYLAND LAW.

### A.    Standard Of Review.

To survive a motion to dismiss, a complaint must allege facts that, if taken as true, would establish each and every element of a claim upon which relief can be granted. Criden v. Steinberg, C.A. No. 17082, 2000 WL 354390, at *2 n.7 (D. Del. Mar. 23, 2000) (citation omitted). Where, as here, the Duplicative Complaints are largely composed of "bald assertions" and "legal conclusions," the Court need not credit those allegations in ruling on a motion to dismiss. Ercole v. Conectiv & Coventry Health Care of Del., Inc., C.A. No. 03-186 GMS, 2003 WL 21104926, at *1 (D. Del. May 15, 2003); Sussex County Senior Servs., Inc. v. Carl J. Williams & Sons, Inc., C.A. No. 99-473-GMS, 1999 WL 33220035, at *1 (D. Del. Dec. 29, 1999)

(citing <u>Morse v. Lower Merion Sch. Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997) (in analyzing a motion to dismiss, the court "need not accept legal conclusions [pled] in the guise of factual allegations as being true"); <u>see also</u> <u>McMillan v. Intercargo Corp.</u>, 768 A.2d 492, 496 (Del. Ch. 2000) (dismissing complaint that alleged "no facts from which a reasonable inference can be drawn that any conflicting self-interest or bad faith motive caused the defendant directors to fail to meet their obligations").

     **B.**     **The Internal Affairs Doctrine Mandates That Maryland Law Governs This Dispute.**

"The internal affairs doctrine is a long-standing choice of law principle which recognizes that only one state should have the authority to regulate a corporation's internal affairs – the state of incorporation." <u>VantagePoint Venture Partners 1996 v. Examen, Inc.</u>, 871 A.2d 1108, 1112 (Del. 2005); <u>see also</u> <u>CTS Corp. v. Dynamics Corp. of Am.</u>, 481 U.S. 69, 91 (1987) (holding it is "an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares"); <u>McDermott Inc. v. Lewis</u>, 531 A.2d 206, 209 (Del. 1987) (noting that the "internal affairs doctrine is a major tenet of Delaware corporation law having important federal constitutional underpinnings"). Indeed, under the internal affairs doctrine, courts routinely apply the law of the state of incorporation to "'the entire gamut of internal corporate affairs.'" <u>VantagePoint</u>, 871 A.2d at 1113 (citations omitted). This includes "those matters that pertain to the relationships among or between the corporation and its officers, directors, and shareholders." <u>Id.</u>; <u>see also</u> <u>McDermott</u>, 531 A.2d at 216 ("[D]irectors and officers have a significant right, under the fourteenth amendment's due process clause, to know what law will be applied to their actions.").

Although its headquarters were located in Delaware, MBNA was *incorporated under Maryland law*.[12]  Accordingly, under the internal affairs doctrine, Plaintiffs' substantive claims against the Outside Directors, including the issue of whether Plaintiffs were excused from making demand on the MBNA Board, are governed by Maryland law.  See McDermott, 531 A.2d at 209; Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 101, 106 (1991) ("[a] court [that is] entertaining a derivative action . . . must apply the demand futility exception as it is defined by the law of the State of incorporation"; to do otherwise "would necessarily infuse corporate decision making with uncertainty" and result in "disruption to the internal affairs of the corporation").

### C.    Under Maryland Law, Breach Of Fiduciary Duty Claims Are Derivative.

Under Maryland law, a director's obligation "*runs . . . to the corporation* and not, at least directly, to the shareholders*.*"  Werbowsky v. Collomb, 766 A.2d 123, 144 (Md. 2001) (emphasis added); see also Maryland Corporate Code ("MCC") § 2-405.1(g) (explaining that "nothing in this section creates a duty of any director of a corporation enforceable *otherwise than by the corporation or in the right of the corporation*") (emphasis added); Goodman v. Poland, 395 F. Supp. 660, 680 (D. Md. 1975) (stating that "an officer or director is not in a fiduciary relationship with an individual stockholder with respect to his stock"); Llewellyn v. Queen City Dairy, Inc., 48 A.2d 322, 327 (Md. 1946) (same principle).

---

[12]  Though Plaintiffs fail to allege that MBNA was incorporated in Maryland, they acknowledge that Maryland law governs their claims by repeatedly alluding to "Maryland fiduciary jurisprudence" in their Complaints.  (See, e.g., Lemon Bay ¶¶ 152, 158; Benoit ¶¶ 153, 159) In any event, the MBNA Charter clearly establishes that it is a Maryland company.  (Ex. E) The Court may take judicial notice of the charter for purposes of this motion.  See In re Wheelabrator Techs. Inc. S'holders Litig., C.A. No. 11495, 1992 WL 212595, at *11 (Del. Ch. Sept. 1, 1992).

By definition, then, any claims of breach of fiduciary duty under Maryland law are derivative in nature, because they are "enforceable" only "by the corporation or in the right of the corporation," and not directly (by way of a class claim or otherwise) by stockholders. *See* MCC § 2-405.1(a); <u>see also</u> <u>Waller v. Waller</u>, 49 A.2d 449, 452 (Md. 1946) ("Where directors commit a breach of trust, they are liable to the corporation, not to its creditors or stockholders, and any damages recovered are assets of the corporation*, and the equities of the creditors and stockholders are sought and obtained through the medium of the corporate entity.*") (emphasis added); <u>Danielewicz v. Arnold</u>, 769 A.2d 274, 281-82 (Md. App. 2001) (explaining that principles set forth in <u>Waller</u> are "well-settled law" in Maryland); <u>Jolly Roger Fund LP v. Sizeler Property Investors, Inc.</u>, C.A. No. RDB 05-841, 2005 WL 2989343, at *6 (D. Md. Nov. 3, 2005) (under Maryland law, "an action that causes harm to a corporation and incidentally injures shareholders by diminishing or destroying the value of their stock *is not a direct action*") (emphasis added) (citing <u>Waller</u>, 49 A.2d at 452)).

Here, the three counts in the Duplicative Complaints that name the Outside Directors admittedly are claims for breach of fiduciary duty or were brought on behalf of the Company,[13] and, therefore, are derivative under Maryland law. As a result, pursuant to black-letter law discussed below, the Duplicative Complaints must be dismissed because Plaintiffs have lost standing to pursue such derivative claims.

---

[13] <u>See, e.g.</u>, Lemon Bay ¶¶ 128-29; Benoit ¶¶ 129-30 (Count IV: "The MBNA Individual Defendants *owed and owe MBNA fiduciary obligations*" and they "breached their *fiduciary duties* of care, loyalty, reasonable inquiry, oversight, good faith and supervision.") (emphasis added); Lemon Bay ¶ 144; Benoit ¶ 145 (Count VI:: "[t]he MBNA Director Defendants *breached their duty of entire fairness*") (emphasis added); Lemon Bay ¶ 154; Benoit ¶ 155 (Count VII: "[t]he Director Defendants breached their <u>Revlon</u> Duties").

**D.     By Virtue Of The Merger, Plaintiffs Have Lost Standing To Pursue     Their Claims Against The Outside Directors.**

It is well-settled under Maryland law, pursuant to the "contemporaneous ownership" rule, that a stockholder suing derivatively must demonstrate actual ownership of shares in the corporation, both at the time of the alleged wrongs and during the litigation.  See, e.g., Ettridge v. TSI Group, Inc., 548 A.2d 813, 817-18 (Md. 1988) (describing contemporaneous ownership rule under Maryland law, noting that it "has been codified in federal practice at Fed. Rule Civ. Proc. 23.1(1), and has been followed by most of the states"); Danielewicz, 769 A.2d at 281-82 (affirming decision that vested remainder interest did not confer standing to pursue derivative claims because plaintiff lacked possessory interest at the time of the alleged wrong). Thus, a plaintiff who owns stock in a Maryland corporation loses standing to pursue derivative claims when that plaintiff ceases to be a shareholder – *including by reason of a merger*.  See, e.g., Ettridge, 548 A.2d at 817-18; Danielewicz, 769 A.2d at 281-82; see also Lewis v. Anderson, 477 A.2d 1040, 1046, 1049 (Del. 1984) (holding that because derivative standing is dependent upon the ownership of stock, "[a] plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit"); In re First Interstate Bancorp Consol. S'holder Litig., 729 A.2d 851, 868 (Del. Ch. 1998) (holding that plaintiff stockholders' ability to pursue derivative claims on behalf of First Interstate was extinguished as a result of a stock-for-stock merger with Wells Fargo); Porter v. Texas Commerce Bancshares, Inc., C.A. No. 9114, 1989 WL 120358, at *5 (Del. Ch. Oct. 12, 1989) (holding that a "merger in which a corporation's shareholders received stock in another

corporation, other securities or cash, *will **always** result in termination of the right of the pre-merger shareholders to sue on behalf of the company*") (emphasis added).[14]

Therefore, by virtue of the Merger, Plaintiffs have lost standing to pursue the derivative claims here, a fact that Plaintiffs concede. (Lemon Bay ¶ 91; Benoit ¶ 92 ("Upon completion of the Merger between MBNA and Bank of America . . . MBNA's derivative claims passed by operation of law to Bank of America, the surviving corporation.")) For this reason, the Duplicative Complaints should be dismissed in their entirety as to the Outside Directors.

In an attempt to avoid this result, Plaintiffs have concocted two arguments for why the black-letter principle established by the contemporaneous ownership rule should be ignored.[15] *First*, Plaintiffs contend that Defendants agreed to the Merger solely to "escape liability" for their derivative claims. (Lemon Bay ¶ 82; Benoit ¶ 83) Plaintiffs, however, offer no alleged factual support for this conclusion, and it is well-settled that conclusory allegations do not suffice to avoid the standing requirement of the contemporaneous ownership rule. Lewis v. Ward, 852 A.2d 896, 905 (Del. 2004) (holding that the "particularized pleading requirement of Rule 9(b) must be satisfied by a derivative complaint that seeks to invoke the fraud exception in Lewis v. Anderson"). Moreover, Plaintiffs' conclusory claim is belied by the Duplicative Complaints, which clearly allege that the MBNA Board *turned down* an earlier offer from

---

[14]  Where appropriate, Maryland courts will consider the expertise of the Delaware courts on questions of corporate law. See, e.g., Jolly Roger, 2005 WL 2989343, at *3 ("With respect to corporate governance issues, Maryland courts often look to Delaware caselaw.").

[15]  It appears that Plaintiffs are attempting to invoke the two recognized exceptions *under Delaware law* to the iron-clad rule that a shareholder of a merger entity loses standing to assert pre-merger derivative claims –  (i) where the merger itself is the subject of a claim of fraud (i.e., designed solely for the purpose of avoiding director liability), or (ii) where the merger is, in reality, merely a reorganization that does not affect plaintiffs' ownership in the business enterprise. See Lewis v. Anderson, 477 A.2d at 1046 n.10.

Wachovia before accepting the BAC offer.  (Lemon Bay ¶ 78; Benoit ¶ 79)  This allegation is inconsistent with Plaintiffs' theory that Defendants, including the Outside Directors, agreed to the Merger solely to avoid derivative liability.

       *Second*, to the extent Plaintiffs contend that receipt of BAC stock in connection with the Merger somehow permits them to circumvent the "contemporaneous ownership" rule and continue to pursue derivative claims against the MBNA directors on behalf of BAC, Delaware courts have conclusively rejected this claim, and the same result should be reached here.  See, e.g., First Interstate, 729 A.2d at 867 (rejecting argument that receiving stock in a merger invoked exception to the standing rule; holding that such an exception "would not apply to mergers with outside or pre-existing corporations with substantial assets").[16]

      **E.**    **Plaintiffs Have Not Alleged That Demand Was Excused.**

       Plaintiffs appear to have abandoned their claim that demand upon the MBNA board of directors would have been futile.  This is most likely because Plaintiffs have conceded that, by virtue of the Merger, "MBNA's derivative claims [have] passed by operation of law to Bank of America, the surviving corporation."  (Lemon Bay ¶ 91; Benoit ¶ 92).

       Even if the Court were to conclude that receiving shares of BAC stock was sufficient to provide Plaintiffs with continued standing to pursue their claims (which it should not), Plaintiffs have also failed to show why demand on the BAC Board would be excused.  By

---

[16]  In fact, under Delaware law, a stock-for-stock merger with a large public company, such as BAC, results in the application of the contemporaneous ownership rule, and deprives Plaintiffs of standing to pursue derivative claims – whether or not they continue on as stockholders of the acquiring company.  See, e.g., In re First Interstate Bancorp Consol. S'holder Litig., 729 A.2d at 867 (holding that plaintiff stockholders' ability to pursue derivative claims on behalf of First Interstate was extinguished as a result of a stock-for-stock merger with Wells Fargo); see also Lewis, 852 A.2d at 903-04 (rejecting plaintiffs' request to ignore application of contemporaneous ownership rule in context of stock-for-stock mergers).

any standard – and, here, the demand futility test relating to the BAC Board would have to be considered under Delaware law, because BAC is a Delaware company – Plaintiffs have not shown that demand is futile.  See Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984); Fed. R. Civ. P. 23.1 (requiring plaintiff to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action [the plaintiff] desires from the directors . . . and the reasons for [the plaintiff's] failure to obtain the action or for not making the effort").  Other than making the conclusory allegation that the "BAC Board has already pre-judged the merits of this action" (Lemon Bay ¶ 93; Benoit ¶ 94), Plaintiffs offer absolutely no particularized allegations about any of BAC's directors that support the notion that they are unable to consider fairly any demand.  In fact, Plaintiffs do not allege any specific facts that raise a reasonable doubt as to the independence or disinterestedness of the seventeen BAC board members.  See, e.g., Pogostin v. Rice,  C.A. No. 6235, 1983 WL 17985, at *3 (Del. Ch. Aug. 12, 1983) (dismissing complaint where "Plaintiffs did not allege any facts," particularized or otherwise, that established that demand on the board was futile), aff'd, 480 A.2d 619 (Del. 1984).

Instead, Plaintiffs' lone attempt to argue that a demand on the BAC Board would be futile is based on their allegation that the BAC board of directors could not pursue the claims Plaintiffs have asserted here because it "agreed to indemnify and hold harmless each present and former director, officer and employee of MBNA from liability and exculpation. . .  to the fullest extent provided by applicable law, the MBNA articles of incorporation and the MBNA bylaws." (Lemon Bay ¶ 94; Benoit 95)  Plaintiffs' reasoning fails as a matter of fact and law.

*First*, written indemnity and insurance obligations do not "preordain that the Board would reject a demand that otherwise had merit."  Grobow v. Perot, 526 A.2d 914, 925 n.14 (Del. Ch. 1987) (granting motion to dismiss for failure to plead demand futility, holding that

22

"[i]ndemnification as an adjunct to a business transaction is not illegal or necessarily imprudent. The corporation's obligation to indemnify a director is not unlimited. Accordingly, it would be incorrect to conclude that the mere presence of the indemnity provision in the buy-out agreement would [contractually obligate] the Board [to] reject a demand that otherwise had merit."), aff'd, 539 A.2d 180 (Del. 1988).

Second, the specific language upon which Plaintiffs rely to support their assertion is the typical boilerplate indemnification language found in any standard merger agreement. See Merger Agreement at Section 6.7: Indemnification; Directors' and Officers' Insurance; relevant excerpt attached hereto as Ex. D; see also In re Talley Indus., Inc. S'holders Litig., C.A. No. 15961, 1998 WL 191939, at *4 n.1 (Del. Ch. Apr. 13, 1998) (recognizing as "typical" and "common[]" the exculpation, indemnification and insurance provisions included in merger agreement). Notably absent from that passage is any mention of these Plaintiffs or their specific claims, as Plaintiffs would have the Court believe. Plaintiffs have no basis to suggest that their lawsuit was the sole impetus for the inclusion of Section 6.7 in the Merger Agreement. In fact, if the boilerplate language of Section 6.7 were really meant to always prohibit the board of the surviving corporation from ever bringing a derivative claim against directors and officers of the absorbed entity, then the futility exception always would swallow the demand rule in the stock-for-stock context. See, e.g., In re Prudential Ins. Co. Derivative Litig., 659 A.2d 961, 973 (N.J. Super. Ct. App. Div. 1995) ("[R]outine excuse of demand based on the existence of such standard exclusions would eviscerate the demand requirement. . . . Pleading that the board would be swayed by the existence of the afore-mentioned policies is insufficient to show lack of director interest."). Therefore, Plaintiffs' assertion that the BAC Board, by indemnifying MBNA's directors and officers, specifically contracted away its ability to bring suit on the very

claims asserted in the Duplicative Actions should be rejected.  (Lemon Bay ¶ 94; Benoit ¶ 95)

For these reasons, Plaintiffs have not shown that demand was futile, and the Duplicative Complaints should be dismissed.

## III.    IN THE ALTERNATIVE, THE DUPLICATIVE COMPLAINTS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.

As explained above, there are powerful reasons why the Court should dismiss the claims against the Outside Directors without reaching the merits of those claims.  However, to the extent the Court does consider the merits, each of the counts of the Duplicative Complaints that name the Outside Directors – Counts Four, Six and Seven –  should also be dismissed for failure to state a claim.

### A.    Conclusory Breach Of Fiduciary Duty Allegations Fail To State A Claim.

Under Maryland law, directors –  such as the Outside Directors here – are entitled to a presumption that they have "acted in good faith and in the best interests of the corporation." Wittman v. Crooke, 707 A.2d 422, 425 (Md. Ct. Spec. App. 1998);  Danielewicz, 769 A.2d at 296 (Maryland law is "well established that courts generally will not interfere with the internal management of a corporation and that the conduct of the corporation's affairs are placed in the hands of the board of directors and if the majority of the board properly exercises its business judgment, the directors are not ordinarily liable") (citations omitted).

This "business judgment" presumption is expressly codified in Maryland's Corporate Code.  Section 2-405.1 of the MCC provides that a director "is presumed to satisfy the standards of subsection (a) of this section," which requires directors to perform their duties "(1) in good faith, (2) in a manner [the director] reasonably believes to be in the best interest of the corporation, and (3) with the care that an ordinarily prudent person in a like position would use under similar circumstances."  Md. Code Ann., Corps. & Ass'ns § 2-405.1(a, e); see also Hudson

v. Prime Retail, Inc., C.A. No. 24-C-03-5806, 2004 WL 1982383, at *1 (Md. Cir. Ct. Apr. 1, 2004) (recognizing Maryland business judgment rule as set forth in Section 2.405).

In order to properly allege a claim for breach of fiduciary duty, a plaintiff must allege facts sufficient to rebut this statutory business judgment presumption; conclusory allegations do not suffice. See, e.g., Hudson, 2004 WL 1982383, at *14 (dismissing breach of fiduciary duty claim because the amended complaint contained conclusory allegations with no allegations of fact); Century Nat'l Bank v. Makkar, 751 A.2d 1, 6 (Md. Ct. Spec. App. 2000) (affirming dismissal of claims where no factual allegations were alleged, only "bare conclusory assertion[s]"); see also Ferguson v. Cramer, 695 A.2d 603, 605, 609 (Md. Ct. Spec. App. 1997) ("The Court, however, need not consider conclusory charges which have no factual support."), aff'd, 709 A.2d 1279 (Md. 1998); Valentine v. On Target, Inc., 686 A.2d 636, 641 (Md. Ct. Spec. App. 1996) (affirming dismissal of complaint that asserted "no facts beyond bald conclusory allegations"), aff'd, 727 A.2d 947 (Md. 1999).[17]

Here, the Duplicative Complaints contain only the most conclusory allegations of wrongdoing against the Outside Directors. In fact, the Duplicative Complaints are most notable for what they do *not* allege. For example, Plaintiffs have not alleged adequately that the Outside Directors received any personal benefit from their approval of the Merger, or that they lacked independence. In fact, the Duplicative Complaints fail to allege *any* facts that establish that a

---

[17]   Similarly, under Delaware law, decisions made by an independent, disinterested board of directors are protected by the "business judgment rule," and the burden of rebutting that presumption falls on the party challenging the decision. See, e.g., Aronson, 473 A.2d at 812. The business judgment rule "creates a powerful presumption in favor of actions taken by . . . directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be 'attributed to any rational business purpose.'" In re Encore Computer Corp. S'holders Litig., C.A. No. 16044, 2000 WL 823373, at *5 (Del. Ch. June 16, 2000) (quoting Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. 1993)).

*majority of the Outside Directors* acted disloyally (i.e., by having a material self-interest in the transaction) or failed to act independently or in good faith in connection with the Merger. As a result, any breach of fiduciary duty claims relating to the Merger – Counts Six and Seven – should be dismissed. McMillan, 768 A.2d at 496 (dismissing complaint that alleged "no facts from which a reasonable inference can be drawn that any conflicting self-interest or bad faith motive caused the defendant directors to fail to meet their obligations"); In re Freeport-McMoran Sulphur, Inc. S'holders Litig., C.A. No. 16729, 2001 WL 50203, at \*5 (Del. Ch. Jan. 11, 2001) (explaining that dismissal was warranted where plaintiff failed to rebut business judgment presumption with particularized allegations establishing that a majority of the board was interested in the transaction).[18]

Moreover, Plaintiffs have failed to allege any specific facts that establish that any of the Outside Directors sold *any* securities (based on inside information or otherwise); committed mismanagement or waste; made any misstatements or omissions to the public; or ignored red flags about MBNA's financial condition at any time. As discussed further below, claims unsupported by such factual allegations should fail.

### 1. Plaintiffs' conclusory allegations of mismanagement and lack of oversight fail to state a claim.

In Count Four, Plaintiffs allege that the Outside Directors breached their fiduciary duties by failing to properly oversee the affairs of the Company. A fiduciary oversight claim is

---

[18] Even if the Complaint sufficiently alleged that *certain* Defendants were improperly conflicted – which it plainly does not – Defendants are still entitled to the benefit of the business judgment rule because the Merger was approved by a *majority* of disinterested Directors. See In re Frederick's of Hollywood, Inc. S'holders Litig., C.A. No. 15944, 2000 WL 130630, at \*7 (Del. Ch. Jan. 31, 2000) (dismissing duty of loyalty claim because plaintiff alleged that only one of four directors was interested and because the challenged merger was approved by a majority of disinterested directors).

"possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959, 967 (Del. Ch. 1996). Only a "sustained or systematic failure of the board to exercise oversight" – such as an utter failure to attempt to assure that a reasonable information and reporting system exists or a conscious disregard of "red flags" that would have alerted the directors to the alleged wrongdoing – will establish the lack of good faith that is a necessary condition to liability. See id. at 971; Stone v. Ritter, 911 A.2d 362, 364 (Del. 2006). Plaintiffs do not come close to satisfying this standard.

From what can be discerned from the Duplicative Complaints, Plaintiffs' claims appear to be premised on the strained theory – which was taken directly from the Securities Complaint – that the MBNA directors, including the Outside Directors, should have realized that the Company was not going to perform as well as expected in the first quarter of 2005 when the Company announced its *annual* projections in January 2005 (or shortly thereafter). However, the Duplicative Complaints are utterly devoid of allegations concerning what specific, material information the Outside Directors knew during the Class Period, when or how they knew or should have known about such information or how that information was contrary to information already discussed publicly. Most importantly, Plaintiffs allege *no connection* between the purportedly offending statements made in January 2005 and the Outside Directors.

Ultimately, the best Plaintiffs can muster to support their claims of lack of oversight are boilerplate allegations concerning the Outside Directors' positions as directors and their general access to Company documents. (Lemon Bay ¶¶ 30-38, 40; Benoit ¶¶ 30-38, 41, repeatedly alleging "[b]ecause of [Defendant's] position, he knew"). This does not suffice. See, e.g., Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc., C.A. No. 13389, 1996 WL 506906, at *14 (Del. Ch. Sept. 3, 1996) (holding that to prevail on a claim

27

for gross mismanagement or gross negligence, a plaintiff must "plead and . . . prove that [the defendant] was 'recklessly uninformed' or acted 'outside the bounds of reason'"), aff'd mem., 692 A.2d 411 (Del. 1997); Guttman v. Huang, 823 A.2d 492, 507 (Del. Ch. 2003) (dismissing claim for lack of oversight because plaintiffs failed to allege that directors had knowledge of, or were on notice of, any "red flags" related to the company's financial controls); In re Citigroup Inc. S'holders Litig., C.A. No. 19827, 2003 WL 21384599, at *2 (Del. Ch. June 5, 2003) (red flags "are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer"), aff'd mem. sub nom. Rabinovitz v. Shapiro, 839 A.2d 666 (Del. 2003); Rattner v. Bidzos, C.A. No. 19700, 2003 WL 22284323, at *13 (Del. Ch. Sept. 30, 2003) (dismissing lack of oversight claims, quoting Citigroup for the same proposition).

     Thus, Count Four of the Duplicative Complaints should be dismissed. [19]

---

[19]   It seems that Plaintiffs have dropped their baseless allegation that the Outside Directors committed waste by paying incentive-based bonuses to certain MBNA executive officers. To the extent Plaintiffs argue otherwise, such claim lacks merit and must be dismissed. Maryland courts have embraced Delaware's stringent standard for waste claims, holding that to state a claim, a plaintiff must show that "what the corporation has received 'is so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid.'"  Werbowsky, 766 A.2d at 139 (citing Grobow v. Perot, 539 A.2d 180, 189 (Del. 1998)); Official Comm. Of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins, C.A. No. 20228-NC, 2004 WL 1949290, at *17 (Del. Ch. Aug. 24, 2004) ("Waste is a standard rarely satisfied in Delaware courts.").  Here, Plaintiffs' allegations do not come close to stating a claim under this standard.  Moreover, the incentive compensation about which Plaintiffs complain was admittedly established *before* the Merger. See, e.g., Nebenzahl v. Miller, C.A. No. 13206, 1993 WL 488284, at *3, 4 (Del. Ch. Nov. 8, 1993) (rejecting plaintiffs' contention that payments set forth in a merger agreement evidenced a breach of duty where compensation was set pre-merger).

**B.     Plaintiffs' Attack On The Merger Process Should Fail.**

**1.     Plaintiffs' reliance on <u>Revlon</u>, <u>Unocal</u> or any other heightened form of judicial scrutiny of director conduct should be rejected.**

Under the Maryland Corporate Code, "an act of a director relating to or affecting an acquisition or a potential acquisition of control of a corporation may not be subject to a higher duty or greater scrutiny than is applied to any other act of a director." Md. Code Ann., Corps. & Ass'ns § 2-405.1(f). As the court in <u>Hudson v. Prime Retail</u> explained: "*in Maryland[,] the business judgment rule applies even to directors' change-in-control decisions.*" 2004 WL 1982383, at *11 n.13 (emphasis added); <u>see also</u> <u>Jasinover v. Rouse Co.</u>, C.A. No. 13-C-04-59594, 2004 WL 3135516, at *9 (Md. Cir. Ct. Nov. 4, 2004) ("A director's acts in connection with [maximizing shareholder value] are 'presumed to satisfy the standards' established by Section 2-405.1(a), and 'may not be subject to a higher duty of greater scrutiny than is applied to any other act of a director.'") (citations omitted); James J. Hanks, Jr., <u>Maryland Corporation Law</u> § 6.6[b] n.105h ("The decisions of the Supreme Court of Delaware in <u>Unocal</u> . . . and <u>Weinberger v. UOP, Inc.</u> . . . should not be applied in Maryland."); Kenneth B. Abel, <u>The Maryland Corporation: Legal Aspects of Organization & Operation</u> § VI(H) (2004) (Section 2-405.1 of the Maryland Corporate Code "negates the applicability of the <u>Unocal</u> and <u>Revlon</u> standards in Maryland").

Plaintiffs ignore this well-settled principle of Maryland corporate law, and instead ask this Court to review the MBNA Board's actions in connection with the Merger pursuant to the heightened forms of judicial scrutiny imposed under the seminal Delaware cases of <u>Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.</u>, 506 A.2d 173 (Del. 1985), and <u>Unocal Corp. v. Mesa Petroleum Co.</u>, 493 A.2d 946 (Del. 1985). (Lemon Bay ¶¶ 152-54, 158; Benoit ¶¶ 153-55, 159) But, as explained above, Maryland law does not recognize these heightened standards of

29

review, and, thus, Count Seven, which is premised entirely on such heightened standards, should be dismissed.

Even under <u>Revlon</u> – assuming it applied under Maryland law, which it does not – Plaintiffs' claim that the MBNA directors breached their fiduciary duties by failing to conduct an auction should fail.  (Lemon Bay ¶ 154; Benoit ¶ 155)  It is well-understood that there is "no single blueprint" for directors to follow in fulfilling so-called <u>Revlon</u> duties, and such duties "do not demand that every change in control of a Delaware corporation be preceded by a heated bidding contest."  <u>See, e.g.</u>, <u>Barkan v. Amsted Indus., Inc.</u>, 567 A.2d 1279, 1286 (Del. 1989); <u>Herd v. Major Realty Corp.</u>, C.A. No. 10707, 1990 WL 212307, at *9 (Del. Ch. Dec. 21, 1990) (dismissing <u>Revlon</u> claim and finding directors' failure to conduct auction or market check was not unreasonable); <u>Freedman v. Rest. Assocs. Indus.</u>, C.A. No. 9212, 1990 WL 135923, at *6 (Del. Ch. Sept. 19, 1990) (dismissing <u>Revlon</u> claim that directors breached fiduciary duties by failing to conduct auction).

> **2.    Plaintiffs' allegations that the Outside Directors failed to obtain the highest Merger price do not state a claim under Maryland law.**

Putting aside Plaintiffs' attempt to impermissibly graft onto Maryland corporate law the heightened standards of review employed in Delaware, Plaintiffs' allegations fall far short of the mark for stating a claim for breach of fiduciary duty.  Plaintiffs' claims fail as a matter of Maryland law for several reasons.

*First*, as explained above, decisions made by an independent, disinterested board of directors are protected by the business judgment presumption.  <u>See, e.g.</u>, <u>Danielewicz</u>, 769 A.2d at 296 (Maryland law is "well established that courts generally will not interfere with the internal management of a corporation and that the conduct of the corporation's affairs are placed in the hands of the board of directors and if the majority of the board properly exercises its

business judgment, the directors are not ordinarily liable").  Here, Plaintiffs fail to allege *any*

facts that establish that a *majority of the Outside Directors* acted disloyally or failed to act

independently or in good faith in connection with the Merger.  See, supra, Part III.A.

      *Second*, Plaintiffs' anemic attempts to rebut the business judgment presumption

should fail.  Plaintiffs allege that the directors "disregarded their duty to get the highest price

from all possible bidders for MBNA" (Lemon Bay ¶ 155; Benoit ¶ 156), a duty Plaintiffs

describe as "that of an auctioneer."  (Lemon Bay ¶ 158; Benoit ¶ 159, see also Lemon Bay ¶ 153;

Benoit ¶ 154 ("When Revlon Duties arise, the board has a duty to . . . auction the company

fairly."))  However, even if Plaintiffs' allegations had some basis in fact, Plaintiffs' claim would

fail as a matter of Maryland law.

      As the Jasinover court stated recently:

> Maryland law is less restrictive than the view of Delaware law that
> Plaintiff espouses.  ***Maryland does not require an auction when***
> ***the decision is made to sell a corporation.***  There is no
> requirement that the Board fully shop the company to multiple
> bidders and have a so-called 'level playing field' for all bidders.
> There will be a need to market-check or test the Board's decision,
> but the Board is free to lock up an attractive deal and use post-
> agreement methods to do so.

2004 WL 3135516, at *9 (emphasis added); see also Hudson, 2004 WL 1982383, at *16

(directors have no duty to obtain highest value reasonably available for shareholders).

      Under Maryland law, the MBNA Board was free to enter into – and lock up  –  an

agreement with BAC if it viewed it as an "attractive" deal for the shareholders.  Jasinover, 2004

WL 3135516, at *8-9 ("[T]he Board is free to lock up an attractive deal.. . .").[20]  The Merger

---

[20]  For this reason, Plaintiffs' allegations relating to certain provisions in the Merger Agreement
fall wide of the mark.  See, e.g., Lemon Bay ¶ 154; Benoit ¶ 155 ("The Director Defendants
breached their Revlon Duties . . .by agreeing to a 'no shop' provision in the merger

*(cont'd)*

31

need "not have been the 'perfect deal' or even the 'best deal,'" but it was a reasonable deal, and that is all Maryland law requires.  <u>Id.</u> at *10.  Other than stating in the most conclusory fashion that the director defendants agreed "to sell MBNA at a potentially unfair price" (Lemon Bay ¶ 144; Benoit ¶ 145), Plaintiffs do not – because they cannot – allege facts to support that BAC did not pay a "reasonable" price for MBNA.  This fails to state a claim, even under Delaware law. <u>Lewis v. Leaseway Transp. Corp.</u>, C.A. No. 8720, 1990 WL 67383, at *5 (Del. Ch. May 16, 1990) (dismissing complaint alleging only that merger price was unfair); <u>Porter</u>, 1989 WL 120358, at *5  ("[P]laintiffs' repeated allegations of the inadequacy of the merger price do not themselves create a claim . . . ."); <u>Globis Partners., L.P. v. Plumtree Software, Inc.</u>, C.A. No. 1577-VCP, 2007 Del. Ch. LEXIS 169 (Del. Ch. Nov. 30, 2007) (dismissing claim that directors breached their fiduciary duties by agreeing to sell the company for an inadequate price).

Any suggestion that MBNA failed to conduct a market check before entering into the Merger Agreement with BAC is likewise insufficient to state a claim.  (Lemon Bay ¶ 154; Benoit ¶ 155)  Plaintiffs repeatedly allege in their Duplicative Complaints facts that preclude them from credibly making this argument.  (<u>See, e.g.</u>, Lemon Bay ¶ 75; Benoit ¶ 76 (admitting that certain directors met to discuss "[p]ossible strategic alternatives . . . including hypothetical scenarios involving a business combination"); Lemon Bay ¶¶ 3, 78; Benoit ¶¶ 3, 79 (acknowledging MBNA's consideration of a potential deal with Wachovia); Lemon Bay ¶ 3; Benoit ¶ 3 (conceding that to "effect a sale of the Company," "MBNA retain[ed] Joseph Perella, a noted investment banker . . . [as well as] UBS Inc. as MBNA's investment advisor"))  Moreover, the members of the MBNA Board met with MBNA management, their financial

_____

*(cont'd from previous page)*
  agreement. . . and by granting Bank of America an option to acquire up to approximately
  249.8 million shares of MBNA common stock.")

advisors and their outside counsel to discuss strategic alternatives. (Lemon Bay ¶ 75; Benoit ¶ 76) Maryland law is clear that "[i]n performing his duties, a director is entitled to rely on any information, opinion, report, or statement" presented by the kind of experts on which the Outside Directors here relied. Jasinover, 2004 WL 3135516, at *9, citing Md. Code Ann., Corps. & Ass'ns § 2-405.1(b)(1).

Nor do Plaintiffs get traction by arguing that the Merger process was defective because Hammonds "wanted to find a strategic buyer for the Company which would [ensure] . . . Hammonds himself would retain an executive position of influence, [and] Hammonds' close friends would be offered employment in the new entity." (Lemon Bay ¶ 2; Benoit ¶ 2) As Maryland's highest court made clear in Wittman, allegations relating to future employment are insufficient to rebut the business judgment presumption. See 707 A.2d at 425 ("The fact that many of the appellees were likely to become directors of the new corporation did not justify judicial intervention.").

Equally unhelpful is Plaintiffs' argument that the Merger negotiations were unfair because Hammonds allegedly negotiated the deal with BAC by himself. (See, e.g., Lemon Bay ¶ 4; Benoit ¶ 4) It is not uncommon for one person – sometimes the Chief Executive Officer – to take the lead in negotiations with a potential merger partner. See, e.g., In re MONY Group Inc. S'holder Litig., 852 A.2d 9, 20 (Del. Ch. 2004) (rejecting, even under more stringent Delaware standards, plaintiffs' "lone wolf" theory that since "the Board relied upon [its CEO] to determine and explore alternatives it breached its fiduciary duties," because "[a] board appropriately can rely on its CEO to conduct negotiations"); In re Toys "R" Us, Inc. S'holder Litig., 877 A.2d 975, 1003 (Del. Ch. 2005) (rejecting plaintiffs' contention that transaction was somehow tainted because CEO, an inside director, played a significant role throughout the search and negotiation

process with potential suitors).[21]  Moreover, even if Hammonds (or any other insider director) was conflicted in connection with the Merger, that "conflict" does not taint the decision of a majority of disinterested and independent directors, nor change that the business judgment presumption still applies to protect their decision.  See, e.g., Cede & Co. v. Technicolor, 634 A.2d 345, 363 (Del. 1993) ("This Court has never held that one director's colorable interest in a challenged transaction is sufficient, without more, to deprive a board of the protection of the business judgment presumption of loyalty.") (emphasis in original); In re Frederick's of Hollywood, Inc. S'holders Litig., C.A. No. 15944, 2000 WL 130630, at *7 (Del. Ch. Jan. 31, 2000) (dismissing duty of loyalty claim because plaintiff alleged that only one of four directors was interested and because the challenged merger was approved by a majority of disinterested directors).

> **3.  The Merger claims fail because the Merger was ratified by the MBNA shareholders after full and fair disclosure.**

Additionally, because the shareholders were fully and adequately informed when they voted to approve the Merger, the actions of the MBNA Board in connection with the Merger have been ratified by the shareholders, and thus, the Merger-related claims have been extinguished.  See, e.g., Wittman, 707 A.2d at 425-26 (dismissing merger-related claims, finding that defendants could not be liable for acts ratified by the shareholders where defendants had made shareholders aware of any interest they may have had in the transaction –  including that

---

[21]  Plaintiffs also erroneously argue that Hammonds made a false and misleading statement "in derogation of [his] duty of candor and his Revlon duties" when he allegedly told "Business Week" that there was "no 'For Sale' sign on MBNA's Wilmington (Del.) headquarters." (Lemon Bay ¶ 155; Benoit ¶ 156)  First, Plaintiffs' reliance on Hammonds' "Revlon duties" ignores, once again, the aforementioned distinctions between Maryland and Delaware law. Second, there was in fact no "For Sale" sign on MBNA's headquarters, and Plaintiffs do not offer any allegations to suggest otherwise.

defendants would be directors in the surviving company); Hudson, 2004 WL 1982383, at *15-16 (affirming dismissal based on ratification, because "the process by which the directors arrived at the merger consideration and allocation [was] disclosed in the proxy materials" before shareholder vote).

For all of these reasons, Counts Six and Seven should be dismissed as to the Outside Directors.

### C.     The Duplicative Complaints Should Be Dismissed In Their Entirety Because The Outside Directors Are Not Subject To Liability For Money Damages.

The Maryland General Corporation Law permits every Maryland corporation to include in its charter a provision "expanding or limiting the liability of its directors and officers to the corporation or its stockholders as described under section 5-418 of the Courts and Judicial Proceedings Article."  Md. Code Ann., Corps. & Ass'ns § 2-405.2.  Section 5-418 states that a corporation's charter "may include any provision expanding or limiting liability of its directors or officers to the corporation or its stockholders for money damages, with only two exceptions:  (i) actual receipt of an improper benefit or profit in money, property, or services, and (ii) active and deliberate dishonesty."  Md. Code Ann., Cts. & Jud. Proc. § 5-418.  In other words, Section 5-418 allows a corporation in its charter to insulate directors from liability stemming from *all claims short of fraud.* [22]  See Hanks, Jr., Maryland Corporation Law at § 6.9.

Article VII of the MBNA Charter imposes the maximum possible limitation under Maryland law on directors' potential liability for money damages.  (Ex. E)  Specifically, Article VII(a) provides that "[t]o the fullest extent that limitations on the liability of directors and

---

[22]   Maryland's director exculpation statute provides even greater protection than Delaware's statute, which permits corporations to eliminate monetary liability on the part of directors only for breaches of the duty of care.  See 8 Del. C. § 102(b)(7).

officers are permitted by the Maryland General Corporation Law, no director or officer of the

Corporation shall have any liability to the Corporation or its stockholders for damages.  This

limitation on liability applies to events occurring at the time a person serves as director or officer

of the Corporation whether or not such person is a director or officer at the time of any

proceeding in which liability is asserted."  (Id.)

Plaintiffs describe their "claims" against the Outside Directors for money

damages in many different ways – alternately purporting to allege breaches of duties of care,

loyalty, candor, disclosure, oversight and more.  (See, e.g., Lemon Bay ¶¶ 129, 144, 151; Benoit

¶¶ 130, 145, 152)  Critically, fraud was not among them.  As a result, all of Plaintiffs' claims

against the Outside Directors fall within the protections offered by Article VII(a) of the MBNA

Charter, and should therefore be dismissed.  See Grill, 771 F. Supp. at 712 (dismissing waste and

mismanagement claims that did not constitute "situations involving 'active and deliberate

dishonesty"); see also Knox v. Rosenberg, No. H-99-0123, slip op. at 17 (S.D. Tex. Sept. 28,

1999) (dismissing mismanagement claims against directors of a Maryland corporation because

complaint contained no allegations of improper benefit or profit involving money, property or

services, or active and deliberate dishonesty); Hayes v. Crown Cent. Petroleum Corp., 249 F.

Supp. 2d 725, 734 (E.D. Va. 2002) (dismissing claim against Maryland directors that price

received in merger was inadequate, noting that plaintiff stockholders "failed to plead facts

suggesting either improper benefit or profit or active and deliberate dishonesty which would

defeat application of the charter provision"), aff'd, 78 Fed. Appx. 857 (4th Cir. 2003).

## CONCLUSION

For the foregoing reasons, the Outside Directors respectfully request that all claims against them be dismissed.

|  |  |
|---|---|
|  | */s/ Edward P. Welch* |
|  | Edward P. Welch (I.D. No. 671) |
|  | Edward B. Micheletti (I.D. No. 3794) |
|  | SKADDEN, ARPS, SLATE, |
|  |     MEAGHER & FLOM LLP |
| *Of The New York Bar*: | P.O. Box 636 |
| Jay B. Kasner | One Rodney Square |
| Susan L. Saltzstein | Wilmington, Delaware  19899 |
| SKADDEN, ARPS, SLATE, | Tel.: (302) 651-3000 |
|     MEAGHER & FLOM LLP | Fax: (302) 651-3001 |
| 4 Times Square | E-mail:  ewelch@skadden.com |
| New York, New York  10036-6522 |  |
| Tel.: (212) 735-3000 | *Attorneys for the MBNA Outside Director Defendants* |

DATED:  April 17, 2008

# EXHIBIT A

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ONE RODNEY SQUARE
P.O. BOX 636
WILMINGTON, DELAWARE 19899-0636
───
TEL: (302) 651-3000
FAX: (302) 651-3001
www.skadden.com

DIRECT DIAL
(302) 651-3220
DIRECT FAX
(302) 651-3001
EMAIL ADDRESS
Edward.Micheletti@skadden.com

FIRM/AFFILIATE OFFICES
───
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

March 27, 2008

**HAND DELIVERY**

Pamela S. Tikellis
Chimicles & Tikellis LLP
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
(302) 656-2500

Re: *Benoit v. Hammonds, et al.*, 07-CV-561-GMS;
    *Lemon Bay Partners v. Hammonds, et al.*, 07-CV-562-GMS

Dear Ms. Tikellis:

      We write in connection with the above-titled actions. Yesterday, the Court denied Plaintiffs' motion for reconsideration of the dismissal of the original *Benoit* and *Lemon Bay Partners* consolidated derivative action (C.A. No. 05-CV-327-GMS). Accordingly, we hereby request that you voluntarily withdraw the virtually identical claims asserted against our clients in the above-titled actions.

      Among other reasons, they are subject to dismissal on *res judicata* grounds. *See, e.g., Bromwell v. Michigan Mut. Ins. Co.*, 115 F.3d 208, 212-13 (3d Cir. 1997) ("A dismissal for lack of subject-matter jurisdiction, while 'not binding as to all matters which could have been raised,' is, however, conclusive as to matters actually adjudged.") (citations omitted); *see also Boone v. Kurtz*, 617 F.2d 435, 436 (5th Cir. 1980) (holding complaint was properly dismissed under the doctrine of *res judicata* where the District Court had already dismissed an almost identical complaint for lack of jurisdiction; noting that "[a]lthough the dismissal of a complaint for lack of jurisdiction does not adjudicate the merits so as to make the case *res judicata* on the substance of the asserted claim, it does adjudicate the court's

Pamela S. Tikellis
March 27, 2008
Page 2


jurisdiction, and a second complaint cannot command a second consideration of the same jurisdictional claims") (emphasis added); *Shaw v. Merritt-Chapman & Scott Corp.*, 554 F.2d 786, 789 (6th Cir. 1977) (holding that plaintiffs were barred from bringing a subsequent suit asserting essentially the same claims and citing the same jurisdictional basis because plaintiff did not appeal the dismissal, stating that while "a dismissal for lack of jurisdiction does not constitute an adjudication upon the merits, it does constitute a binding determination on the jurisdictional question, which is not subject to collateral attack"); *Zoriano Sanchez v. Caribbean Carriers Ltd.*, 552 F.2d 70, 71 (2d Cir. 1977) (citation omitted) (barring second suit arising from identical facts and issues where court had already dismissed a similar action for lack of jurisdiction and finding that new claim asserted by plaintiff did not affect the decision; holding that "[t]he *res judicata* doctrine . . . not only binds the parties and their privies as to grounds or issues actually litigated, but also as to any other admissible matter which might have been offered for that purpose").

Please let us know by the close of business on April 10, 2008, if you will agree to voluntarily withdraw your claims against our clients. If we do not hear from you by that time, we intend to file a motion to dismiss the above-titled actions.


Very truly yours,

Edward B. Micheletti


cc:    Richard H. Morse

# EXHIBIT B

# PASKOWITZ & ASSOCIATES

60 EAST 42ND STREET, 46TH FLOOR
NEW YORK, NEW YORK 10165

TEL. (212) 685-0969 · (800) 705-9529
FAX (212) 685-2306
E-MAIL: CLASSATTORNEY@AOL.COM

April 2, 2008

**By Overnight Mail and E-Mail**
Edward B. Micheletti, Esq.
Skadden Arps Slate Meagher &
Flom, LLP
One Rodney Square
Wilmington, DE 19899

Re:  *Benoit v. Hammonds, et al.,* 07 CV 561 *(GMS)*
     *Lemon Bay Partners v. Hammonds, et al.,* 07CV 562 (GMS)

Dear Ed:

I write on behalf of plaintiffs in response to your March 27, 2008 letter to Pamela Tikellis, Esq.

We ask that you defer any motion based upon the doctrine of *res judicata* for three reasons: (1) Plaintiffs intend to seek appellate review of the District Court's Orders. Deferring your motion until we receive a Third Circuit decision may well allow all parties and the District Court to avoid unnecessary proceedings; (2) such a motion would be contrary to the parties' Joint Stipulation Regarding Scheduling approved by the Court on December 7, 2007, which contemplates the appointment of lead plaintiffs, and lead counsel, and then provides plaintiffs the opportunity to amend the pleadings before any dismissal motions are made; and (3) established Third Circuit law explicitly permits the re-assertion of claims dismissed on jurisdictional grounds where, as here, a new basis is alleged to support the assertion of subject matter jurisdiction.

On the last point, we have previously directed defendants to *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870 (3d Cir. 1972)("jurisdictional dismissals do not bar further litigation of the cause of action when the subsequent complaint cures the jurisdictional defect."), citing, *Etten v. Lovell Manufacturing Company,* 225 F.2d 844, 846 (3d Cir. 1955). *Smith* and *Etten* are not discussed in your letter. *Bromwell v. Michigan Mut. Ins. Co.,* 115 F.3d 208 (3d Cir. 1997) is inapposite because the plaintiff in *Bromwell* returned to federal court with the very same federal claim that had proved unavailing originally. Here, plaintiffs have alleged different bases in their more recent complaints than what was originally alleged.  Where the second complaint contains a different basis for the assertion of jurisdiction, *Bromwell* has no application, as was explained in *Able Bldg. Maint. Co. v. Bd. of Trs. of Gen. Emples. Trust Fund,* 2003 U.S. Dist. LEXIS 20816, at

Edward B. Micheletti, Esq.
April 2, 2008
Page Two

*7-9 (N. D. Cal. Nov. 18, 2003)(discussing the scope and limits of *Bromwell*). The Seventh Circuit has read *Bromwell* in this same limited way. *Okoro v. Bohman,* 164 F.3d 1059, 1063 (7th Cir. 1999).

Given the inapplicability of *Bromwell* to this situation, and for the other reasons discussed above, we urge that you refrain from filing the motion you describe, and await the result of the upcoming appellate review. If you would like to discuss this matter further, I am generally available at your convenience.

Sincerely yours,

Laurence D. Paskowitz

cc: All Counsel (by e-mail)

# EXHIBIT C

Data: Unadjusted
 No data available.

Data: Unadjusted
 No data available.

**KRB, MBNA Corporation**

Daily prices from 01-Apr-2005 to 01-Jul-2005
Currency: USD | Data: Unadjusted | Exchange: NYSE

| Date | Close | High | Low | Volume |
|------|-------|------|-----|--------|
| 01-Jul-2005 | 25.77 | 26.30 | 25.50 | 46,908,000 |
| 30-Jun-2005 | 26.16 | 26.75 | 26.08 | 78,461,000 |
| 29-Jun-2005 | 21.07 | 21.29 | 21.03 | 5,380,600 |
| 28-Jun-2005 | 21.30 | 21.35 | 21.04 | 9,442,700 |
| 27-Jun-2005 | 21.02 | 21.38 | 20.98 | 9,400,100 |
| 24-Jun-2005 | 21.45 | 21.73 | 21.25 | 12,432,000 |
| 23-Jun-2005 | 21.25 | 21.48 | 20.89 | 5,711,700 |
| 22-Jun-2005 | 21.22 | 21.39 | 21.15 | 5,016,200 |
| 21-Jun-2005 | 21.22 | 21.34 | 21.13 | 6,589,000 |
| 20-Jun-2005 | 21.30 | 21.50 | 21.13 | 6,565,200 |
| 17-Jun-2005 | 21.10 | 21.68 | 21.02 | 12,565,000 |
| 16-Jun-2005 | 21.46 | 21.71 | 21.45 | 7,750,700 |
| 15-Jun-2005 | 21.55 | 21.65 | 20.45 | 5,344,000 |
| 14-Jun-2005 | 21.42 | 21.53 | 21.38 | 4,743,500 |
| 13-Jun-2005 | 21.65 | 21.78 | 21.36 | 5,010,500 |
| 10-Jun-2005 | 21.60 | 21.95 | 21.55 | 5,879,300 |
| 09-Jun-2005 | 21.97 | 22.05 | 21.56 | 6,767,900 |
| 08-Jun-2005 | 21.60 | 21.74 | 21.50 | 5,904,600 |
| 07-Jun-2005 | 21.49 | 21.67 | 21.41 | 11,539,000 |
| 06-Jun-2005 | 21.39 | 21.46 | 21.05 | 5,892,800 |
| 03-Jun-2005 | 21.25 | 21.36 | 21.19 | 5,420,900 |
| 02-Jun-2005 | 21.30 | 21.47 | 21.24 | 7,216,700 |
| 01-Jun-2005 | 21.37 | 21.47 | 20.95 | 4,959,400 |
| 31-May-2005 | 21.09 | 21.65 | 21.07 | 8,183,300 |
| 27-May-2005 | 21.35 | 21.93 | 21.28 | 13,883,000 |
| 26-May-2005 | 21.20 | 21.25 | 20.82 | 5,742,300 |
| 25-May-2005 | 20.94 | 21.02 | 20.70 | 5,190,300 |
| 24-May-2005 | 20.79 | 20.95 | 20.65 | 4,799,800 |

| Date | | | | |
|---|---|---|---|---|
| 23-May-2005 | 20.95 | 21.05 | 20.75 | 6,070,700 |
| 20-May-2005 | 20.74 | 20.74 | 20.40 | 5,070,800 |
| 19-May-2005 | 20.75 | 20.90 | 20.55 | 5,593,400 |
| 18-May-2005 | 20.85 | 20.91 | 20.61 | 5,633,300 |
| 17-May-2005 | 20.58 | 20.63 | 20.35 | 6,327,200 |
| 16-May-2005 | 20.50 | 20.50 | 20.11 | 6,312,500 |
| 13-May-2005 | 20.00 | 20.12 | 19.85 | 7,010,800 |
| 12-May-2005 | 19.94 | 20.20 | 19.84 | 6,805,100 |
| 11-May-2005 | 20.00 | 20.20 | 19.86 | 9,831,000 |
| 10-May-2005 | 20.12 | 20.30 | 20.00 | 8,671,900 |
| 09-May-2005 | 20.08 | 20.08 | 19.81 | 5,542,300 |
| 06-May-2005 | 19.85 | 20.00 | 19.46 | 7,816,100 |
| 05-May-2005 | 19.98 | 20.17 | 19.80 | 10,259,000 |
| 04-May-2005 | 19.97 | 20.25 | 19.30 | 13,253,000 |
| 03-May-2005 | 19.87 | 20.01 | 19.70 | 8,634,300 |
| 02-May-2005 | 19.80 | 19.89 | 19.54 | 12,008,000 |
| 29-Apr-2005 | 19.75 | 19.81 | 19.21 | 11,758,000 |
| 28-Apr-2005 | 19.54 | 19.66 | 19.01 | 11,588,000 |
| 27-Apr-2005 | 19.09 | 19.31 | 18.85 | 12,181,000 |
| 26-Apr-2005 | 18.90 | 19.00 | 18.82 | 12,067,000 |
| 25-Apr-2005 | 18.95 | 19.26 | 18.62 | 17,000,000 |
| 22-Apr-2005 | 18.45 | 19.25 | 18.28 | 26,344,000 |
| 21-Apr-2005 | 19.28 | 20.01 | 18.50 | 51,851,000 |
| 20-Apr-2005 | 23.11 | 23.70 | 23.11 | 7,202,000 |
| 19-Apr-2005 | 23.22 | 23.56 | 23.13 | 4,721,400 |
| 18-Apr-2005 | 23.45 | 23.76 | 23.30 | 6,717,800 |
| 15-Apr-2005 | 23.45 | 24.00 | 23.39 | 5,354,300 |
| 14-Apr-2005 | 23.99 | 24.48 | 23.77 | 7,362,000 |
| 13-Apr-2005 | 24.37 | 24.90 | 24.25 | 4,562,300 |
| 12-Apr-2005 | 24.97 | 25.03 | 24.32 | 5,248,800 |
| 11-Apr-2005 | 24.83 | 24.88 | 24.65 | 2,374,800 |
| 08-Apr-2005 | 24.87 | 25.07 | 24.84 | 4,286,300 |
| 07-Apr-2005 | 25.10 | 25.13 | 24.70 | 7,423,600 |
| 06-Apr-2005 | 25.05 | 25.12 | 24.88 | 3,757,000 |
| 05-Apr-2005 | 24.90 | 25.15 | 24.72 | 4,187,000 |
| 04-Apr-2005 | 24.64 | 24.87 | 24.12 | 5,668,300 |
| 01-Apr-2005 | 24.20 | 25.04 | 24.16 | 4,994,000 |

Source: SunGard PowerData (Tradeline), subject to Terms and Conditions

© 2006 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

# EXHIBIT D

Exhibit 2.1

AGREEMENT AND PLAN OF MERGER

by and between

MBNA CORPORATION

and

BANK OF AMERICA CORPORATION

DATED AS OF JUNE 30, 2005

-----------------------------------------------------------------------------

wage and annual bonus opportunities that are substantially similar, in the aggregate, to the aggregate rates of base salary or hourly wage provided to such Covered Employees and the aggregate employee benefits and annual bonus opportunities provided to such Covered Employees under the MBNA Benefit Plans as in effect immediately prior to the Effective Time; provided that nothing herein shall limit the right of Bank of America or any of its Subsidiaries to terminate the employment of any Covered Employee at any time or require Bank of America or any of its Subsidiaries to provide any such employee benefits, rates of base salary or hourly wage or annual bonus opportunities for any period following any such termination.

(b) To the extent that a Covered Employee becomes eligible to participate in an employee benefit plan maintained by Bank of America or any of its Subsidiaries, other than MBNA or its Subsidiaries, Bank of America shall cause such employee benefit plan to (i) recognize the service of such Covered Employee with MBNA or its Subsidiaries for purposes of eligibility and vesting and, except under defined benefit pension plans, benefit accrual under such employee benefit plan of Bank of America or any of its Subsidiaries to the same extent such service was recognized immediately prior to the Effective Time under a comparable MBNA Benefit Plan in which such Covered Employee was a participant immediately prior to the Effective Time or, if there is no such comparable benefir plan, to the same extent such service was recognized under the MBNA 401(k) Plus Savings Plan immediately prior to the Effective Time; provided that such recognition of service shall not operate to duplicate any benefits with respect to the Covered Employee, and (ii) with respect to any health, dental or vision plan of Bank of America or any of its Subsidiaries (other than MBNA and its Subsidiaries) in which any Covered Employee is eligible to participate in the plan year that includes the year in which such Covered Employee is eligible to participate, (x) cause any pre-existing condition limitations under such Bank of America or Subsidiary plan to be waived with respect to such Covered Employee to the extent such limitation would have been waived or satisfied under the MBNA Benefit Plan in which such Covered Employee participated immediately prior to the Effective Time, and (y) recognize any medical or other health expenses incurred by such Covered Employee in the year that includes the Closing Date for purposes of any applicable deductible and annual out-of-pocket expense requirements under any such health, dental or vision plan of Bank of America or any of its Subsidiaries.

(c) From and after the Effective Time, Bank of America shall, or shall cause its Subsidiaries to, honor, in accordance with the terms thereof as in effect as of the date hereof or as may be amended after the date hereof with the prior written consent of Bank of America, each employment agreement and change in control agreement listed on Section 3.11 of the MBNA Disclosure Schedule and the obligations of MBNA and its Subsidiaries as of the Effective Time under each deferred compensation plan or agreement listed on Section 3.11 of the MBNA Disclosure Schedule. Bank of America agrees to take all action necessary to effectuate and satisfy the obligations set forth in Section 6.6(c) of the MBNA Disclosure Schedule.

6.7 Indemnification; Directors' and Officers' Insurance.

(a) In the event of any threatened or actual claim, action, suit, proceeding or investigation, whether civil, criminal or administrative (a "Claim"), including any such Claim in which any individual who is now, or has been at any time prior to the date of this Agreement, or who becomes prior to the Effective Time, a director, officer or employee of MBNA or any of its

41

--------------------------------------------------------------------------------

Subsidiaries or who is or was serving at the request of MBNA or any of its Subsidiaries as a director, officer or employee of another person (the "Indemnified Parties"), is, or is threatened to be, made a party based in whole or in part on, or arising in whole or in part out of, or pertaining to (i) the fact that he is or was a director, officer or employee of MBNA or any of its Subsidiaries prior to the Effective Time or (ii) this Agreement or any of the transactions contemplated by this Agreement, whether asserted or arising before or after the Effective Time, the parties shall cooperate and use their best efforts to defend against and respond thereto. All rights to indemnification and exculpation from liabilities for acts or omissions occurring at or prior to the Effective Time now existing in favor of any Indemnified Party as provided in their respective certificates or articles of incorporation or by-laws (or comparable organizational documents), and any existing indemnification agreements set forth in Section 6.7 of the MBNA Disclosure Schedule, shall survive the Merger and shall continue in full force and effect in accordance with their terms, and shall not be amended, repealed or otherwise modified for a period of six years after the Effective Time in any manner that would adversely affect the rights thereunder of such individuals for acts or omissions occurring at or prior to the Effective Time or taken at the request of Bank of America pursuant to Section 6.8 hereof, it being understood that nothing in this sentence shall require any amendment to the certificate of incorporation or by-laws of the Surviving Corporation.

(b)    From and after the Effective Time, the Surviving Corporation shall, to the fullest extent permitted by applicable law, indemnify, defend and hold harmless, and provide advancement of expenses to, each Indemnified Party against all losses, claims, damages, costs, expenses, liabilities or judgments or amounts that are paid in settlement of or in connection with any Claim based in whole or in part on or arising in whole or in part out of the fact that such person is or was a director, officer or employee of MBNA or any Subsidiary of MBNA, and pertaining to any matter existing or occurring, or any acts or omissions occurring, at or prior to the Effective Time, whether asserted or claimed prior to, or at or after, the Effective Time (including matters, acts or omissions occurring in connection with the approval of this Agreement and the consummation of the transactions contemplated hereby) or taken at the request of Bank of America pursuant to Section 6.8 hereof.

(c)    Bank of America shall cause the individuals serving as officers and directors of MBNA or any of its Subsidiaries immediately prior to the Effective Time to be covered for a period of six years from the Effective Time by the directors' and officers' liability insurance policy maintained by MBNA (provided that Bank of America may substitute therefor policies of at least the same coverage and amounts containing terms and conditions that are not less advantageous than such policy) with respect to acts or omissions occurring prior to the Effective Time that were committed by such officers and directors in their capacity as such; provided that in no event shall Bank of America be required to expend annually in the aggregate an amount in excess of 250% of the annual premiums currently paid by MBNA (which current amount is set forth in Section 6.7 of the MBNA Disclosure Schedule) for such insurance (the "Insurance Amount"), and provided further that if Bank of America is unable to maintain such policy (or such substitute policy) as a result of the preceding proviso, Bank of America shall obtain as much comparable insurance as is available for the Insurance Amount.

42

------------------------------------------------------------------------------------

(d)    The provisions of this Section 6.7 shall survive the Effective Time and are intended to be for the benefit of, and shall be enforceable by, each Indemnified Party and his or her heirs and representatives.

6.8 Additional Agreements. In case at any time after the Effective Time any further action is necessary or desirable to carry out the purposes of this Agreement (including any merger between a Subsidiary of Bank of America, on the one hand, and a Subsidiary of MBNA, on the other) or to vest the Surviving Corporation with full title to all properties, assets, rights, approvals, immunities and franchises of either party to the Merger, the proper officers and directors of each party and their respective Subsidiaries shall, at Bank of America's sole expense, take all such necessary action as may be reasonably requested by Bank of America.

6.9 Advice of Changes. Each of Bank of America and MBNA shall promptly advise the other of any change or event (i) having or reasonably likely to have a Material Adverse Effect on it or (ii) that it believes would or would be reasonably likely to cause or constitute a material breach of any of its representations, warranties or covenants contained in this Agreement; provided, however, that no such notification shall affect the representations, warranties, covenants or agreements of the parties (or remedies with respect thereto) or the conditions to the obligations of the parties under this Agreement; and provided further that a failure to comply with this Section 6.9 shall not constitute a breach of this Agreement or the failure of any condition set forth in Article VII to be satisfied unless the underlying Material Adverse Effect or material breach would independently result in the failure of a condition set forth in Article VII to be satisfied.

6.10 Exemption from Liability Under Section 16(b). Prior to the Effective Time, Bank of America and MBNA shall each take all such steps as may be necessary or appropriate to cause any disposition of shares of MBNA Common Stock or conversion of any derivative securities in respect of such shares of MBNA Common Stock in connection with the consummation of the transactions contemplated by this Agreement to be exempt under Rule 16b-3 promulgated under the Exchange Act, including any such actions specified in the No-Action Letter dated January 12, 1999, issued by the SEC to Skadden, Arps, Slate, Meagher & Flom, LLP.

6.11 No Solicitation.

(a)    None of MBNA, its Subsidiaries or any officer, director, employee, agent or representative (including any investment banker, financial advisor, attorney, accountant or other retained representative) of MBNA or any of its Subsidiaries shall directly or indirectly (i) solicit, initiate, encourage, facilitate (including by way of furnishing information) or take any other action designed to facilitate any inquiries or proposals regarding any merger, share exchange, consolidation, sale of assets, sale of shares of capital stock (including by way of a tender offer) or similar transactions involving MBNA or any of its Subsidiaries that, if consummated, would constitute an Alternative Transaction (any of the foregoing inquiries or proposals being referred to herein as an "Alternative Proposal"), (ii) participate in any discussions or negotiations regarding an Alternative Transaction or (iii) enter into any agreement regarding any Alternative Transaction. Notwithstanding the foregoing, the Board of Directors of MBNA shall be permitted, prior to the meeting of MBNA stockholders to be held pursuant to

43

--------------------------------------------------------------------------------

# EXHIBIT E

ARTICLES OF INCORPORATION

OF

MBNA CORP.

RECEIVED

'90 DEC 6 AM 11 34

STATE DEPT. OF
ASSESSMENTS & TAXATION

John W. Scheflen, 1800 Mercantile Bank and Trust
Building, 2 Hopkins Plaza, Baltimore, Maryland 21201, being
over eighteen years of age and acting as incorporator, forms a
corporation under the Maryland General Corporation Law.

ARTICLE I

NAME

The name of the corporation is:

MBNA Corp.

ARTICLE II

PURPOSE

Corporation is formed to engage in the business of
banking and finance, directly and through subsidiaries. It may
engage in any other business permitted by law.

ARTICLE III

PRINCIPAL OFFICE AND RESIDENT AGENT

The address of the principal office of the Corporation
in the State of Maryland is c/o The Corporation Trust
Incorporated, 32 South Street, Baltimore, Maryland 21202. The
resident agent of the Corporation in the State of Maryland is
The Corporation Trust Incorporated, 32 South Street, Baltimore,
Maryland 21202. The resident agent is a Maryland corporation.

ARTICLE IV

CAPITAL STOCK

(a) The total number of shares of stock of all
classes which the Corporation has authority to issue is
210,000,000 shares, of which 200,000,000 shares are classified
as Common Stock, par value $.01 per share, and 10,000,000
shares are classified as Preferred Stock, par value $.01 per
share. The aggregate par value of all shares of all classes
which the Corporation is authorized to issue is $2,100,000.

STATE DEPARTMENT OF ASSESSMENTS
AND TAXATION

APPROVED FOR RECORD

03418042  12/6/90 at 11:34  03418042

03418042

03418042

(b)   The Preferred Stock may be issued in series. Prior to issuance, the Board of Directors shall set the terms of the Preferred Stock, including the preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms and conditions of redemption.

(c)   The Board of Directors shall have the power to classify or reclassify any unissued stock, whether now or hereafter authorized, by setting or changing the preferences, conversion or other rights, voting powers, restrictions, limitations as to dividends, qualifications, or terms or conditions of redemption of such stock.

(d)   Unless otherwise provided by the Board of Directors, no holder of stock of any class shall be entitled to preemptive rights to subscribe for or purchase or receive any stock of any class or securities convertible into stock of any class of the Corporation.

## ARTICLE V

### BOARD OF DIRECTORS

(a)   The Corporation shall initially have four directors.  The initial directors, who shall act as such until the first annual meeting or until their successors are duly elected and qualify shall be Charles M. Cawley, John R. Cochran, Bruce L. Hammonds and M. Scot Kaufman.  The number of directors may be increased or decreased as provided in the By-Laws of the Corporation.

(b)   The Board of Directors may authorize the issuance from time to time of stock of the Corporation of any class, now or hereafter authorized, and securities convertible into stock of the Corporation of any class, now or hereafter authorized, for such consideration and on such other terms as the Board of Directors may deem advisable, without stockholder approval.

## ARTICLE VI

### VOTING

Notwithstanding any provision of law requiring any action to be taken or authorized by the affirmative vote of the holders of a greater proportion of the votes of all classes or of any class of stock of the Corporation, such action shall be effective and valid if taken or authorized by the affirmative vote of a majority of the total number of votes entitled to be cast thereon, except as otherwise provided in the charter.

-2-

541/BLISEC

## ARTICLE VII

### LIABILITY AND INDEMNIFICATION

(a) To the fullest extent that limitations on the liability of directors and officers are permitted by the Maryland General Corporation Law, no director or officer of the Corporation shall have any liability to the Corporation or its stockholders for damages. This limitation on liability applies to events occurring at the time a person serves as a director or officer of the Corporation whether or not such person is a director or officer at the time of any proceeding in which liability is asserted.

(b) To the fullest extent permitted by the Maryland General Corporation Law, the Corporation shall indemnify and advance expenses to its currently acting and its former directors. The Corporation shall indemnify and advance expenses to its officers to the same extent as its directors, and may do so to such further extent as is consistent with law. The Board of Directors may by bylaw, resolution or agreement make further provision for indemnification of directors, officers, employees and agents to the fullest extent permitted by the Maryland General Corporation Law.

(c) References to the Maryland General Corporation Law in this Article are to that law as from time to time amended. No amendment to the charter of the Corporation shall affect any right of any person under this Article based on any event, omission or proceeding prior to the amendment.

## ARTICLE VIII

### AMENDMENTS

Except as set forth in this Article, The Corporation reserves the right to make, from time to time, any amendments of its charter which may now or hereafter be authorized by law, including any amendments which alter the contract rights of any class of outstanding stock as expressly set forth in the charter.

IN WITNESS WHEREOF, I have signed these Articles of Incorporation on the 6th day of December, 1990, and have acknowledged such Articles to be my act.

John W. Scheflen
Incorporator

541/BLUSEC

-3-