## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| DONALD F. BENOIT, Derivatively on Behalf of MBNA CORP and on Behalf of Himself and All Others Similarly Situated,<br>　　　　　　　　　　Plaintiffs,<br><br>　　　vs.<br><br>BRUCE L. HAMMONDS, KENNETH A. VECCHIONE, RICHARD K. STRUTHERS, JOHN R. COCHRAN, III, LANCE L. WEAVER, CHARLES C. KRULAK, MICHAEL G. RHODES, JOHN W. SCHEFLEN, RANDOLPH D. LERNER, JAMES H. BERICK, MARY M. BOIES, BENJAMIN R. CIVILETTI, WILLIAM L. JEWS, STUART L. MARKOWITZ, WILLIAM B. MILSTEAD, THOMAS G. MURDOUGH, LAURA S. UNGER and KENNETH D. LEWIS,<br>　　　　　　　　　　Defendants,<br><br>　　　- and –<br><br>BANK OF AMERICA CORPORATION, a Delaware Corporation, AS SUCCESSOR IN INTEREST TO MBNA CORP., and MBNA CORP., a Maryland Corporation,<br>　　　　　　　　Nominal Defendants. | Case No. 1:07-cv-561-GMS |

[Caption continued on following page]

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE MBNA OUTSIDE DIRECTOR DEFENDANTS' MOTION TO DISMISS

Dated: May 21, 2008

**CHIMICLES & TIKELLIS LLP**
Pamela S. Tikellis (#2172)
A. Zachary Naylor (#4539)
Tiffany J. Cramer (#4998)
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
Tel: 302-656-2500

*Counsel for Plaintiff Benoit*

**ROBBINS UMEDA & FINK, LLP**
Brian J. Robbins
Jeffrey P. Fink
Shane P. Sanders
Julia M. Williams
Jill E. Klemann
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990

```
                                          x
LEMON BAY PARTNERS and MALCOLM   :
ROSENWALD,                                :
                      Plaintiffs,        : Case No. 1:07-cv-562-GMS
                                          :
          vs.                             :
BRUCE L. HAMMONDS, KENNETH A.            :
VECCHIONE, RICHARD K. STRUTHERS,        :
JOHN R. COCHRAN, III, LANCE L.          :
WEAVER, CHARLES C. KRULAK,              :
MICHAEL G. RHODES, JOHN W.              :
SCHEFLEN, RANDOLPH D. LERNER,           :
JAMES H. BERICK, MARY M. BOIES,         :
BENJAMIN R. CIVILETTI, WILLIAM L.       :
JEWS, STUART L. MARKOWITZ,              :
WILLIAM B. MILSTEAD, THOMAS G.          :
MURDOUGH, LAURA S. UNGER and            :
KENNETH D. LEWIS,                        :
                      Defendants,        :
        - and –                          :
BANK OF AMERICA CORPORATION, AS          :
SUCCESSOR IN INTEREST TO MBNA           :
CORP., and MBNA CORP.,                   :
                Nominal Defendants.    x
```

**CHIMICLES & TIKELLIS LLP**
Pamela S. Tikellis (#2172)
A. Zachary Naylor (#4539)
Tiffany J. Cramer (#4998)
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
Tel: 302-656-2500

**PASKOWITZ & ASSOCIATES**
Laurence Paskowitz
60 East 42nd Street, 46th Floor
New York, NY 10165
Telephone: (212) 685-0969

**ROY JACOBS & ASSOCIATES**
Roy L. Jacobs
60 East 42nd Street, 46th Floor
New York, NY 10165
Telephone: (212) 867-1156

**BALLON STOLL BADER & NADLER LLP**
Irving Bizar
1450 Broadway
New York, NY 10018
Telephone: (212) 575-7900

*Counsel for Plaintiffs Lemon Bay Partners and Malcolm Rosenwald*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... iii

I.      NATURE AND STAGE OF PROCEEDINGS ................................................ 1

II.     SUMMARY OF THE ARGUMENT ............................................................. 5

III.    STATEMENT OF FACTS ........................................................................... 7

        A.    History of Excessive Compensation at MBNA ................................... 7

        B.    MBNA's Insider Defendants Artificially Inflate the Value of MBNA's
              Stock Price, Allowing Them to Cash in on Illegal Stock Sales ............... 8

        C.    MBNA's Merger with BAC ............................................................ 9

IV.     LEGAL STANDARDS .............................................................................. 12

V.      PLAINTIFFS' CLAIMS ARE NOT PRECLUDED BY ANY OTHER PRIOR
        ACTION ................................................................................................ 14

VI.     PLAINTIFF DONALD F. BENOIT HAS ADEQUATELY ALLEGED
        COMPLETE DIVERSITY ......................................................................... 16

VII.    THE COMPLAINT SUFFICIENTLY ALLEGES CLAIMS FOR BREACHES
        OF FIDUCIARY DUTY AGAINST DEFENDANTS IN CONNECTION WITH
        NEGOTIATION OF THE MERGER............................................................ 17

        A.    The MBNA Directors Owed Fiduciary Duties to MBNA Shareholders
              Under Maryland Law in Connection with the Merger........................... 19

        B.    The Actions of the Outside Directors in Connection with the Merger
              Violated Their Fiduciary Duties ...................................................... 22

        C.    The MBNA Outside Directors Violated Their *Revlon* Duties ............... 24

VIII.   DEFENDANTS' CONDUCT IS NOT PROTECTED BY §5.418 OR
        SHAREHOLDER RATIFICATION OF the MERGER..................................... 29

        A.    The Outside Directors Are Not Exculpated Under §5-418................... 29

        B.    The Outside Directors Cannot Establish Shareholder Ratification on These
              Motions .................................................................................... 32

IX.     PLAINTIFFS HAVE STANDING TO PURSUE DERIVATIVE CLAIMS ON
        BEHALF OF THE COMPANY .................................................................. 34

        A.    Plaintiffs Have Retained a Direct Equity Interest in the Entity on Whose
              Behalf a Recovery Is Sought.......................................................... 34

        B.      Demand upon the BAC Board of Directors Would Be Futile ...............................37

X.      CONCLUSION.................................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Able Bldg. Maint. Co.* v. *Bd. ofTrs. of Gen. Employees Trust Fund,*
No. C0303958CRB, (N. D. Cal. Nov. 18, 2003) ..............................................................16

*Acierno* v. *Haggerty,*
No. 04-1376-KAJ, (D. Del. Nov. 23, 2005) ......................................................................9

*Alidina* v. *Internet. com Corp.,*
No. 17235-NC, (Del. Ch. Nov. 6, 2002)....................................................................23, 30

*Am. Nat'! Bank* v. *Fed. Deposit Ins. Corp.,*
710 F.2d 1528 (11th Cir. 1983) .......................................................................................15

*Baker* v. *MBNA Corp.,*
No. 05-272 (GMS), (D. Del. July 6, 2007) ........................................................................1

*Barkan* v. *Amsted Indus., Inc.,*
567 A.2d 1279 (Del. 1989) ........................................................................................24, 25

*Bayberry Assocs.* v. *Jones,*
783 S.W.2d 553 (Tenn. 1990) ..........................................................................................21

*Biondi* v. *Scrushy,*
820 A.2d 1148 (Del. Ch. 2003) .......................................................................................38

*Bonar, Inc.* v. *Schottland,*
631 F. Supp. 990 (E.D. Pa. 1984) ......................................................................................5

*Brody* v. *Hankin,*
No. 04-1376, (3d Cir. Aug. 29, 2005) ..............................................................................32

*Bromwell* v. *Michigan Mut. Ins. Co.,*
115 F.3d208 (3dCir.1997) ........................................................................................15, 16

*Carter* v. *US Dep't of the Navy,*
No. 06-5378, (D.C. Cir. Dec. 3, 2007) .............................................................................15

*Churchill* v. *Star Enters.,*
183 F.3d 184 (3d Cir. 1999) .............................................................................................14

*Crescent/Mach I Partners, L.P.* v. *Turner,*
846 A.2d 963 (Del. Ch. 2000) ...................................................................................23, 30

*DeBiasse* v. *Chevy Chase Bank Corp.,*
2005 WL 1841676 (3d Cir. Aug. 4, 2005) .......................................................................17

*Delmarva Sash & Door Co. of Md., Inc. v. Andersen Windows, Inc.,*
  218 F. Supp. 2d 729 (D. Md. 2002) ........................................................................22

*Estate of RujJu v. Collier,*
  No. 06-3531 (NLH), (D. N.J. Mar. 20, 2008) .......................................................17

*Fanucchi & Limi Farms v. United Agri Prods.,*
  414 F.3d 1075 (9th Cir. 2005) ...............................................................................13

*Felker v. Anderson,*
  No. 04-0372-CV-W-ODS, (W.O. Mo. Feb. 11, 2005) ...................................30, 38

*Fradkin v. Ernst,*
  571 F. Supp. 829 (N.D. Ohio 1983) .......................................................................34

*Gabriel v. Preble,*
  396 F.3d 10 (1st Cir. 2005) ...................................................................................17

*Gatz v. Ponsoldt,*
  No. 174-N, (Del. Ch. Nov. 5, 2004) ......................................................................22

*Goldstein v. Lincoln Nat'l Convertible Sees. Fund, Inc.,*
  140 F. Supp. 2d 424 (E.D. Pa. 2001) ....................................................................13

*Gregory v. Chehi,*
  843 F.2d III (3d Cir. 1988) ...................................................................................14

*Growe v. Bedard,*
  No. 03-198-8-5, (D. Me. Nov. 23, 2004) ...............................................................24

*Hammond v. Lyon Realty Co.,*
  163 A. 480 (Md. 1932) ...........................................................................................22

*Hartford Accident & lndem. Co. v. First Fa. Bank, NA.,*
  859 F .2d 295 (3d Cir. 1988) .................................................................................30

*Hudson v. Prime Retail, Inc.,*
  No. 24-C-03-5806, 2004 WL 1982383 ............................................................ *passim*

*Hughes v. United States,*
  71 U.S. 232 (1866) .................................................................................................16

*In re 3COM Corp. S'holders Litig.,*
  No. 16721, (Del Ch. Oct. 25, 1999) .......................................................................32

*In re Emerging Commc'ns., Inc. S'holders Litig.,*
  No. 16415, (Del. Ch. May 3, 2004) .......................................................................32

*In re First Interstate Bancorp Consol. S'holder Litig.,*
  729 A.2d 851 (Del. Ch. 1998) ..........................................................................36, 37

*In re IT Group Inc.,*
   No. 02-10118, 04-1268-KAJ, (D. Del. Nov. 15, 2005) .....................................................13

*In re LNR Prop. Corp. S'holders Litig.,*
   No. 674-N, (Del. Ch. Nov. 4, 2005) ................................................................................31

*In re MONY Group Inc. S'holder Litig.,*
   852 A.2d 9 (Del. Ch. 2004) .............................................................................................27

*In re Paracelsus Corp. Sees. Litig.,*
   No. H-96-4291, (S.D. Tex. Mar. 6, 1998) .......................................................................35

*In re Ply Gem Indus., S'holders Litig.,*
   No. 15779-NC, (Del. Ch. June 26, 2001) ........................................................................22

*In re Reliance Secs. Litig.,*
   91 F. Supp. 2d 706 (D. Del. 2000) ..................................................................................31

*In re Santa Fe Pac. Corp. S'holder Litig.,*
   669 A.2d 59 (Del. 1995) ..................................................................................................33

*In re Tower Air, Inc.,*
   416 F.3d 229 (3d Cir. 2005) .....................................................................................13, 29

*In re Walt Disney Co. Derivative Litig.,*
   906 A. 2d 27 (Del. 2006) .................................................................................................30

*In re Walt Disney Co. Derivative Litig.,*
   906 A.2d 27 (Del. 2006) ..................................................................................................24

*In re Walt Disney Co. Derivative Litig.,*
   907 A. 2d 693 (Del. Ch. 2005) ........................................................................................30

*Indurated Concrete Corp. v. Abbott,*
   74 A.2d 17 (Md. 1950) ....................................................................................................19

*Jasinover v. Rouse,*
   No. 13-C-04-59594, (Md. Cir. Ct. Nov. 4, 2004) ..........................................20, 26, 27, 31

*Jolly Roger Fund LP v. Sizeler Prop. Investors, Inc.,*
   No. RDB 05-841, (D. Md. Nov. 3, 2005) .....................................................................21, 35

*Kaplan v. Peat, Marwick, Mitchell & Co.,*
   540 A.2d 726 (Del. 1988) ............................................................................................3, 35

*Kessler v. Sinclair,*
   641 N.E.2d 135 (Mass. App. Ct. 1994) .......................................................................35, 37

*LeBoyer v. Greenspan,*
   No. 03-5603-GHK (JTLx), (C.D. Cal. June 13, 2007) ....................................................20

*Lemon Bay Partners LLP* v. *Hammonds,*
   No. 05-327 (GMS), (D. Del. June 26, 2007) .......................................................................2

*Lewis* v. *Anderson,*
   477 A.2d 1040 (Del. 1984) .............................................................................................36

*Lewis* v. *Ward,*
   852 A.2d 896 (Del. 2004) ...............................................................................................36

*Mona* v. *Mona Elec. Group, Inc.*
   934 A.2d 450 (Md. Ct. Spec. App. 2007) .........................................................................20

*Morris* v. *Bush,*
   No. 3:98-CY-2452-G, (N.D. Tex. June 23, 1999) ............................................................32

*N.A.A.C.P.* v. *Golding,*
   679 A.2d 554 (Md. 1996) ...............................................................................................13

*Nagy* v. *Bistricer,*
   770 A.2d 43 (Del. Ch. 2000) ..........................................................................................24

*ODS Techs., L.P.* v. *Marshall,*
   832 A.2d 1254 (Del. Ch. 2003) .......................................................................................33

*Okoro* v. *Bohman,*
   164 F.3d 1059 (7th Cir. 1999) ........................................................................................16

*Omnicare, Inc.* v. *NCS Healthcare, Inc.,*
   818 A.2d 914 (Del. 2003) .........................................................................................18, 31

*Parish* v. *Md. & Va. Milk Producers Ass 'n,*
   242 A.2d at 512 (Md. 1968) ...........................................................................................33

*Parnes* v. *Bally Entm't Corp.,*
   722 A.2d 1243 (Del. 1999) ......................................................................................22, 30

*Pesnell* v. *Arsenault,*
   490 F.3d 1158 (9th Cir. 2007) ........................................................................................15

*Phillips* v. *County of Allegheny,*
   515 F. 3d 224 (3d Circ. 2008) ........................................................................................39

*Phillips* v. *County of Allegheny,*
   515 F.3d 224 (3d Cir. 2008) ...........................................................................................14

*Pittsburgh Terminal Corp.* v. *Baltimore & Ohio. R.R. Co.,*
   680 F.2d 933 (3d Cir. 1982) ...........................................................................................21

*Porter* v. *Tex. Commerce Bancshares, Inc.,*
   No. 9114, (Del. Ch. Oct. 12, 1989) .................................................................................37

*Radol* v. *Thomas*,
  772 F.2d 244 (6th Cir. 1985) ............................................................................18

*Revlon, Inc.* v. *MacAndrews & Forbes Holdings, Inc.*,
  506 A.2d 173 (Del. 1985) .........................................................................24, 31

*S.E.C* v. *Dorchester Gas Corp.*,
  No. 10255, (D.C. Cir. Jan. 9, 1984) .................................................................34

*S.E.C* v. *Lehman Bros., Inc.*,
  157 F.3d 2(1stCir.1998) ...................................................................................30

*Sale* v. *Pittsburgh Steel Co.*,
  57 F. Supp. 283 (W.D. Pa. 1944) .....................................................................17

*Schoen* v. *Mountain Producers Corp.*,
  170 F.2d 707 (3d Cir. 1948) .............................................................................17

*Shaev* v. *Saper*,
  320 F.3d 373 (3d Cir. 2003) ........................................................................33, 34

*Shirk* v. *Fifth Third Bancorp*,
  No. 05-cv-49 (S.D. Ohio April 10, 2007) ........................................................23

*Smith* v. *Pittsburgh Gage & Supply Co.*,
  464 F.2d 870 (3d Cir. 1972) ..........................................................................2, 15

*Smith* v. *Sperling*,
  354 U.S. 91 (1957) ...........................................................................................17

*Storetrax.com, Inc.* v. *Gurland*,
  397 Md. 37 (2007) .............................................................................................20

*Strougo* v. *Bassini*,
  282 F.3d 162 (2d Cir. 2003) .............................................................................21

*Tex. Partners* v. *Conrock Co.*,
  685 F.2d 1116 (9th Cir. 1982) .........................................................................34

*Thorn* v. *Reliance Van Co., Inc.*,
  No. 84-1740, (3d Cir. Dec. 6,1985) .................................................................20

*Toner* v. *Baltimore Envelope Co.*,
  498 A.2d 642 (Md. 1985) .................................................................................19

*United States* v. *Athlone Indus., Inc.*,
  746 F.2d 977 (3d Cir. 1984) .............................................................................14

*VantagePoint Venture Partners 1996* v. *Examen, Inc.*,
  871 A.2d 1108 (Del. 2005) ...............................................................................13

*Werbowsky v. Collomb,*
766 A.2d 123 (Md. 2001) ................................................................38

*Wittman v. Crooke,*
707 A.2d 422 (Md. Ct. Spec. App. 1998) ....................................24, 29, 32, 33

## STATUTES

15 U.S.C.
§78j(b) ................................................................................2

28 U.S.C.
§1332 ................................................................................2, 7

28 U.S.C.
§1401 ................................................................................16

8 Del. Code
§ 1 02(b )(7) ........................................................................29

Fed. R. Civ. P.
Rule23.1 ............................................................................3

Fed. R. Civ. P.
Rule 41 (b) ..........................................................................16

Fed. R. Civ. P.
Rule 8 ..............................................................................13, 14

Md. Corps. & Ass'ns Code Ann.
§§2-405.1(a), 2-405.1(e) ..............................................................25

Md. Corps. & Ass'ns Code Ann.
§2-405.1(b) ..........................................................................27

Md. Corps. & Ass'ns Code Ann.
§2-405.1 (b )(2) ......................................................................28

Md. Corps. & Ass'ns Code Ann.
§5-418 ..........................................................................*passim*

Md. Corps. & Ass'ns Code Ann.
§5-418(a)(I) ........................................................................29

Md. Corps. & Ass'ns Code Ann.
§5-4l8(a)(2) ........................................................................29

## OTHER AUTHORITIES

*Black's Law Dictionary*
    134 (7th ed. 1999) ................................................................................................30

*Federal Practice and Procedure: Jurisdiction*
    §4435 at 139 (2d ed. 2002) ...................................................................................16

## I.    NATURE AND STAGE OF PROCEEDINGS

On September 18, 2007 two substantially identical class and derivative actions were filed by plaintiff Donald F. Benoit (the "*Benoit* Action") and plaintiffs Lemon Bay Partners and Malcolm Rosenwald (the "*Lemon Bay* Action"). The actions allege that the top executives of MBNA Corp. ("MBNA" or the "Company"), who were forced by shareholder outrage to retreat from a long-running scheme to obtain excessive compensation, instead turned to insider trading as a means of enrichment. The insider trading profits they enjoyed were made possible by an open market securities fraud involving misrepresentations and omissions regarding MBNA's financial health.[1] Unable to continue with these schemes upon the exposure of the securities fraud, the MBNA executives then orchestrated a merger with Bank of America Corp. ("BAC") whose terms both substantially enriched the insiders, and provided that BAC would indemnify *all* MBNA directors for suits relating to wrongdoing that occurred during their tenure in office.

All of these actions were carried out with the acquiescence and, in some instances, the active assistance of MBNA's Board of Directors (the "Board"), whose members consciously disregarded their duties to MBNA and its public shareholders. The Merger[2] itself was allegedly accomplished through the dissemination of a fraudulent Proxy Statement ("Proxy"), in violation of Section 10(b) of the Securities Exchange Act of 1934, and by means of various maneuvers designed to discourage a public auction for MBNA which would have obtained a higher and fairer price, but which would likely have been on terms less favorable to the members of the outgoing MBNA Board. These allegations are asserted variously against MBNA's former top executives (the "Insider Defendants"), and its former non-executive directors (the "Outside

---

[1]  In a related class action brought by open market purchasers of MBNA common stock, this Court upheld claims of securities fraud under Section 10(b) of the Securities Exchange Act of 1934 against MBNA, and three of its top officers and directors: CEO and President Bruce L. Hammonds ("Hammonds"); Vice Chairman and CFO Kenneth A. Vecchione ("Vecchione"); and Vice Chairman of the Board Charles C. Krulak ("Krulak"). *See Baker v. MBNA Corp.*, No. 05-272 (GMS), 2007 WL 2009673, slip op. (D. Del. July 6, 2007) (the "Securities Class Action").

[2]  "Merger" refers to a stock and cash merger between MBNA and BAC that was approved by MBNA shareholders on November 3, 2005.

Directors"). To the extent claims are asserted derivatively, they are brought on behalf of BAC, as successor to MBNA.

In disregard of the Stipulation Regarding Scheduling (D.I. #24 in *Benoit*; D.I. #24 in *Lemon Bay*) approved by the Court on December 7, 2007, which prohibits motions to dismiss until the *Benoit* and *Lemon Bay* Actions have been consolidated and plaintiffs have had a chance to file a consolidated amended complaint, the defendant Outside Directors filed the present Motion to Dismiss (the "Motion") on April 17, 2008 (D.I. #38 in *Benoit*, D.I. #38 in *Lemon Bay*). The Outside Directors claim that this Court's previous dismissal of a similar action (hereinafter referred to as "the *MBNA I* Action") solely on jurisdictional grounds serves as a bar under the doctrine of *res judicata* to the re-filing of plaintiff's claim on different jurisdictional grounds than were before the Court at the time of its rulings in *MBNA I*.[3]  It is important to note that this Motion was filed even after plaintiffs apprised the Outside Directors by letter dated April 2, 2008 (attached as Exhibit B to the Outside Directors' Motion) that a re-filing asserting different jurisdictional bases has been explicitly authorized by the Third Circuit[4] and that a previous Court Order barred any motions to dismiss at this time.  It is also important to note that *all other defendants have obeyed this Court's Order*, and have not joined in the present Motion. Thus, this Motion only involves the claims asserted against the Outside Directors, and *does not* involve the validity of the claims asserted against the Insider Defendants (such as Hammonds, Vecchione and Krulak).

---

[3]  The Court's decisions in *MBNA I* dealt only with the issue of whether derivative claims brought under Section 21D of the PSLRA, 15 U.S.C. §78u-4, were sufficient to support subject matter jurisdiction. *See Lemon Bay Partners LLP v. Hammonds*, No. 05-327 (GMS), 2007 WL 1830899 (D. Del. June 26, 2007), and Order dated March 26, 2008 (denying reconsideration). The present complaints include previously unasserted federal claims for proxy fraud under 15 U.S.C. §78j(b). The *Benoit* Action also asserts compete diversity under 28 U.S.C. §1332. The Orders rendered in *MBNA I* are presently on appeal to the Third Circuit Court of Appeals. Should they be reversed or vacated, the Outside Directors' *res judicata* arguments will evaporate. For this reason, this Court should defer proceedings on this Motion until the Third Circuit has had an opportunity to clarify the status of *MBNA I*.

[4]  *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972) ("jurisdictional dismissals do not bar further litigation of the cause of action when the subsequent complaint cures the jurisdictional defect.").

In sum, this Motion raises the following basic issues: (a) whether the complaints properly assert breach of fiduciary duty class claims against the Outside Directors, including *state law* claims related to the Merger; (b) whether these Merger-related claims are barred by "ratification," which requires a fully informed proxy vote on the Merger; (c) whether plaintiffs may assert derivative claims against the Outside Directors for breach of fiduciary duty;[5] (d) whether the Court's rulings in *MBNA I* bar the present actions under the doctrine of *res judicata*; and (e) whether plaintiff Benoit has properly invoked this Court's diversity jurisdiction.

The following issues are *not* raised by the Outside Directors' Brief (D.I. #39 in *Benoit*; D.I. #39 in *Lemon Bay*), and are not presently before the Court: (a) whether, putting issues of *res judicata* aside, plaintiffs' proxy-related Section 10(b) claims create federal subject matter jurisdiction; (b) whether plaintiffs have adequately asserted federal proxy fraud class claims against defendants Hammonds, Vecchione and Krulak; (c) whether the complaints properly assert breach of fiduciary duty class claims relating to the Merger against the Insider Defendants; (d) whether demand on BAC prior to filing derivative claims was excused under Fed. R. Civ. P. 23.1 and Delaware law; (e) and whether such derivative claims have been extinguished by reason of the Merger.[6]

The Outside Directors are not entitled to dismissal of any of the claims set forth in the complaints as they are adequately alleged to have consciously violated their fiduciary duties. Accordingly, these defendants are not entitled to dismissal of the Merger related claims set forth in the complaints.  These Board members knowingly allowed defendant Hammonds to exercise

---

[5]  As discussed herein, plaintiffs do not believe the Outside Directors have any standing to assert that the derivative claims should be dismissed. (*See* Opening Brief in Support of the MBNA Director Defendants' Motion to Dismiss ("Outside Dirs. Br." or "Brief" at 21). Only Bank of America has standing to make such a motion, and it has not yet done so. The Outside Directors cannot raise this argument unless and until BAC joins with them. *See Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 729, 731-32 (Del. 1988) (refusing to find lack of derivative standing where corporation itself had not raised that argument).  These derivative issues should accordingly be deferred until such time as BAC has determined whether to move for dismissal.

[6] Plaintiffs' belief that these last two issues are not properly raised by the present motion is based on the standing issue discussed in Fn. 5, *supra*.

complete control over the negotiations of the Merger, to obtain huge personal benefits for himself and his colleagues, and to approve the grant of a show-stopper lock-up option to BAC, ending any market-check of the Merger. While the Outside Directors assert they acted in good faith, the well-pled allegations of the complaints, which are binding on these motions, show otherwise.

Further, the Outside Directors' reliance on any exculpatory clause or shareholder ratification is misplaced. Plaintiffs' detailed allegations of the defendants' conscious wrongdoing and omissions to act preclude, at the motion to dismiss stage, dismissal based on any exculpatory provisions contained in Md. Courts & Jud. Proc. Code §5-418. The Outside Directors also ignore that any shareholder ratification defense requires full and fair disclosure – which plaintiffs and other class members did not receive in the misleading Proxy. In any event, these are both affirmative defenses not properly raised on this Motion.

Assuming the Outside Directors do have standing to raise issues regarding derivative standing, they are not entitled to dismissal of the derivative claims based on their contention that the Merger eliminated plaintiffs' status as shareholders and, thus, their interest in the derivative recovery. Because plaintiffs are now BAC shareholders, have asserted the derivative claims on behalf of BAC (MBNA's successor-in-interest), and have alleged that demand on BAC's Board of Directors would be futile, they retain standing to pursue their claims derivatively. This is because plaintiffs still have a direct equity interest in the corporation which would benefit from a derivative recovery, BAC. The Outside Directors do not and cannot cite any pertinent legal authority for the proposition that, where plaintiff retains a direct equity interest in the entity that would receive the recovery, plaintiff is not permitted to pursue their claims.

Finally, since the complaints demonstrate that pre-suit demand is futile, the Outside Directors are not entitled to dismissal. As the derivative claims have passed to BAC, any demand would have to be made on the BAC Board of Directors, unless such a demand would be futile. In connection with the Merger, BAC agreed not only to defend the MBNA defendants, but also agreed to cooperate with them and use its best efforts to defeat the claims against them. Thus, the

- 4 -

BAC Board of Directors is contractually committed to be *forever hostile* to the derivative claims set forth in the complaints.

For all of these reasons, and as set forth more fully below, the Outside Directors' motion should be denied.

## II.    SUMMARY OF THE ARGUMENT

The movants are not entitled to dismissal of any of the claims set forth in the complaints:

1.    The Outside Directors' actions are in violation of the Court-ordered stipulation agreeing to stay this action until after the Court has ruled on the pending motion to appoint leadership, and plaintiffs have filed a consolidated amended complaint. The Outside Directors further violated the provisions in the stipulation setting forth a briefing schedule for a consolidated complaint, motion to dismiss and other related briefing.

2.    Plaintiffs' claims are not barred on *res judicata* grounds because: (1) plaintiffs have set forth new jurisdictional grounds in their Complaints, and re-filed them in keeping with binding Third Circuit precedent; (2) the previous dismissal was not "on the merits"; (3) plaintiffs have cured the previous jurisdictional defects found by this Court; and (4) defendants have not met their burden demonstrating that plaintiffs' claims are, in fact, barred on *res judicata* grounds. Despite the Outside Directors' overheated rhetoric, the claims asserted herein are not "duplicative" since the *MBNA I* claims, unless and until restored by the Third Circuit, remain dismissed on narrow jurisdictional grounds, and must be considered a nullity at the present time.[7]

3.    Plaintiffs state a cause of action against the Outside Directors for breach of their fiduciary duties. The MBNA Board intentionally allowed defendant Hammonds to have complete control over the negotiations of the Merger, allowed Hammonds to obtain huge personal benefits for himself and his colleagues, and approved the grant of a show-stopper lock-up option to BAC, ending any market-check of the Merger. While defendants assert their good

---

[7]    *See Bonar, Inc. v. Schottland*, 631 F. Supp. 990, 994 (E.D. Pa. 1984) (once a case has been dismissed on subject matter jurisdiction grounds, anything decided in that case is considered "a nullity and absolutely meaningless...").

faith, the well-pled allegations of the complaints show otherwise. Thus, the Outside Directors are not entitled to dismissal.

4.      Plaintiffs' detailed allegations of the Outside Directors' conscious wrongdoing and omissions to act preclude any dismissal based on Md. Courts & Jud. Proc. Code §5-418. Further, §5-418 is an affirmative defense not properly raised on this Motion. Thus, defendants are not shielded by the Maryland exculpatory clause.

5.      The Outside Directors are not entitled to dismissal based on shareholder ratification by reason of the Merger vote. Once again, the Outside Directors have raised an affirmative defense not properly before the Court on the present Motion. Second, ratification requires full and fair disclosure, and the Proxy at issue was materially false and misleading. The Proxy did not ask shareholders to ratify the misconduct alleged at bar, including the unlawful lock-up option granted to BAC. Finally, the BAC lock up option rendered any vote of no effect; the deal presented was coercive in that MBNA shareholders had no real choice; and the lock up precluded any other deal from materializing. For the above reasons, shareholder ratification does not shield the Outside Director defendants from liability for their actions.

6.      The Outside Directors are not entitled to dismissal of the derivative claims based on their view that the Merger eliminated plaintiffs' status as shareholders and, thus, their interest in the derivative recovery. Because plaintiffs are now BAC shareholders and have both asserted the derivative claims on behalf of BAC (MBNA's successor-in-interest), and have alleged that demand on BAC's Board of Directors would be futile, they retain standing to pursue their claims derivatively. The Outside Directors' authorities otherwise concern situations in which the derivative plaintiff did not retain a direct equity interest in the entity that would receive the recovery, or where such plaintiff violated procedure by not asserting the derivative claims on behalf of the successor-in-interest or explaining why demand on that successor's board would be futile. Here, as plaintiffs followed proper procedure by showing demand on BAC to be futile and have retained their shares, this action is not barred under the contemporaneous ownership rule.

7.    The Outside Directors have no standing to raise demand futility arguments, as such claims must be raised by BAC. But even if they did have standing, their arguments would have to be rejected. Because the complaints demonstrate that pre-suit demand on BAC is futile, the Outside Directors are not entitled to dismissal.

## III.    STATEMENT OF FACTS

### A.    History of Excessive Compensation at MBNA

MBNA has historically been run by a closely knit group of officers and directors. ¶55.[8] Throughout the Company's history, its executives received outstanding amounts of executive compensation. *Id.* During 2001 to 2003, the Company's five most highly paid officers-defendants Hammonds, John R. Cochran ("Cochran"), Lance L. Weaver ("Weaver"), Richard K. Struthers ("Struthers") and Vecchione received well over $60 million in cash compensation, not including the tens of thousands of stock options and shares of restricted stock they also received. *Id.* As the Sarbanes-Oxley Act of 2002 raised standards for corporate governance, MBNA and its Board's pervasive pattern of excessive compensation awarded to its executives, a history of nepotism, and a cozy relationship between its executives and its purportedly independent directors came under attack. ¶¶7, 56, 59, 60. Further, before the Company's annual meeting of shareholders in May 2004, significant individual shareholders waged a campaign questioning the Board's independence. ¶59. Under this pressure, MBNA undertook measures to remedy these abuses, resulting in cuts to its traditionally overly generous compensation packages. ¶61.

---

[8] All paragraph references ("¶__" or "¶¶__") references are to the *Benoit* Verified Shareholder's Class and Derivative Complaint ("Complaint") (D.I. #1) filed Sept. 18, 2007. The *Lemon Bay* Verified Shareholder's Class and Derivative Complaint (D.I. #1) is essentially identical, save for the allegations asserted in the *Benoit* Complaint establishing complete diversity of citizenship for purposes of 28 U.S.C. §1332. Although the Insider Defendants have not moved to dismiss, this Statement of Facts will discuss all claims made against all defendants because a comprehensive overview of the claims is necessary to understand the crucial role played by the movant Outside Directors, and because many of the claims set forth against the defendants are intertwined.

**B.    MBNA's Insider Defendants Artificially Inflate the Value of MBNA's Stock Price, Allowing Them to Cash in on Illegal Stock Sales**

As a result of the 2004 compensation cuts at MBNA, the Company's senior executives faced massive reductions in their compensation levels, which they had grown accustomed to receiving. ¶62. At the same time, the Company's senior executives were in possession of tens of thousands of shares they had received in prior years as part of their compensation and unexercised stock options which would expire if not exercised by the expiration date. *Id.* The strike price on these options was generally set at the price the stock was trading at on the day the options were granted, making them worthless if the stock price dropped below the strike price. *Id.* Some of these stock options would have expired in 2005 if not exercised. *Id.*

In order to regain the lavish compensation the Insider Defendants had previously enjoyed, they began to make deceptive misstatements to the public in order to inflate the Company's stock price. ¶¶64-73. From January 2005 to April 2005, defendants Hammonds, Cochran, Weaver, Struthers, Vecchione, Krulak, Michael G. Rhodes ("Rhodes") and John W. Scheflen ("Scheflen") (previously defined as the "Insider Defendants") failed to disclose and/or misrepresented numerous adverse facts.

The Insider Defendants' scheme to inflate the Company's value, however, could not be hidden from the public forever. On April 21, 2005, MBNA shocked the market by disclosing that the Company had earned only $0.02 cents per share in 1Q:05 – a 94% decline from the $0.59 per share reported in Q4:04 – and that it was guiding 2005 EPS growth down to "significantly below" its prior 10% growth estimate. ¶¶10, 72. Following the Company's shocking April 21, 2005 disclosures concerning its business operations, financial results and reduced 2005 earnings expectations, the Company's stock price plummeted from its closing price of $23.11 on April 20, 2005 to below $19 per share on extremely high trading volume of 51 million shares, or 793% of its 52-week average daily trading volume. ¶10. MBNA's value *declined by over $5.8 billion in one trading session*. *Id.* As a consequence of this wrongdoing, BAC as an indemnitor and successor in interest by reason of merger stands to lose many millions of dollars, if not billions, as a consequence of potential payments that may be made in settlement,

- 8 -

or as a consequence of a potential adverse jury verdict in the Securities Class Action. In fact, this Court has found that the securities plaintiffs adequately stated claims under Section 10(b) against Hammonds, Vecchione, Krulak and MBNA. The parties in the Securities Class Action are currently engaging in fact discovery.

### C.     MBNA's Merger with BAC

In the spring of 2005 following the Company's shocking April 21, 2005 disclosures concerning its business operations, financial results and reduced 2005 earnings expectations, MBNA's share price was languishing at about $20 per share, and shareholder dissatisfaction was growing. ¶14. According to the Proxy dated September 19, 2005, the MBNA Board met with MBNA management and the Company's outside advisors, including representatives of UBS Securities LLC ("UBS") and Wachtell, Lipton, Rosen & Katz, in early June 2005, to discuss MBNA's recent financial performance and prospects, consolidation activity in the credit card industry and the general environment, long-term trends and other developments in the markets in which MBNA conducts business. ¶76.[9]   Possible strategic alternatives were summarized, including hypothetical scenarios involving a business combination. *Id.* Wachovia, Inc. was identified at the MBNA Board meeting as potentially having the greatest interest in a possible transaction. ¶¶15, 79. Even though Wachovia, Inc. decided not to make a bid for MBNA after being contacted by the Company, there was no doubt that MBNA was, in fact, for sale, and the MBNA Insider Defendants were desperate to find a buyer for the Company. ¶¶15, 77, 79. To effect a sale of the Company, defendant Hammonds then had MBNA retain Joseph Perella ("Perella"), a noted investment banker and agreed to pay him $40 million, in addition to the mammoth fees already being paid to UBS as MBNA's investment advisor. ¶3. Perella was retained to do one thing: find a buyer. *Id.* Although the Outside Directors would have known of

---

[9]   This Proxy was attached as Exhibit C to the Affidavit of Richard C. Pepperman, II, ("Pepperman Aff.") dated January 20, 2006 in connection with motions to dismiss made in *MBNA I*. The Court may take judicial notice of its contents on a motion to dismiss, without converting the pending motions into ones for summary judgment. *See Acierno v. Haggerty*, No. 04-1376-KAJ, 2005 WL 3134060, at *5-*6 (D. Del. Nov. 23, 2005).

these matters, none of this information was publicly disclosed at the time; thus, no other potential bidder for MBNA was made aware of the Insider Defendants' plan to sell the Company and secure their own futures. Indeed, the Proxy never mentions Perella, or his huge fee, an omission which serves to conceal the fact that an extraordinary effort was underway in June 2005 to sell MBNA and sell it quickly. Perella's mission was to serve as Hammonds' special envoy to bidders who were willing to accede to Hammonds' personal demands. *See id.*

Despite the highly secret ongoing efforts to sell MBNA, on June 13, 2005 an article entitled "One Tough Card Game; MBNA's Stock Is Down 25% This Year, and it's Suddenly a Takeover Candidate," authored by Amy Barrett and Mike McNamee, was published in *Business Week's* June 20, 2005 edition. In the article, defendant Hammonds' was quoted as saying "*[t]here's no 'For Sale' sign on MBNA's Wilmington (Del.) headquarters.*" ¶79. Hammonds' comments were highly deceptive and had the purpose and effect of artificially deflating MBNA's stock price, giving Hammonds the opportunity to offer the Company at attractively low prices. *Id.* The Outside Directors would have known this statement was untrue, yet they issued no corrective statement on behalf of MBNA.

Just one week after the publication of Hammonds' sales denial, representatives of MBNA contacted BAC management to gauge the level of BAC's interest in a possible transaction with MBNA. *Id.* From this point, merger talks moved rapidly forward, but were fatally infected by Hammonds' unfair dealing. ¶¶77, 80, 82. With the acquiescence and approval of the Outside Directors, Hammonds negotiated the deal himself over a two hour dinner with BAC's President and CEO, Kenneth A. Lewis ("Lewis"), even though he and Lewis had never even met before. *Id.* Incredibly, the MBNA Board abdicated any role in the negotiation of MBNA's transaction with BAC and no special committee was appointed to negotiate or evaluate the deal. ¶¶7, 78, 82. The Board, including the Outside Directors, instead chose to "rubber stamp" the merger that was negotiated in its entirety by Hammonds, the Company's conflicted CEO. Hammonds, for his part, concentrated primarily on what compensation he and his compatriots would receive in return for agreeing to the Merger. *Id.*

As the Outside Directors would have been aware, the Insider Defendants stood to receive significant personal benefits as a result of MBNA's merger with BAC. First, defendants Cochran, Hammonds, Struthers, Vecchione and Weaver all received high executive positions with BAC. ¶¶87, 88. Second, upon completion of the merger on January 1, 2006, defendants Cochran, Hammonds, Struthers, Vecchione and Weaver, respectively, received approximately $22.7 million, $23 million, $17 million, $5.8 million and $17 million pursuant to their retention agreements with BAC. *Id.* Third, the vesting of the Insider Defendants' stock options was accelerated to permit immediate vesting as a result of the change of control initiated by the merger with BAC. ¶¶2, 85. Fourth, and quite importantly, the defendants extracted an agreement from BAC as part of the Merger, to indemnify all securities class action and derivative suit defendants from liability (*including the Outside Directors*), to cooperate with these defendants and to use BAC's best efforts to defend and defeat these claims. ¶¶5, 88.

In order to ensure that the merger agreement with BAC was consummated and provided MBNA's Insider Defendants with the substantial compensation that flowed from its completion, MBNA and the Outside Directors agreed to "no shop" provisions which limited MBNA's ability to discuss, facilitate or commit to competing third-party proposals to acquire all or a significant part of the company. ¶¶2, 5, 80. But the Outside Directors went further than this, granting BAC an option to acquire up to approximately 249.8 million shares of MBNA common stock under the stock option agreement at a low price, amounting to a discount of approximately $1.4 billion. *Id.* This provision effectively ended any possibility of a competing bid for MBNA. These provisions had the purpose and effect of ensuring that no auction of the Company would ever take place and discouraged any potential competing bidder who might have an interest in acquiring all or a significant part of MBNA from considering or proposing that acquisition. *Id.*

Defendants then filed the Proxy soliciting shareholder approval of the deal. ¶¶5, 15, 16. The Proxy included an assortment of facts and figures about the terms and the process leading to the Merger. This superficially appeared to furnish investors with adequate information with which to evaluate the fairness of the transaction. *Id.* The Proxy also included a purported (but

misleading) chronology of the process leading up the announcement of the Merger, the process by which UBS evaluated the fairness of the Merger transaction, and the factors that led to UBS's opinion that the transaction was fair to MBNA shareholders from a financial point of view. *Id.* Ultimately, on November 3, 2005, MBNA's shareholders approved the Merger between MBNA and BAC based upon the deceptive Proxy, which concealed Hammonds' misconduct in negotiating the deal, the true purpose and effect of the BAC option, and other material facts. *Id.*

## IV.    LEGAL STANDARDS

Plaintiffs assert claims against the Outside Directors in Counts IV, VI and VII of their complaints. Count IV asserts derivative claims against the Outside Directors for breaches of fiduciary duties based on allegations: (a) that they "had actual or constructive knowledge that they had either caused MBNA to improperly misrepresent the business and prospects of the Company, or breached their duties of oversight in failing to be informed and active in the ultimate management of the Company;" and (b) allegations  that  "these Defendants approved and caused or permitted MBNA to re-purchase approximately $250,000,000 of its shares on the open market, at allegedly inflated prices, causing substantial damage to MBNA for overpaying for its shares." ¶¶131-32. Count VI asserts direct class claims against the Outside Directors for *inter alia* having "breached their duty of entire fairness by agreeing to sell MBNA at a potentially unfair price and to the detriment of the Company's shareholders, in exchange for indemnification and personal benefit." ¶145. Count VII alleges direct class claims under State law against the Outside Director based on *inter alia* allegations that the defendants "breached their Revlon Duties in the following ways: by failing to conduct a public market test and to auction the Company fairly; by agreeing to a "no shop" provision in the merger agreement which prohibited MBNA to discuss, facilitate or commit to competing third-party proposals to acquire all or a significant part of the company; and by granting Bank of America an option to acquire up to approximately 249.8 million shares of MBNA common stock under the stock option agreement at a substantial discount." ¶155.  Plaintiffs' state law claims are governed by

- 12 -

Maryland law, because MBNA was a Maryland corporation prior to its merger with BAC.[10]

Because BAC is a Delaware corporation, however, derivative suit standing issues are governed

by Delaware law. *See VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108,

112-13 (Del. 2005).[11]

Where a state law breach of fiduciary duty claim is asserted in a federal pleading, Fed. R.

Civ. P. 8 ("Rule 8") requires only a short and plain statement of how the defendant corporate

directors and officers breached their fiduciary obligations.  This is true even where a state court

considering that same claim would require the assertion of evidence or factual detail regarding

the fiduciaries' misconduct before such a claim would be upheld. *See, e.g., In re Tower Air, Inc.*,

416 F.3d 229 (3d Cir. 2005) (reversing district court's dismissal of several breach of fiduciary

duty claims pled under Delaware law and finding that the Fed. R. Civ. P. do not require a

plaintiff to plead detailed facts to make out a claim for breach of fiduciary duty under Delaware

law).  The claims alleged here are supported with much greater factual specificity than those

asserted in *Tower Air*, and thus suffice to withstand defendants' motions to dismiss. *See also In

re IT Group Inc.*, No. 02-10118, 04-1268-KAJ, 2005 WL 3050611, at *8 (D. Del. Nov. 15, 2005)

(upholding breach of fiduciary duty claims and assertion that majority of directors were not

independent based on notice pleading); *Fanucchi & Limi Farms v. United Agri Prods.*, 414 F.3d

1075, 1082 (9th Cir. 2005) (notice pleading under Rule 8 applied to claim brought in diversity

under California law).

---

[10]  *See N.A.A.C.P. v. Golding*, 679 A.2d 554, 559 (Md. 1996).  Although Maryland courts have rendered a number of decisions relevant to the issues raised by the motions to dismiss, its body of corporate law is not as well-developed as that of Delaware.  Maryland often looks to Delaware decisions for guidance where no Maryland precedents exist addressing a particular point. *See Goldstein v. Lincoln Nat'l Convertible Secs. Fund, Inc.*, 140 F. Supp. 2d 424, 439 n.12 (E.D. Pa. 2001), *vacated in part by* No. 01-2259 2003 WL 1846095 (3d Cir. Apr. 2, 2003) ("With respect to issues on which the Maryland courts have not spoken, this Court looks primarily to the state law of Delaware for guidance.  In the area of corporate law, the Maryland Court of Appeals has noted the respect due Delaware decisions.").

[11]  Both plaintiffs and defendants agree that the law of the relevant state of incorporation shall be applied to all of plaintiffs' substantive allegations.  MBNA was a Maryland corporation, while BAC is a Delaware corporation.

*Tower's* reasoning as to breach of fiduciary duty claims brought under Delaware law applies with equal force to claims brought under Maryland law.  Further, the Third Circuit recently noted that these liberal pleading standards were reaffirmed by the Supreme Court in *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007).  In *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008), the Court stated:

> Thus, under our reading, the notice pleading standard of Rule 8(a)(2) remains intact, and courts may generally state and apply the Rule 12(b)(6) standard, attentive to context and a showing that "the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  It remains an acceptable statement of the standard, for example, that courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." 1969 n.8 (citing as consistent with its rejection of the "no set of facts" language the statement that "if, in view of what is alleged, it can reasonably be conceived that the plaintiffs ... could, upon a trial, establish a case which would entitle them to . . . relief, the motion to dismiss should not have been granted").

Accordingly, the present claims should be upheld, as they are pled with more factual detail than is required under Rule 8.

## V.    PLAINTIFFS' CLAIMS ARE NOT PRECLUDED BY ANY OTHER PRIOR ACTION

Established Third Circuit law explicitly permits the reassertion of claims dismissed on jurisdictional grounds where, as here, a new basis is alleged to support the assertion of subject matter jurisdiction.  In order to dismiss an action under the doctrine of *res judicata*, defendants must show three separate requirements: (1) an adjudication on the merits, (2) the same parties, and (3) the same cause of action.  *Churchill v. Star Enters.*, 183 F.3d 184, 194 (3d Cir. 1999); *see also Gregory v. Chehi*, 843 F.2d 111 (3d Cir. 1988) (describing generally the principles of *res judicata*).  The party seeking to take advantage of claim preclusion has the burden of establishing those requirements.  *United States v. Athlone Indus., Inc.*, 746 F.2d 977, 983 (3d Cir. 1984).  Plaintiffs' prior action did not involve identical causes of action, nor was there an adjudication on the merits.  Indeed, defendants have not met their burden of showing *any* of the above elements, thus plaintiffs' claims should not be dismissed on the basis of *res judicata*.

First, plaintiffs have brought additional claims in this action. In addition to other counts, plaintiffs seek relief against the Insider Defendants under Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 for knowingly and recklessly preparing and approving a false and misleading Proxy – new claims which were not brought in the prior complaint. Plaintiff Benoit has additionally asserted diversity jurisdiction. In these circumstances, the Third Circuit has explicitly approved the re-filing of claims, so long as the new filing cures the prior pleading defects. *See, e.g.*, *Smith*, 464 F.2d at 874 ("jurisdictional dismissals do not bar further litigation of the cause of action when the subsequent complaint cures the jurisdictional defect. The Third Circuit is not alone in so ruling. *See Pesnell v. Arsenault*, 490 F.3d 1158, 1161-62 (9th Cir. 2007) ("Because we conclude that the judgment in *Pesnell I* was based on lack of jurisdiction, the FTCA's judgment bar rule does not preclude Pesnell from bringing his current *Bivens* and RICO claims arising out of the same subject matter. Similarly, this action is not barred by res judicata or collateral estoppel because each of these doctrines requires a final judgment on the merits."); *Carter v. U.S. Dep't of the Navy,* No. 06-5378, 2007 WL 4561149, at *2 (D.C. Cir. Dec. 3, 2007) (plaintiff could assert new jurisdictional basis in new complaint following subject matter jurisdiction dismissal, as "Mr. Carter never alleged an APA claim in his initial complaint, the court never litigated an APA claim nor ruled on one, and as a result, there is no final judgment on any potential APA claim, and therefore there is no *res judicata* as to any potential APA claims"); *Am. Nat'l Bank v. Fed. Deposit Ins. Corp.*, 710 F.2d 1528, 1536 (11th Cir. 1983) ("The earlier damages action, while arising out of the same transaction, was dismissed for lack of subject matter jurisdiction. Thus, no final judgment was entered on the merits of that action and *res judicata* may not apply to bar claims that were or should have been raised in that action.").

Defendants' citation to *Bromwell v. Michigan Mut. Ins. Co.*, 115 F.3d 208 (3d Cir. 1997), is unavailing. In *Bromwell*, the plaintiff returned to federal court with the *very same* federal claim that had failed before. Here, plaintiffs have alleged additional and different bases in the operative complaints than those originally alleged. Where the second complaint contains a different basis for the assertion of jurisdiction, *Bromwell* has no application. *See Able Bldg.*

- 15 -

*Maint. Co. v. Bd. of Trs. of Gen. Employees Trust Fund*, No. C0303958CRB, 2003 WL
22749151 (N. D. Cal. Nov. 18, 2003) (discussing the scope and limits of *Bromwell*).    The
Seventh Circuit has read *Bromwell* in this same limited way.  *Okoro v. Bohman*, 164 F.3d 1059,
1063 (7th Cir. 1999).

Secondly, there was no "on the merits" adjudication in plaintiffs' previous suit because
the lawsuit was dismissed for lack of subject matter jurisdiction.  Under Fed. R. Civ. P. Rule
41(b) ("Rule 41(b)") "any dismissal not provided for in this rule, — *except* one for lack of
jurisdiction ... operates as an adjudication on the merits." Fed. R. Civ. P. 41(b).  Under Rule
41(b), a dismissal for lack of jurisdiction does not preclude a second action based on the same
cause of action that includes claims that overcome the initial defect of jurisdiction. 18A Charles
Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure:
Jurisdiction* §4435 at 139 (2d ed. 2002); *see also Hughes v. United States*, 71 U.S. 232, 237,
(1866) (noting "[i]f [a] first suit was dismissed for ... the want of jurisdiction, or was disposed of
on any ground which did not go to the merits of the action, the judgment rendered will prove no
bar to another suit").  Similarly, *Bromwell* acknowledges the rule that a dismissal for lack of
subject matter jurisdiction is "not binding as to all matters which could have been raised."
*Bromwell*, 115 F.3d at 212-13.

Because defendants have not satisfied their burden of demonstrating that plaintiffs' claims
are barred, and because plaintiffs have cured their jurisdictional defects, this action should not be
dismissed on the basis of *res judicata*.

## VI.    PLAINTIFF DONALD F. BENOIT HAS ADEQUATELY ALLEGED COMPLETE DIVERSITY

The Outside Directors erroneously assert that Plaintiff Donald F. Benoit has not alleged
complete diversity.  Outside Dirs.' Br. at 11 n.10.  The statute they cite addresses venue in
derivative suits, and has nothing to do with the standards in gauging diversity jurisdiction. *See*
28 U.S.C. §1401.  The cases movants rely upon, which are of ancient vintage, apply an
outmoded rule that a corporation will be treated as a derivative *plaintiff* for purposes of diversity

rather than as a defendant. *See Schoen v. Mountain Producers Corp.*, 170 F.2d 707 (3d Cir. 1948); *Sale v. Pittsburgh Steel Co.*, 57 F. Supp. 283 (W.D. Pa. 1944).

In *Smith v. Sperling*, 354 U.S. 91 (1957), however, the Supreme Court held that when shareholders file a derivative suit, the corporation will be aligned as ***defendant*** for diversity purposes where "the [complaining] stockholder and those who manage the corporation are completely and irrevocably opposed on a matter of corporate practice and policy." *Id.* at 97. Thus, as here, where MBNA no longer exists as an independent entity and BAC – the inheritor of the derivative claims – must be considered "opposed" to those derivative claims for the reasons discussed above, BAC will be considered a defendant for purposes of diversity under *Sperling. See, e.g., Gabriel v. Preble*, 396 F.3d 10, 14 (1st Cir. 2005) ("A corporation is deemed adverse to a derivative suit [and will be treated as a defendant] when, regardless of the reason, the corporation's management opposes the maintenance of the action.); *Estate of Ruffu v. Collier*, No. 06-3531 (NLH), 2008 WL 801274, slip op., at *4 (D. N.J. Mar. 20, 2008) ("Jensen Beach is antagonistic to plaintiff and should be aligned as a defendant in this action.").

Thus, Plaintiff Benoit has asserted complete diversity, as he is a citizen of Florida and no defendant is also a citizen of Florida. *DeBiasse v. Chevy Chase Bank Corp.*, No. 05-2452, (3d Cir. Aug. 4, 2005) ("Jurisdiction under § 1332(a)(1) requires complete diversity – 'that is that no plaintiff can have the same state citizenship as any of the ... Defendants.'").

## VII.    THE COMPLAINT SUFFICIENTLY ALLEGES CLAIMS FOR BREACHES OF FIDUCIARY DUTY AGAINST DEFENDANTS IN CONNECTION WITH NEGOTIATION OF THE MERGER

While facts and evidence need not be pled to support a claim for breach of fiduciary duty at this stage of the proceedings, the complaints at bar are nonetheless replete with factual detail supporting a claim of wrongful misconduct by all defendants. After having received exorbitant compensation for years as approved by the Outside Directors, plaintiffs allege that Hammonds further increased his personal fortune by resorting to securities fraud and insider trading. The Outside Directors permitted this in breach of their duties to oversee Hammonds and the other insiders. ¶131.    Then, threatened with exposure and personal liability, Hammonds and the

Outsider Directors orchestrated a merger which deprived MBNA shareholders of billions of dollars in value while providing a windfall to Hammonds of tens of millions of dollars, a lucrative new job with BAC and protection for all directors against securities fraud and other liabilities. The misconduct included the dissemination of a false public statement that MBNA was not for sale, designed to depress the stock price, hand-picking an acquirer who would provide him with a shield from personal liability, and then participating in the issuance of a materially misleading Proxy.[12] ¶¶15, 16, 77, 79. Worse yet, the Outside Directors duly rubber-stamped the deal in violation of their fiduciary duties. ¶¶1, 2, 82. To add insult to injury, the Outside Directors agreed to a "show-stopper" option which prevented the emergence of a competing bidder who might not have been as generous to Hammonds personally as was the all too accommodating "bidder," BAC. ¶¶2, 80. This type of option, effectively eliminating the possibility of the emergence of a competing bidder, is unlawful because it is "preclusive" of other competing deals, and coerces shareholders into accepting the only possible deal that could emerge under the circumstances. *See Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 934-36 (Del. 2003).

The Outside Directors consciously turned a blind eye toward Hammonds' misleading public statements and failed to ensure that the deal was fair, failed to solicit competing bids and failed to independently evaluate the offer. ¶¶4, 77, 78. *See Radol v. Thomas*, 772 F.2d 244, 259 (6th Cir. 1985) ("The law is clear that directors and officers of a corporation are jointly and severally liable if they jointly participate in a breach of fiduciary duty or approve, acquiesce in, or conceal a breach by fellow officer or director."). The Board knowingly allowed Hammonds to control all of the Merger negotiations despite his history of self-dealing and conflicts of interest.

---

[12] The Complaints herein do not assert any personals claim against the Outside Directors for the dissemination of a false Proxy. These defendants do, however, raise ratification by means of that Proxy as a ground for dismissal. Although, as discussed *infra*, this affirmative defense cannot be raised on this Motion, plaintiffs will rebut these assertions herein in the event the Court reaches the ratification issue. If the Court agrees that ratification is an affirmative defense not properly raised at this juncture, it does need to rule on whether the Proxy has been adequately alleged under Rule 8(a) to have omitted material facts.

The Board appointed no special committee to neutralize Hammonds' influence. ¶¶4, 78, 81. Most egregiously, the Board, composed of sophisticated business and professional persons, approved the unlawful lock-up option to BAC despite knowledge that it would make the BAC transaction impossible to match by other suitable bidders. ¶¶2, 80. The transaction was effected by the dissemination of a materially misleading Proxy. ¶¶16, 82. These facts overwhelmingly support the causes of action against the Outside Directors for breach of fiduciary duty.[13]

### A.    The MBNA Directors Owed Fiduciary Duties to MBNA Shareholders Under Maryland Law in Connection with the Merger

The Outside Directors attempt to evade direct liability for their numerous breaches of fiduciary duty by claiming that they owed a fiduciary duty only to MBNA in connection with the negotiation of the Merger, and owed *no* fiduciary duty to the very shareholders whose stock they allowed to be exchanged for BAC shares at an unfairly low price. Outside Dirs.' Br. at 17, 30, 31. The Outside Directors not only fail to advance any cogent argument as to how such conduct would hurt MBNA as a corporate entity, rather than its shareholders directly, but they also misstate Maryland law regarding fiduciary obligations.[14]

Corporate directors have an "inherent obligation" to use their best efforts to promote the interests of the company's shareholders. *Indurated Concrete Corp. v. Abbott*, 74 A.2d 17, 20 (Md. 1950) *Toner v. Baltimore Envelope Co.*, 498 A.2d 642, 648 (Md. 1985) ("From the

---

[13] Defendants herein argue that Maryland statutory law requires an allegation of "fraud" to make out a claim for breach of fiduciary duty. *See* Outside Dirs.' Br. at 35, discussing Md. Courts & Jud. Proc. Code Ann. §5-418. Defendants cite to no Maryland decisional or statutory law supporting such a high pleading standard. Maryland's Section 5-418 is discussed in greater detail *infra* at 30.

[14] Defendants must concede that MBNA as a corporate entity was not harmed by the negotiation of an unfair "exchange ratio" of BAC shares for MBNA shares because MBNA itself did not exchange any shares in the Merger. Only the individual class members exchanged shares and received less consideration than they should have for their property. The claim for damages to the shareholders thus could not be asserted by MBNA. *See Tafflin v. Levitt*, 608 A.2d 817, 820 (Md. 1992) (distinguishing direct and derivative suits, and noting that a suit is direct if the allegations are not "premised on conduct that had harmed the institution," and derivative if the claims are assertible by the corporation itself). In addressing this issue the *Tafflin* court relied upon, *inter alia*, the Third Circuit's analysis of a similar question in *Univ. of Md. at Baltimore v. Peat Marwick Main & Co.*, 923 F.2d 265, 273-74 (3d Cir. 1991).

standpoint of Charles Jr. and Murphy as directors, it is well settled in Maryland that they owe a fiduciary duty to Envelope Co. *and* its shareholders."). A corporate director cannot stand silent in the face of a scheme that involves a fiduciary breach. *See Thorn v. Reliance Van Co., Inc.*, No. 84-1740, 1985 U.S. App. LEXIS 25929, at *6 (3d Cir. Dec. 6, 1985) ("directors who are aware of a breach of fiduciary duty committed by a fellow officer or director, but remain silent, are jointly and severally liable for the breach") (interpreting Pennsylvania law).

The Outside Directors contend that Maryland corporate directors owe duties only to the corporation, and not to the shareholders. Outside Dirs. Br. at 17. Just recently, however, in *Storetrax.com, Inc. v. Gurland,* 397 Md. 37, 53 (2007), Maryland's highest court noted that: "It is well-settled that directors of a corporation occupy a fiduciary relationship to the corporation *and* its stockholders." A claim that shareholders did not receive enough for their shares in a merger due to fiduciary breaches involves their personal property, not corporate property. "A shareholder may bring a direct action against the corporation, its officers, directors, and other shareholders to enforce a right that is personal to him." *Mona v. Mona Elec. Group, Inc.,* 934 A. 2d 450, 464 Md. Ct. Spec. App. (2007). *See also, LeBoyer v. Greenspan,* No. 03-5603-GHK (JTLx), 2007 WL 4287646, at *5 (C.D. Cal. June 13, 2007) ("Delaware provides for direct relief through a shareholder class action, in which the shareholders can obtain damages in the form of the difference between the cash-out price and the fair value of the company, including the value of any claims eliminated by the merger.").

Defendants' own authority recognizes that directors owe fiduciary duties to shareholders and that a violation of those duties gives rise to a direct claim. *See* Outside Dirs.' Br. at 31 (citing *Jasinover v. Rouse*, No. 13-C-04-59594, 2004 WL 3135516 (Md. Cir. Ct. Nov. 4, 2004)). In *Jasinover*, a shareholder of The Rouse Company ("Rouse") brought a direct action against the directors of Rouse alleging that they breached their fiduciary duties in approving and recommending the sale of Rouse. *Id.* at *1. The plaintiff then brought a motion to enjoin the consummation of the merger. *Id.* In ruling on the motion for a preliminary injunction, the court evaluated plaintiff's likelihood of success on the merits. *Id.* at *7-*13. Had no direct action

against directors for breach of fiduciary duty existed, the court would have simply found that there was no likelihood of success on the merits because no cause of action existed. Instead, the court partook in a six page discussion and evaluation of plaintiff's claims based on the facts before the court. *Id.* Clearly, a direct cause of action against directors of a corporation exists under Maryland law.

Indeed, outside of *dictum* in one recent federal decision that never decided the issue,[15] federal and state courts construing Maryland law have overwhelmingly recognized that Maryland directors owe fiduciary duties to the shareholders of the corporations they serve, and that breaches of these duties can give rise to ***direct*** claims against those directors where the harm was done to investors, rather than to the corporation. *See, e.g., Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2003) (where all shareholders are equally harmed by fiduciary misconduct which does not likewise harm the corporation, shareholders have a direct claim under Maryland law against the fiduciaries who caused that harm); *Pittsburgh Terminal Corp. v. Baltimore & Ohio. R.R. Co.*, 680 F.2d 933, 941 (3d Cir. 1982) ("Maryland directors must act as fiduciaries to all equity participants"); *Bayberry Assocs. v. Jones*, 783 S.W.2d 553, 563 (Tenn. 1990) (upholding direct claim against directors of Comdata Network, Inc. under Maryland law relating to unfair merger, and noting that: "It is not Comdata which would benefit from a recovery against the defendants … It is the shareholders alone who have been damaged and would benefit from the recovery."). *See also Delmarva Sash & Door Co. of Md., Inc. v. Andersen Windows, Inc.*, 218 F. Supp. 2d

---

[15] *See Jolly Roger Fund LP v. Sizeler Prop. Investors, Inc.*, No. RDB 05-841, 2005 WL 2989343 (D. Md. Nov. 3, 2005), recognizing that:

> [C]ertain types of actions may be brought by a shareholder directly. *"[U]nquestionably[,] a stockholder may bring suit in his own name* to recover damages from an officer of a corporation for acts which are violations of a duty arising from contract or otherwise and owing directly from the officer to the injured stockholder, though such acts are also violations of duty owing to the corporation."

*Id.* at *5 n.12. Undoubtedly, a merger accomplished by improper means directly impairs both a common stockholder's right to vote, and his right to obtain the highest value for his shares, which shares are ***personal*** property, not corporate property.

729, 734 (D. Md. 2002) (finding that, under Maryland law, "the shareholder plaintiffs have alleged a claim separate and distinct from the claims of Delmarva").

These Maryland precedents are consonant with the law of Delaware, to which Maryland courts often look for guidance, and Delaware would reach the same result. *See, e.g., In re Ply Gem Indus., S'holders Litig.*, No. 15779-NC, 2001 WL 755133, at *5 (Del. Ch. June 26, 2001) (direct claim exists where a corporate CEO placed his interests above those of shareholders when negotiating a merger, and the "alleged breaches of fiduciary duties resulted in unfair price and/or unfair process"); *Gatz v. Ponsoldt*, No. 174-N, 2004 WL 3029868, at *8 n.54 (Del. Ch. Nov. 5, 2004) (where a particular transaction hurt disfavored class of public shareholders, but had not affected the overall value of the corporate entity, claim to reverse the wrongful transaction was direct and not derivative).

Thus, the claims asserted in this case relating to damages caused by the negotiation of an unfair merger ratio, the breach of *Revlon* duties and the false and misleading Proxy plainly state claims for direct duties owed to shareholders under Maryland law.

## B. The Actions of the Outside Directors in Connection with the Merger Violated Their Fiduciary Duties

It is well-established under Maryland law that fiduciaries may not place their personal interests above those to whom they owe a fiduciary duty. *See Hammond v. Lyon Realty Co.*, 163 A. 480, 484 (Md. 1932) (persons occupying a fiduciary position "cannot innocently sacrifice the interest of those who trust them to their own personal advantage").

Numerous decisions in Delaware and elsewhere have upheld claims similar to those in the instant action against both corporate CEOs who engage in self-dealing in the course of negotiating a merger, and corporate directors who exhibit a deliberate indifference to their fiduciary obligation, in order to protect public shareholders from a self-interested executive. *See, e.g., Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1246-47 (Del. 1999) (where CEO extracted special concessions for himself when negotiating a merger to the detriment of public shareholders, class claims were adequately stated against both the CEO and the members of Bally's Board of Directors, for consciously permitting such misconduct); *Alidina v. Internet.com*

*Corp.*, No. 17235-NC, 2002 WL 31584292 at *6 (Del. Ch. Nov. 6, 2002) (direct claim for breach of fiduciary duty upheld against all directors where plaintiffs alleged that "the board members knew [CEO] Meckler allegedly sought out an interested merging partner, dictated the terms of the Transaction, secured a valuable asset of the Company at a grossly unfair price, and diverted funds away from the Company to himself"); *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 982-83 (Del. Ch. 2000) (claim against directors upheld where board members deliberately allowed CEO to negotiate "side deals" for himself during merger process, and failed in their duty to take measures to ensure a fair price).

The common thread among these decisions is a pattern of self-dealing by the CEO, which culminates in an unfair merger process tainted by the CEO's negotiation of special benefits for himself and not shared by public stockholders. Plaintiffs here allege exactly this. Hammonds, MBNA's CEO, completely controlled the Merger negotiation process. ¶¶1, 77, 82. The MBNA Board members are alleged to have known of his conflict of interest in doing so, yet they appointed no special committee to neutralize this influence or performed any diligence to inform themselves about the deal. ¶¶4, 78, 81. Nor did the directors fulfill their duty of disclosure by setting forth the truth after Hammonds falsely stated that MBNA was not for sale, thus depressing the stock price and scaring off potential bidders, in violation of their duty of disclosure. ¶¶4, 79.

The Outside Directors acquiesced in a hurried process involving Hammond's negotiation of special benefits for himself, and no merger premium for the MBNA shareholders. ¶¶1, 2, 88. The Outside Directors then approved an unlawful lock-up agreement which would make a better and competing bid (and one which might not favor Hammonds' interests) effectively impossible. ¶¶4, 80, 82. Finally, the Merger vote was procured by a materially misleading Proxy. ¶¶5, 16. These allegations are more than sufficient to set forth breach of fiduciary duty claims against the Outside Directors. *See Shirk v. Fifth Third Bancorp*, No. 05-CV-49, 2007 WL 1100429 slip op. (S.D. Ohio April 10, 2007) (allegations detailing manner in which outside directors failed to prudently manage affairs of corporation satisfied Rule 8); *Growe v. Bedard*, No. 03-198-B-5,

2004 WL 2677216, at *8 (D. Me. Nov. 23, 2004) (rejecting summary judgment motion where there was evidence of the "Outside Directors' abdication of their duty to oversee an important corporate transaction or contract pertaining to executive compensation for self-dealing insiders."); *see also In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 66 (Del. 2006) ("Cases have arisen where corporate directors have no conflicting self-interest in a decision, yet engage in misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision. To protect the interests of the corporation and its shareholders, fiduciary conduct of this kind ... should be proscribed."); *Nagy v. Bistricer,* 770 A.2d 43, 48, n.2 (Del. Ch. 2000) ("regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes," even if for a reason "other than personal pecuniary interest").

As defendants herein are fully apprised of the basic facts underpinning what they are alleged to have done to breach their fiduciary obligations, plaintiffs have met their pleading burden, and have stated a cause of action against the Outside Directors for their fiduciary breaches.

### C.    The MBNA Outside Directors Violated Their *Revlon* Duties

Notwithstanding movants' arguments to the contrary, it is established law in Maryland that in the context of mergers, directors "have a duty of loyalty to [the company] and [its] shareholders to do their *very best* for them in [the] merger." *Wittman v. Crooke,* 707 A.2d 422, 425 (Md. Ct. Spec. App. 1998); *see also Hudson v. Prime Retail, Inc.,* No. 24-C-03-5806, 2004 WL 1982383, at *11 (citing *Wittman* and noting that Maryland, like Delaware, appears to impose "*Revlon* duties" upon directors in the merger context that require directors to "to try to secure the best merger terms available for stockholders").[16]    Despite the clear language of these two

---

[16]    The duties of directors in a change of control situation, such as a negotiation of a merger, were most famously set down by the Delaware Supreme Court in *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 182 (Del. 1985). Although "*Revlon* does not demand that every change in the control of a Delaware corporation be preceded by a heated bidding contest," it does demand "that directors act with scrupulous concern for fairness to shareholders." *Barkan v. Amsted Indus., Inc.* 567 A.2d 1279, 1286 (Del. 1989). While defendants attempt to construe plaintiffs' claims as merely alleging that the defendants failed to conduct an auction and is

decisions, movants assert that "*Revlon* does not apply under Maryland law." Outside Dirs.' Br. at 30. The Outside Directors are incorrect. The only difference between Delaware law and Maryland law in relation to "*Revlon* duties" is that Delaware courts employ a heightened level of scrutiny to evaluate claims based on those duties, whereas in Maryland, the business judgment rule provides a presumption that the directors satisfied those duties. *Hudson*, 2004 WL 1982383, at *11 n.13.[17] The presumption, however, does not "render directors impervious to plaintiff[s]['] claims." *Id* at *11. Instead, plaintiffs merely have the burden of rebutting the presumption. *Id*. Thus, under Maryland law, to survive a motion to dismiss, Plaintiffs need only "allege facts showing a failure of the directors to adhere to their [*Revlon*] duties," *Id*. The pleading burden in federal court does not require that this be done with particularity. Plaintiffs have set forth actionable claims under any standard.

In the merger context, the inquiry is "'directed solely at the manner, or process, by which a director makes decisions.'" *Id*; *see* Md. Corps. & Ass'ns Code Ann. §§2-405.1(a), 2-405.1(e). Here, Plaintiffs have adequately alleged that the MBNA Directors, including the Outside Directors, failed to engage in a process that sought to maximize shareholder value. ¶¶1, 2, 4, 77-82.

First, the MBNA Outside Directors agreed to show-stopper provisions designed to *prevent* the emergence of any other potential bidder that might better maximize shareholder value. ¶¶2, 77, 80. Specifically, the MBNA Outside Directors agreed to a no show shop provision and granted to Bank of America an option to acquire up to approximately 249.8 million shares of MBNA common stock at a discount of approximately $1.4 billion. *Id*. This

---

therefore insufficient to state a claim, Outside Dirs.' Br. at 32, plaintiffs have actually alleged much more to demonstrate that defendants failed to act with that scrupulous concern for the fairness to shareholders required of fiduciaries. ¶¶1, 2, 4, 77-82.

[17] Even this distinction is illusory as the Delaware Supreme Court has said that in change of control situations "a board's actions must be evaluated in light of relevant circumstances to determine if they were undertaken with due diligence and in good faith. If no breach of duty is found, the board's actions are entitled to the protections of the business judgment rule." *Barkan*, 567 A.2d at 1286.

option gave BAC the right to purchase up to 19.9% of MBNA's common stock. ¶¶2, 80 Agreeing to this provision effectively guaranteed that shareholder value would not be maximized beyond what BAC had offered. This show-stopper was not provided to BAC to provide it some reasonable protection from a competitor seeking to acquire MBNA at a marginally higher price, and to secure a favorable offer for the MBNA shareholders. Rather it was agreed to so that the Insider Defendants would be assured that the very deal they wanted would be effected by virtue of the fact that no other entity would come forward in the face of the BAC option. Given their duty to attempt to maximize shareholder value, an agreement that effectively stifles the process and prevents the maximization of shareholder value cannot be a valid exercise of business judgment in carrying out the Outside Directors' *Revlon* duties.

Defendants, relying on *Jasinover*, attempt to justify the show-stopper provisions by arguing that they were allowed to lock up an agreement. Outside Dirs.' Br. at 31. *Jasinover*, however, provides no support for the option granted to BAC as being an acceptable lock up agreement in attempting to maximize shareholder value. In *Jasinover*, the court was entertaining a motion for a preliminary injunction and was therefore evaluating the likelihood that plaintiffs would succeed on the merits of their claims, not whether they had adequately pled a claim. 2004 WL 3135516, at *7. More importantly, the court in *Jasinover* made clear that the locking up the merger in that case was acceptable because that the size of the breakup fee "[would] not preclude another party from making a competing proposal." *Id.* at *10. Here, however, the option granted to BAC would effectively preclude another party from making a competing proposal. Thus, *Jasinover* supports plaintiffs' allegations that the option granted to MBNA is not protected by the business judgment rule because it was a breach of the directors' *Revlon* duties.

The BAC option agreement was also in violation of the MBNA Outside Directors' *Revlon* duties because it guaranteed that there would be no effective market check after the deal was locked up. *Jasinover*, 2004 WL 3135516, at *9. Movants' argument that a market check took place before the defendants locked up the deal with BAC because the price was reasurable misses the point. Outside Dirs.' Br. at 71-82. As an initial matter, the negotiations with

- 26 -

Wachovia were not a valid market check given that Hammonds and other officers were seeking a deal beneficial to them and not to MBNA. Thus, any value indicators provided by the Wachovia negotiations are skewed to the personal terms Hammond sought. More importantly, when a board locks up a deal, a post-agreement market check is required. *Jasinover*, 2004 WL 3135516, at \*9. Here, there was no post-agreement public market test/check. Accordingly, agreeing to the lock up provision in this case was a breach of the MBNA Director Defendants' *Revlon* duties.

The Outside Directors are not protected by the business judgment rule because they failed to correct defendant Hammonds' statement that MBNA was not for sale. ¶¶77-79. Hammonds' statement deflated the stock value of MBNA and prevented other potential bidders from stepping forward in what they perceived to be an unlikely or hostile bid. *Id.* Allowing MBNA's stock to remain artificially depressed resulted in a lower price for MBNA shareholders and cannot be seen as anything but a deliberate abrogation of the Outside Directors' duty to maximize shareholder value.

The presumption afforded by the business judgment rule is rebutted if the facts alleged show that the directors' decision was based on extraneous influences rather than the corporate merits. *Hudson*, 2004 WL 1982383, at \*12. Here, Outside Directors acquiesced to an unfair deal orchestrated by the self-interested Hammonds. ¶¶1, 2, 3, 77, 78, 82. Defendant Hammonds and others in MBNA's management sought out a company that would (i) buy MBNA; (ii) keep Hammonds on at the new company in an executive position of influence; (iii) offer Hammonds' close friends employment with the new entity; and (iv) agree that the liability arising out of the Securities Class Action and this derivative action, in which  Hammonds and the other Defendants (including Outside Directors) were personally named as defendants, would effectively disappear through the extraction of broad indemnification from acquirer, *Id.*, yet the Outside Directors did nothing to prevent this self-interested behavior.[18]

---

[18]  Defendants' citations to Md. Corps. & Ass'ns Code Ann. §2-405.1(b) and *In re MONY Group Inc. S'holder Litig.*, 852 A.2d 9 (Del. Ch. 2004) for the proposition that the directors are free from liability because they were allowed to rely on defendant Hammonds, like much of their motion, misses the point. Outside Dirs.' Br. at 33. While directors are allowed to rely on officers to conduct negotiations, a "director is not acting in good faith if he has any knowledge

While the Proxy identified a financial institution having the greatest interest in MBNA and thus the best likely result for MBNA shareholders, with Hammonds' self-interested requirements for a merger partner in mind, a deal could not be negotiated with management. ¶¶3, 15, 79, 82. Instead, BAC was contacted. As defendant Lewis of BAC was willing to agree to Hammonds' self-interested requirements in a merger partner, Hammonds and Lewis negotiated and agreed to a deal in two hours. *Id.* This process was clearly initiated and undertaken, with the Outside Directors' knowledge and acquiescence, to further the interests of Hammonds instead of attempting to maximize shareholder value and allowing the Outside Directors to escape liability for plaintiffs' shareholder derivative and class actions. Thus, the Outside Directors' actions are not protected by the business judgment rule because these directors failed to adhere to their duty to maximize shareholder value, and their actions in approving or permitting the conduct alleged in the complaints were facially unreasonable. In approving the merger, Outside Directors put their own interests and those of Hammonds, ahead of the interests of the Company rather than complying with their *Revlon* duties. ¶¶4, 78, 82. Indeed, BAC promised in the Merger Agreement that it would not pursue plaintiffs' derivative claims and would "use their best efforts" to "defend" against and defeat the derivative claims (and the class claims). ¶95.[19] Under Maryland law, these allegations of self interest are sufficient to rebut the presumption of the business judgment rule. *Hudson*, 2004 WL 1982383, at *11.

In sum, plaintiffs have alleged that the Outside Directors engaged in "self dealing or unconscionable conduct" instead of acting in the best interests of MBNA's shareholders in

concerning the matter in question which would cause such reliance to be unwarranted." Md. Corps. & Ass'ns Code Ann. §2-405.1(b)(2). In *MONY*, the court found that the board's reliance on its CEO to conduct merger negotiations was reasonable because the board actively supervised his negotiations and even rejected one proposal. 852 A.2d at 20. In stark contrast, the two hour negotiation of the deal, the terms of the deal, and Hammonds' obvious self dealing demonstrate that the Outside Directors had knowledge that it was not reasonable to rely solely on defendant Hammonds to maximize shareholder value.

[19] Plaintiffs' allegations are supported by movants' current argument that plaintiffs lack standing to pursue their derivative claims because the Merger purportedly eliminated their exposure to derivative claims by eliminating plaintiffs' "contemporaneous ownership." Outside Dirs.' Br. at 19.

fulfilling their *Revlon* duties. Under Maryland law, such allegations are sufficient to rebut the business judgment of the Board. *Wittman*, 707 A.2d at 425. Accordingly, plaintiffs' claim regarding defendants' breach of their *Revlon* duties must not be dismissed.

## VIII. DEFENDANTS' CONDUCT IS NOT PROTECTED BY §5.418 OR SHAREHOLDER RATIFICATION OF THE MERGER

### A. The Outside Directors Are Not Exculpated Under §5-418

Defendants maintain that the Outside Directors are exempt from liability under an exculpatory clause inserted in MBNA's Certificate of Incorporation, which was adopted pursuant to authority granted by Md. Courts & Jud. Proc. Code Ann. §5-418. Section 5-418(a)(1) limits the liability of corporate officers and directors to cases where it is "proved" that the fiduciary received an "improper benefit [in property] or money" or where a "judgment or other final adjudication adverse to the person is entered in a proceeding based on a finding in the proceeding that the person's action, or failure to act, was the result of active and deliberate dishonesty and was material to the cause of action adjudicated in the proceeding ...." Md. Courts & Jud. Proc. Code Ann. §5-418(a)(2). On its face, Section 5-418 is not a pleading statute; it confines itself to what a *jury* or other trier of fact must find if a fiduciary is ultimately to be held liable. While this statute may have some relevance to the type of evidence that must be presented at trial, movants cite no authority that it heightens the pleading standard on a motion to dismiss.[20]

Even if Section 5-418 does affect what a plaintiff must plead to set forth a claim Plaintiffs have met their burden. As no Maryland precedent exists, guidance may be found from Delaware precedents construing an analogous exculpatory statute, 8 Del. Code §102(b)(7). Delaware courts have ruled that Section 102(b)(7) requires a plaintiff to establish "bad faith" to support a cause of action, and this requirement can be satisfied by alleging, as to a fiduciary, an

---

[20] In *Tower*, the Third Circuit, intimated that a similar Delaware corporate charter provision that exculpated the fiduciaries from liability unless it was proved they engaged in certain types of misconduct probably would not support a motion to dismiss, "the protection of an exculpatory charter provision appears to be in the nature of an affirmative defense. As we have said, affirmative defenses generally will not form the basis for dismissal under Rule 12(b)(6)." 416 F.3d at 242.

"intentional dereliction of duty, a *conscious disregard for one's responsibilities*," or a "[d]eliberate indifference ... in the face of a duty to act." *In re Walt Disney Co. Derivative Litig.*, 907 A. 2d 693, 753, 755, *affirmed*, 906 A. 2d 27 (Del. 2006). (Del. Ch. 2005). While Maryland's statute uses the word "dishonesty" and Delaware courts employ the term bad faith, "dishonesty," "bad faith" and "intentional dereliction of duty" all are interchangeable legal concepts. *See, e.g., Hartford Accident & Indem. Co. v. First Pa. Bank, N.A.*, 859 F.2d 295, 297 (3d Cir. 1988) ("a finding of bad faith must be predicated on a showing of dishonesty"); *S.E.C. v. Lehman Bros., Inc.*, 157 F.3d 2, 7 (1st Cir. 1998) ("The SEC points to cases that forbid someone from deliberately averting his eyes from evident misconduct. We agree that such conduct, even if literally short of actual knowledge, could fairly be equated with dishonesty or bad faith.").[21] As plaintiffs have pled that the Outside Directors consciously abrogated their duties, plaintiffs have satisfied any potential pleading burden sufficient to overcome the exculpatory clause.

The complaints are replete with allegations concerning the MBNA Board members, including the Outside Directors, *intentional derelictions of duty*, their conscious disregard for their responsibilities, and their deliberate indifference in the face of a duty to act. *See* ¶¶4, 78, 82. These allegations demonstrate that the director defendants are not protected under §5-418.

As noted, courts have time and again recognized that such actions by Board members in connection with a corporate merger can constitute deliberate, bad faith misconduct. *See, e.g., Parnes*, 722 A.2d at 1246-47; *Alidina*, 2002 WL 31584292; *Crescent/Mach*, 846 A.2d at 982-83. Furthermore, directors who are alleged to have knowingly permitted misstatements to be made, either to the press or in SEC-filed documents (such as proxies) are not covered by exculpatory provisions like Section 5-418. *See Felker v. Anderson, No. 04-0372-CV-W-ODS*, 2005 WL 602974, at *4 (W.D. Mo. Feb. 11, 2005) (applying Maryland law and refusing to dismiss disclosure claims under Section 5-418). *See also In re Reliance Secs. Litig.*, 91 F. Supp. 2d 706,

---

[21]  Indeed, Black's Law Dictionary defines "bad faith" as "*dishonesty* of belief or purpose." *Black's Law Dictionary* 134 (7th ed. 1999). Maryland's Section 5-418(a)(2), which explicitly permits liability for a "failure to act," comports with Section 102(b)(7) which has been interpreted, as noted above, to apply to conscious derelictions of duty.

732 (D. Del. 2000) ("Plaintiffs have averred sufficient circumstantial evidence to permit the inference that one or more defendants may have knowingly withheld material information from the Company's shareholders. Such conduct may rise to a violation of the directors' duty of loyalty to the Company's shareholders, and thus would not warrant immunity under the exculpatory clause of the Company's corporate charter."); *In re LNR Prop. Corp. S'holders Litig.*, No. 674-N, 2005 WL 3149876, (Del. Ch. Nov. 4, 2005), *revised*, 896 A. 2d 169 (Del. Ch. Dec. 14, 2005) (court refused to employ exculpatory clause to dismiss complaint against purportedly "independent" Board members who allowed self-interested fiduciary to negotiate merger, and voted to foreclose the consideration of other bids, as circumstances could support claim that directors made no honest effort to protect minority shareholders).

Defendants again unavailingly cite *Jasinover*, to justify their conduct. Not only does *Jasinover* require that a Board act in a vigorous and well-informed manner in protecting the interests of all shareholders, but the decision makes plain that Maryland directors must engage in a "post-agreement market check." A post-agreement market check here was precluded by the onerous stock option granted to BAC. *Jasinover*, 2004 WL 3135516, at *10. Thus, *Jasinover* is inapposite.

As detailed *supra*, *Revlon* duties are consistent with Maryland fiduciary principles, but the MBNA directors here fell far short of fulfilling their obligations. Potential bidders for MBNA were hand-picked by Hammonds without any "demonstrable market check." ¶¶2, 3, 77. Once Hammonds located his preferred buyer, he and the Outside Directors agreed immediately to the Merger price, and the BAC lock-up option. ¶¶2, 15, 80. The type of onerous lock-up option the MBNA Board rubber-stamped at Hammonds' behest is no more acceptable in Maryland than it is in Delaware, as it makes any post-agreement market check effectively impossible and does not allow a fair opportunity for higher offers. *Revlon*, 506 A.2d at 176-77. *See also Omnicare*, 818 A.2d at 936 (holding deal protection devices unenforceable).

Given the knowing and deliberate breaches of fiduciary duty alleged in the complaints against the Outside Directors, defendants' motion to dismiss these claims based on MBNA's exculpatory clause must be denied.

### B. The Outside Directors Cannot Establish Shareholder Ratification on These Motions

The Outside Directors claim that the MBNA shareholders "ratified" the misconduct alleged in the Complaint thus they somehow avoid liability for their breaches of fiduciary duties. Defendants' ratification argument is an affirmative defense as to which they have the burden of proof, and which cannot (except in rare circumstances not present here) be properly raised on a motion to dismiss. *See Brody v. Hankin*, No. 04-1376, 2005 WL 2077180, at *2 (3d Cir. Aug. 29, 2005) (affirmative defense was improperly asserted on motion to dismiss); *In re 3COM Corp. S'holders Litig.*, No. 16721, 1999 Del. Ch. LEXIS 215, at *10 (Del Ch. Oct. 25, 1999) (shareholder ratification is "an *affirmative defense that can only be raised in defendants' answer and on which defendants' bear the burden of proof*"). Further, because "the precise conduct" alleged to be unlawful was never made known to or approved by the shareholders, and any defense of ratification at this stage must fail. *See Morris v. Bush*, No. 3:98-CV-2452-G, 1999 U.S. Dist. LEXIS 9994, at *14 (N.D. Tex. June 23, 1999).

Even if ratification could be raised at this stage, ratification requires full disclosure of the exact misconduct alleged in the complaints, a standard the Outside Directors cannot possibly satisfy on this motion. *See In re Emerging Commc'ns, Inc. S'holders Litig.*, No. 16415, 2004 Del. Ch. LEXIS 70, at *114 (Del. Ch. May 3, 2004) ("Shareholders cannot be deemed to have ratified board action unless they are afforded the opportunity to express their approval of *the precise conduct being challenged*.").

Movants argue with the complaints, assert that the Proxy was not misleading and that the actions of the MBNA officers and directors were not wrongful. Plaintiffs, by contrast, set forth various misrepresentations, omissions, and undisclosed fiduciary breaches. *See supra* at 6-12. Defendants cite both *Wittman, supra,* and *Hudson, supra,* as supporting their ratification argument, but in both of those cases the issue was not non-disclosure of all pertinent facts to

- 32 -

shareholders (as the courts found that full disclosure had indeed been provided), but rather whether the *disclosed* conduct constituted a breach of fiduciary duty. *Wittman*, 707 A.2d at 426; *Hudson*, 2004 WL 1982383, at *18. In *Wittman* and *Hudson*, the precise conduct alleged to be wrongful was fully and fairly disclosed, and no credible claim was made of shareholder coercion, or preclusion of superior deals. 707 A.2d at 426. In contrast, the issue of full disclosure in the case at bar is hotly disputed, and plaintiffs here have presented viable disclosure claims, including claims that facts relating to the process and conduct which led to the Merger were misrepresented, and omitted. *See Shaev v. Saper*, 320 F.3d 373, 384 (3d Cir. 2003).

In addition, the MBNA shareholders cannot have ratified the grant of the BAC "show-stopper" BAC option because: (1) they were never asked to approve it or disapprove it, as the MBNA Board had already approved it; and (2) they were misled as to its nature and effect. The Proxy never sought shareholder approval of the lock-up option, therefore, MBNA shareholders could not possibly have ratified this illegal device. *See In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 68 (Del. 1995) (declining to find ratification whose shareholders had merely voted in favor of the merger and not the defensive measures). In a similar vein, MBNA shareholders were never asked specifically to approve the improper actions of Hammonds that were not discussed in the Proxy, such as his misrepresentation to the press, which had the effect of unlawfully depressing the pre-merger stock price. Under Maryland law, fraudulent actions cannot not be ratified. *See Parish v. Md. & Va. Milk Producers Ass'n,* 242 A.2d 512, 546 (Md. 1968) ("Nor may a majority of the membership ratify the fraudulent action of the directors.").

Even if the Proxy could somehow be construed as seeking stockholder ratification of the lock-up option, which it cannot, the discussion of the purpose and effect of this option was misleading. A Proxy is required to be completely frank about the purpose and effect of anti-takeover measures adopted by the Board. If the Board intends a particular measure to quell other bids, it must candidly admit its motivations. *ODS Techs., L.P. v. Marshall*, 832 A.2d 1254, 1261 (Del. Ch. 2003) ("The Board is required to disclose its motivations candidly, a proposition that 'hardly needs citation of authority.") *See also S.E.C. v. Dorchester Gas Corp.*, No. 10255,

- 33 -

1984 WL 2369, at *3 (D.C. Cir. Jan. 9, 1984) ("Companies must disclose all the material effects of anti-takeover measures, including their impact on any proposed corporate transaction, whether hostile or friendly ... Absent such disclosure, shareholders will be unable to make informed voting decisions on the matters being proposed.").

The BAC lock-up option was undoubtedly intended to block other bidders, and it was reasonably *certain* to discourage other bidders given that any new bidder would have to pay up to $6 *billion* more than BAC if the option were exercised. The false and misleading Proxy presents this "show-stopper" as raising a mere possibility that superior bids would be discouraged by using the word "could" when defendants know the lock-up *would* discourage other bids, and shareholders were entitled to know this. *See Tex. Partners v. Conrock Co.*, 685 F.2d 1116, 1120-21 (9th Cir. 1982) (holding a plaintiff had stated a claim that the proxy "did not adequately disclose the extent to which the anti-takeover proposal insulated [the company]"). Nor would ordinary shareholders have realized that the lock-up option would present a potential bidder with an additional $6 billion cost. This figure (and its chilling effect on a potential bidder) was neither disclosed, nor obvious, and its omission precludes any finding on this motion that MBNA shareholders were fully informed of all material facts. *See, e.g., Fradkin v. Ernst,* 571 F. Supp. 829, 851 (N.D. Ohio 1983) (proxy was misleading where it did not set out amounts that would be paid to insiders upon a reorganization transaction, even though general formula was available. *See also Shaev,* 320 F.3d at 382 ("A proxy statement should inform, not challenge a shareholder's critical wits.").

In sum, as shareholders could not approve either the illegal show-stopper provision nor the undisclosed self-dealing by Hammonds, shareholder ratification cannot present a valid defense to this action.

## IX. PLAINTIFFS HAVE STANDING TO PURSUE DERIVATIVE CLAIMS ON BEHALF OF THE COMPANY

### A. Plaintiffs Have Retained a Direct Equity Interest in the Entity on Whose Behalf a Recovery Is Sought

The parties agree that plaintiffs' derivative claims have passed to BAC as a result of the

Merger. The defendants err, however, in insisting that this straightforward stock-for-stock merger deprives plaintiffs of standing to continue their derivative claims.[22]

The purpose of the continuous ownership requirement is to "to assure that the plaintiff remains financially interested in the result of the suit and thus a fair representative of other shareholders." *Kessler v. Sinclair*, 641 N.E.2d 135, 137 (Mass. App. Ct. 1994) (applying Delaware law). Plaintiffs were MBNA shareholders, with a direct equity interest in the corporation that would benefit from a derivative recovery, MBNA. Plaintiffs held their shares through the Merger, continue to do so. Nothing substantive has changed: as BAC shareholders, they still have a direct equity interest in the corporation that would benefit from the derivative recovery. In such circumstances, plaintiffs satisfy the continuous ownership rule, and retain standing to press their derivative claims. *In re Paracelsus Corp. Secs. Litig.*, No. H-96-4291, 1998 U.S. Dist. LEXIS 5484, at *12 (S.D. Tex. Mar. 6, 1998) (where plaintiff received shares in resultant corporation following a merger, and continued to hold those shares, he still had standing under Delaware and federal law to prosecute his derivative claims). *Accord Kessler*, 641 N.E.2d at 138.

Defendants' contention that plaintiffs have lost standing due to the Merger stems from a misreading of both *Jolly Roger*, 2005 WL 2989343 and *Lewis v. Anderson*, 477 A.2d 1040, 1047 (Del. 1984). *See* Outside Dirs.' Br. at 18, 19. In *Jolly Roger*, the Court held that a shareholder who sells his shares ***during the pendency*** of a lawsuit loses standing to pursue a derivative claim on behalf of the corporation, as he then lacks any possible financial interest in a recovery. 2005

---

[22] The Outside Directors' arguments will be addressed herein, even though they have no standing to seek dismissal of derivative claims now owned by BAC, and have no say over these matters in the absence of any indication of BAC's present posture toward these claims. *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 729, 731-32 (Del. 1988) (court could not find lack of derivative standing to bring corporate claims where defendant accounting firm raised that argument, and corporation itself had not taken a position). Here, the Outside Directors moved ahead with their Motion in violation of the Court's scheduling order, a defalcation in which BAC has been unwilling to join. Having acted precipitously, the claims made by the Outside Defendants regarding whether the derivative claims should or should not proceed should be either struck from this Motion, or held in abeyance until BAC has taken a position on these issues.

WL 2989343, at *23-*24, *24 n.13. Here, plaintiffs have not sold their shares at all, yet alone "during the pendency."

The *Lewis* decision similarly focused on the question of whether a plaintiff continued to have a sufficient financial interest in the corporation to maintain derivative standing. There, the corporation in which the plaintiff owned shares and on whose behalf he brought a derivative claim, Conoco, later merged with a subsidiary of E.I. Du Pont. As a result of this merger, Du Pont "became the sole stockholder" of Conoco. 477 A.2d at 1042. Because he was no longer a stockholder of the entity on whose behalf the claim was asserted (Conoco), plaintiff lost standing. *Id.* at 1049. This differs from the situation at bar, as plaintiffs here are direct shareholders of the exact entity on whose behalf the claim is brought, BAC.[23] This distinction also applies to *Lewis v. Ward*, 852 A.2d 896 (Del. 2004), another case in which, as a result of a complex "reverse triangular merger," *id.* at 906, plaintiff lost standing because at the end of the day he was not a shareholder of the corporation on whose behalf he had asserted derivative claims. *Id.* at 903 (a "stockholder-plaintiff may not continue to pursue derivative claims following a merger that eliminates the plaintiff's shareholder status...").[24]

Defendants' citation to *In re First Interstate Bancorp Consol. S'holder Litig.*, 729 A.2d 851 (Del. Ch. 1998) is inappropriate. The plaintiff there was a First Interstate shareholder who, by reason of a merger, became a Wells Fargo shareholder. The court instructed that the proper course for such a plaintiff, if he wished to continue his claim, was to assert it on behalf of Wells Fargo, and explain why demand on the Wells Fargo Board would be futile. This is exactly what plaintiffs have done here. Plaintiff's failure in *First Interstate* to follow this correct procedure led to his dismissal for lack of standing because he never purported to satisfy the demand requirements for a derivative suit on behalf of Wells Fargo. *Id.* at 868. Defendants' reliance

---

[23] Further, unlike the case at bar, plaintiff Lewis never challenged "the propriety of the Du Pont-Conoco merger." *Id.* at 1042.

[24] Here, unlike *Lewis v. Anderson* and *Lewis v. Ward,* which involved **indirect** mergers, the BAC/MBNA Merger was done in a more traditional way — the two companies were directly merged together. *See* Proxy in Pepperman Aff. at 3.

- 36 -

upon *dictum* in *Porter v. Tex. Commerce Bancshares, Inc.*, No. 9114, 1989 WL 120358 (Del. Ch. Oct. 12, 1989) is also unavailing. In *Porter*, there was no simple stock-for-stock exchange, but rather an indirect merger employing a subsidiary of the acquirer. Because unlike here, the plaintiff in *Porter* did not retain a direct ownership interest in the entity that would benefit from the derivative recovery, *Porter* is inapposite.

In this simple stock-for-stock merger, there can be no doubt that plaintiffs will financially benefit if they achieve a recovery on behalf of BAC, as they are holders of BAC shares. *Kessler*, 641 N.E.2d at 138 ("in the present case we have a simple stock-for-stock exchange with clear continuity of interest. ... We conclude that the plaintiff will have standing despite the merger to press the alleged claim..."). For all the reasons stated above, plaintiffs continue to have a financial interest in a derivative recovery on behalf of the corporation in which they directly own shares, and thus continue to have derivative standing.

### B. Demand upon the BAC Board of Directors Would Be Futile

Defendants ask that the present Complaint be dismissed, so that the relevant Board might consider a demand to bring legal action. Insofar as the derivative claims have now passed to BAC, a demand would now have to be made on the BAC Board of Directors. Such a demand would be futile because that Board and BAC promised in the Merger Agreement that they would not pursue these very claims, and indeed would "use their best efforts" to "defend" against and defeat the derivative claims set forth by plaintiffs. ¶95.

Defendants cite no case in which it has been held that a demand must be made on a Board of Directors that has pledged in writing to oppose and defend the very claims plaintiffs have asserted. The BAC directors were aware of the derivative claims at the time they approved the merger agreement. Making a demand in such circumstances would truly be an exercise in futility, as the BAC directors have committed themselves to defend the claims at bar, not prosecute them. *See Werbowsky v. Collomb*, 766 A.2d 123, 144 (Md. 2001) (demand is excused where the directors are so "committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment

rule."). *Cf. Felker*, 2005 WL 602974, at *3 (holding demand excused under Maryland law where, *inter alia*, the directors "have not sought to recover any part of the damages suffered by NovaStar...").

In an analogous situation, in *Biondi v. Scrushy*, 820 A.2d 1148 (Del. Ch. 2003), the Chairman of a "special committee" made an *oral* statement to the effect that he believed a previous investigation of the company's CEO by a law firm had exonerated the CEO from any wrongdoing. He later denied that such statement evidenced his inability to independently judge the merits of the derivative claim based on his own investigation. *Id.* at 1165. The Court held that a committee of directors, headed up by a director who had already made up his mind that the claims should not be asserted, did not meet the definition of an independent-minded Board — *i.e.*, "one that is not compromised in its ability to act impartially." *Id.* at 1166. Similarly, here, there is ample reason pled as to why the BAC Board of Directors would not initiate the suit — it has already agreed to oppose it, and thus are not independent or impartial.

As in *Biondi*, there can be no doubt here that the BAC Board of Directors, contractually bound to defend against these derivative claims, would do anything other than "paper a decision that had already be made." Accordingly, even if the Outside Directors had standing to raise this issue (which they do not), this Court should not order plaintiffs to go through the legal charade of a demand upon the BAC Board. It is plain that in these peculiar circumstances requiring demand on the BAC Board would be a futile and useless act, and is thus excused.

## X.    CONCLUSION

For all of the foregoing reasons, the complaints' allegations against the Outside Directors should be upheld in full. Should the Court find any portion of the complaints lacking, however, plaintiffs respectfully request leave to re-plead. *See Phillips v. County of Allegheny*, 515 F.3d 224, 245 (3d Circ. 2008) ("if a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such amendment would be inequitable or futile.").

Dated:  May 21, 2008

Respectfully submitted,

CHIMICLES & TIKELLIS, LLP

_Tikellis / Crame_

Pamela S. Tikellis (#2172)
A. Zachary Naylor (#4539)
Tiffany J. Cramer (#4998)
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
Telephone: (302) 656-2500
Facsimile: (302) 656-9053

ROBBINS UMEDA & FINK, LLP
JEFFREY P. FINK
SHANE P. SANDERS
JULIA M. WILLIAMS
JILL E. KLEMANN
610 West Ash Street, Suite 1800
San Diego, CA  92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Counsel for Plaintiff Donald F. Benoit

PASKOWITZ & ASSOCIATES
LAURENCE PASKOWITZ
60 East 42nd Street, 46th Floor
New York, NY 10165
Telephone: (212) 685-0969
Facsimile: (212) 685-2306

ROY JACOBS & ASSOCIATES
Roy L. Jacobs
60 East 42nd Street, 46th Floor
New York, NY 10165
Telephone: (212) 867-1156
Facsimile: (212) 504-8343

BALLON STOLL BADER & NADLER LLP
Irving Bizar
1450 Broadway
New York, NY 10018
Telephone: (212) 575-7900
Facsimile: (212) 764-5060

- 39 -

Counsel for Plaintiffs Lemon Bay Partners
and Malcolm Rosenwald